**No. 26-10858**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

NEIMA BENAVIDES, of Naibel Benavides Leon, deceased,
MR. DILLON ANGULO,

*Plaintiffs-Appellees*,

v.

TESLA, INC.

*Defendant-Appellant*.

————————

On Appeal from the United States District Court
for the Southern District of Florida,
No. 1:21-cv-21940-BB

————————

## BRIEF FOR APPELLANT TESLA, INC.

————————

THEODORE J. BOUTROUS, JR.
JULIAN W. POON
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
tboutrous@gibsondunn.com

PAUL D. CLEMENT
C. HARKER RHODES IV
PHILIP HAMMERSLEY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*(Additional counsel listed on inside cover)*

*Counsel for Appellant Tesla, Inc.*

July 2, 2026

JEFFREY B. WALL
MORGAN L. RATNER
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
jwall@gibsondunn.com

WENDY F. LUMISH
BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600
wendy.lumish@bowmanandbrooke.com

i

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rule of Appellate Procedure 34(a)(1), Tesla, Inc. respectfully requests oral argument.  This appeal presents important questions of Florida product-liability law, punitive damages, and federal due process arising from a $242 million judgment.  Tesla respectfully submits that oral argument would assist the Court in resolving the important issues presented in this case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................... ii

TABLE OF AUTHORITIES ................................................................................ v

INTRODUCTION ............................................................................................. 1

JURISDICTIONAL STATEMENT ..................................................................... 3

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE ............................................................................ 4

    A.    Factual Background ......................................................................... 4

        1.    The 2019 Tesla Model S and its Autopilot features ................... 4

        2.    McGee speeds through a T-intersection and crashes into a parked car ....................................................................... 8

    B.    Procedural Background ................................................................... 10

    C.    Standard of Review ........................................................................ 17

SUMMARY OF ARGUMENT ........................................................................... 17

ARGUMENT ................................................................................................... 20

I.    Plaintiffs' Claims Fail As A Matter Of Law .................................................. 20

    A.    Plaintiffs' Design-Defect Theory Fails as a Matter of Law ............... 21

        1.    McGee's car was not defectively designed ............................. 21

        2.    Plaintiffs failed to prove causation ........................................ 29

    B.    Plaintiffs' Failure-to-Warn Theory Fails as a Matter of Law ............. 32

        1.    Tesla had no duty to warn McGee against the open and obvious risks of reckless driving ............................................ 33

        2.    Tesla provided adequate warnings in any event ...................... 34

        3.    Any purported failure to warn did not cause the crash ............ 36

II.     The District Court's Serious And Prejudicial Evidentiary Errors Require A New Trial ................................................................................... 37

    A.    The Data-Handling Evidence Was Irrelevant and Highly Prejudicial .................................................................................... 37

    B.    The District Court Admitted Evidence of Dissimilar Accidents Under the Wrong Legal Standard ....................................... 40

    C.    Musk's Statements Were Irrelevant and Highly Prejudicial .............. 42

III.    The Unlawful and Excessive Punitive-Damages Award Cannot Stand ........................................................................................................ 44

    A.    Florida Law Prohibits Any Punitive Damages Here ........................... 45

    B.    Federal Due Process Limits Any Punitive Damages Here to No More Than the Amount of the Compensatory Damages Awarded Against Tesla ....................................................................... 49

        1.    Tesla's conduct was not reprehensible ..................................... 51

        2.    There is a substantial disparity between the $200 million punitive-damages award and the far smaller compensatory-damages award against Tesla ........................... 51

        3.    The civil penalty for comparable conduct underscores the excessiveness of the punitive-damages award ................... 54

    C.    Florida's Statutory Cap Limits Any Punitive Damages Here to Three Times the Compensatory Damages Awarded Against Tesla ................................................................................................... 55

CONCLUSION ............................................................................................... 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
  37 F.3d 1460 (11th Cir. 1994) ................................................................40

*Allstate Life Ins. Co. v. Miller*,
  424 F.3d 1113 (11th Cir. 2005) ..............................................................46

*Aubin v. Union Carbide Corp.*,
  177 So.3d 489 (Fla. 2015) ................................................................ 21, 24

*\*BMW of N. Am. v. Gore*,
  517 U.S. 559 (1996)................................................... 47, 48, 50, 51, 54

*Carraway v. Revell*,
  116 So.2d 16 (Fla. 1959)..........................................................................47

*Cavanaugh v. Stryker Corp.*,
  308 So.3d 149 (Fla. Ct. App. 2020)........................................................21

*Chaney v. City of Orlando*,
  483 F.3d 1221 (11th Cir. 2007)................................................................17

*\*Chrysler Corp. v. Wolmer*,
  499 So.2d 823 (Fla. 1986) ............................................................ 45, 47, 49

*Clark v. Chrysler Corp.*,
  436 F.3d 594 (6th Cir. 2006)...................................................................53

*Coates v. R.J. Reynolds Tobacco Co.*,
  375 So.3d 168 (Fla. 2023) .......................................................................56

*Cohen v. Gen. Motors Corp.*,
  427 So.2d 389 (Fla. Dist. Ct. App. 1983) .......................................... 33, 34

*Dawe v. Corrs. USA*,
  506 F. App'x 657 (9th Cir. 2013)............................................................53

---

[*] Citations upon which Appellant primarily relies are marked with asterisks.

*Drabik v. Stanley-Bostitch, Inc.*,
  997 F.2d 496 (8th Cir. 1993)..................................................................48

*\*DZE Corp. v. Vickers*,
  299 So.3d 538 (Fla. Dist. Ct. App. 2020) ............................................. 29, 30, 32

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
  980 F.3d 1117 (7th Cir. 2020) ...............................................................52

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008)...............................................................................50

*Grabinski v. Blue Springs Ford Sales, Inc.*,
  203 F.3d 1024 (8th Cir. 2000).................................................................53

*\*Grieco v. Daiho Sangyo, Inc.*,
  344 So.3d 11 (Fla. Dist. Ct. App. 2022) ............................... 24, 32, 33, 34, 36, 39

*\*Henderson v. Ford Motor Co.*,
  72 F.4th 1237 (11th Cir. 2023)................................................................41

*Hendrix v. Raybestos-Manhattan, Inc.*,
  776 F.2d 1492 (11th Cir. 1985)...............................................................40

*Jeep Corp. v. Walker*,
  528 So.2d 1203 (Fla. Dist. Ct. App. 1988) ..............................................45

*Jones v. Otis Elevator Co.*,
  861 F.2d 655 (11th Cir. 1988).................................................................41

*Kerrivan v. R.J. Reynolds Tobacco Co.*,
  953 F.3d 1196 (11th Cir. 2020) ..............................................................53

*Kohler v. Medline Indus., Inc.*,
  453 So.2d 908 (Fla. Dist. Ct. App. 1984) ................................................31

*Koon v. United States*,
  518 U.S. 81 (1996).................................................................................17

*Leoncio v. Louisville Ladder, Inc.*,
  2014 WL 11429056 (S.D. Fla. Apr. 8, 2014)...........................................37

vi

*Leoncio v. Louisville Ladder, Inc.*,
   601 F.App'x 932 (11th Cir. 2015)...........................................................37

*Lompe v. Sunridge Partners, LLC*,
   818 F.3d 1041 (10th Cir. 2016)...........................................................53

*Lopez v. S. Coatings, Inc.*,
   580 So.2d 864 (Fla. Dist. Ct. App. 1991) ..........................................36

*Mamani v. Sánchez Bustamante*,
   968 F.3d 1216 (11th Cir. 2020)...........................................................39

*McGinnis v. Am. Home Mortg. Servicing, Inc.*,
   817 F.3d 1241 (11th Cir. 2016)...........................................................17

*McGriff v. Minn. Mut. Life Ins. Co.*,
   127 F.3d 1410 (11th Cir. 1997).............................................................20

*Morgan v. N.Y. Life Ins. Co.*,
   559 F.3d 425 (6th Cir. 2009)..............................................................53

*Myers v. Cent. Fla. Invs., Inc.*,
   592 F.3d 1201 (11th Cir. 2010)...........................................................17

*Peat, Inc. v. Vanguard Rsch., Inc.*,
   378 F.3d 1154 (11th Cir. 2004)...........................................................40

*Peoples Gas Sys. v. Posen Constr., Inc.*,
   322 So.3d 604 (Fla. 2021) .................................................................29

*Proctor v. Fluor Enters., Inc.*,
   494 F.3d 1337 (11th Cir. 2007)...........................................................17

*Roberts v. Sea-Land Servs., Inc.*,
   566 U.S. 93 (2012)............................................................................56

*Royal v. Black & Decker Mfg. Co.*,
   205 So.2d 307 (Fla. Dist. Ct. App. 1967) ..........................................25

*Sorrels v. NCL (Bahamas) Ltd.*,
   796 F.3d 1275 (11th Cir. 2015)................................................... 41, 42

*State Farm Mut. Auto. Ins. Co. v. Campbell,
538 U.S. 408 (2003).......................................................... 43, 44, 50, 51, 52

State Farm Mut. Auto. Ins. Co. v. Duckworth,
648 F.3d 1216 (11th Cir. 2011) .......................................................... 46

*Tesla, Inc. v. Banner,
411 So.3d 1 (Fla. Dist. Ct. App. 2025) ... 1, 3, 6, 7, 10, 11, 13, 22, 23, 25, 28, 34, 36, 45, 46, 47, 55, 57

U.S. Steel, LLC v. Tieco, Inc.,
261 F.3d 1275 (11th Cir. 2001) .......................................................... 40

Valladares v. Bank of Am. Corp.,
197 So.3d 1 (Fla. 2016) .......................................................... 45

Voynar v. Butler Mfg. Co.,
463 So.2d 409 (Fla. Dist. Ct. App. 1985) .......................................................... 25

Williams v. First Advantage LNS Screening Sols. Inc.,
947 F.3d 735 (11th Cir. 2020) .......................................................... 52

**Statutes**

28 U.S.C. §1291 .......................................................... 3

28 U.S.C. §1332 .......................................................... 3

49 U.S.C. §30165(a) .......................................................... 54

*Fla. Stat. §768.1257 .......................................................... 21, 24, 43

Fla. Stat. §768.72(2) .......................................................... 45

Fla. Stat. §768.72(2)(a) .......................................................... 45, 49

Fla. Stat. §768.72(2)(b) .......................................................... 45, 49

Fla. Stat. §768.73(1)(a) .......................................................... 55, 56

## INTRODUCTION

An extraordinarily reckless driver—not a defective car—caused the fatal crash underlying this case. That driver took a 2019 Tesla Model S equipped with state-of-the-art safety features, and drove it so recklessly that no vehicle in existence could have avoided the tragic consequences. He was speeding and distracted, and while fumbling around for a dropped cell phone, took his eyes off the road but kept his foot on the accelerator, blowing through a stop sign and T-intersection and crashing into a parked car, killing one pedestrian and injuring another. Nothing in the vehicle malfunctioned. On the contrary, the vehicle gave multiple warnings, which the driver ignored. A jury recognized that the crash was primarily the driver's fault (as he himself admitted) and apportioned most of the blame to him. But it still awarded $242 million against Tesla—including $200 million in punitive damages— on the theory that Tesla should have deviated from industry standards or provided additional warnings to the reckless driver who ignored the countless warnings already provided.

That award cannot stand. Indeed, the punitive-damages award is squarely foreclosed by Florida law. There is no need for an *Erie* guess here. In *Tesla, Inc. v. Banner*, 411 So.3d 1 (Fla. Dist. Ct. App. 2025), a Florida appellate court considered indistinguishable circumstances—the same Tesla driver-assistance features and the same alleged design defects—and found punitive damages precluded by established

Florida law.  Remarkably, when confronted with *Banner*, the district court did not even try to reconcile the $200 million punitive award here with that on-point Florida precedent.  The verdict is explainable only as a reaction to inflammatory, improperly admitted evidence, not as a permissible application of Florida law.

That alone dooms more than 80% of the award, but the problems here run far deeper.  Florida law does not allow a jury to deem state-of-the-art technology a design defect or require warnings for known and obvious dangers.  Plaintiffs' contrary argument—that Tesla's advanced safety features *enabled* reckless driving—would create perverse incentives to forgo safety improvements for responsible users to protect reckless users from themselves.  Virtually any safety feature that makes products safer for the vast majority of (attentive and reasonable) users can be abused by a reckless few, and Florida law makes clear that manufacturers cannot be held responsible just because some customers will inevitably choose to recklessly misuse their products.

This is a case in point:  The 2019 Model S included numerous state-of-the-art features that improve safety for attentive drivers.  But those are the same features the driver here abused and overrode in ignoring the road and accelerating through a stop sign and T-intersection.  The vehicle also collected data to facilitate future improvements—but that is the same feature Plaintiffs said showed the Tesla should do things no vehicle on the road could do at the time.  The driver's own conceded

2

extreme recklessness, not Tesla's design choices, was the sole proximate cause of the collision here, and Tesla "cannot be liable for failing to provide technology that it did not advertise and that did not exist." *Banner*, 411 So.3d at 5. Companies cannot be held liable—let alone punished—for failing to anticipate the future without flatly contravening Florida law and the federal Due Process Clause. But the decision below goes even further to skew incentives by allowing juries to punish companies for advancing the state of the art. Treating innovative features that improve safety for countless responsible drivers as a basis for tort liability and punitive damages when they are recklessly misused by a few is a recipe for deterring the next generation of safety innovation. That is a dangerous precedent that cannot stand.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1332 because the parties are completely diverse and the amount in controversy exceeds $75,000. The court entered final judgment on August 3, 2025. D.Ct.Dkt.538. Tesla timely moved for judgment as a matter of law or for a new trial or to amend the judgment. D.Ct.Dkt.568. The court denied that motion on February 19, 2026. D.Ct.Dkt.612. Tesla timely noticed its appeal on March 16, 2026. D.Ct.Dkt.616. This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether Tesla is entitled to judgment because Plaintiffs' design-defect and failure-to-warn claims fail as a matter of law.

2. Whether Tesla is entitled to a new trial in light of the district court's serious and highly prejudicial evidentiary errors.

3. Whether the jury's unlawful and excessive punitive-damages award must be eliminated or at least reduced because it is foreclosed by *Banner*, the federal Due Process Clause, and Florida's statutory cap.

## STATEMENT OF THE CASE

### A.    Factual Background

### 1.    The 2019 Tesla Model S and its Autopilot features.

Tesla is an innovative firm that works tirelessly to improve safety and design state-of-the-art vehicles. The 2019 Model S is no exception. It featured Tesla's state-of-the-art Autopilot system, a suite of driver-assistance features that can assist with steering, speed, braking, and lane changes while the driver remains responsible for driving the vehicle. *See* D.Ct.Dkt.577.at.62; D.Ct.Dkt.584.at.84-88.

Tesla employs a rigorous design and validation regimen with the aim of constantly improving safety features while ensuring they are fully functioning and improve safety before they are made generally available to customers. As part of this process, proposed new features are evaluated using "shadow mode," which allows software to run in the background so Tesla can evaluate a potential feature—

before its actual deployment—to determine how it would perform across millions or even billions of miles of real-world driving.    D.Ct.Dkt.577.at.64-66, D.Ct.Dkt.584.at.180-81.    From there, the process includes simulation testing, engineering road tests and quality assurance drives, limited and phased release to Early Access Program participants who provide millions of miles of real-world driving data and customer feedback, and trained drivers who test the features in challenging situations.  D.Ct.Dkt.577.at.59, 62-64; *see* D.Ct.Dkt.584.at.149-51.

George McGee—the reckless driver who caused the collision here—owned a 2019 Tesla Model S equipped with various Autopilot features that had already passed Tesla's rigorous testing and validation process.    D.Ct.Dkt.584.at.124, 149; D.Ct.Dkt.579.at.42.    Those features included (a) Traffic Aware Cruise Control (TACC), an adaptive cruise-control system that helps drivers maintain a safe dis-tance behind a detected vehicle; (b) Autosteer, which provides lane-centering; (c) Forward Collision Warning (FCW), which provides visual and audible warnings when a potential frontal collision is detected; and (d) Automatic Emergency Braking (AEB), which automatically brakes to reduce the severity of a potential collision with another vehicle in the same lane and traveling in the same direction (but not out-of-lane vehicles or hazards).  D.Ct.Dkt.584.at.84-85; D.Ct.Dkt.585.at.24-25, 29-30; D.Ct.Dkt.586.at.64-67.  Each of those features was designed to improve safety by assisting an attentive driver who remains ultimately responsible for operating the

vehicle, and like the driver-assistance features in every car, the driver could always override them. *See* D.Ct.Dkt.584.at.84-85, 156-59. As the Florida District Court of Appeal recently observed in *Banner*, those exact same features "were 'state-of-the-art' and complied with all industry and regulatory standards." 411 So.3d at 5.

In industry terminology, the combination of steering assistance and speed-control assistance made Autopilot a Level 2 driver-assistance system, as defined by the Society of Automotive Engineers and adopted by the National Highway Traffic Safety Administration (NHTSA); it was not a hands-free (Level 3), highly autonomous (Level 4), or fully autonomous (Level 5) system. Level 2 systems do not replace the human driver, who remains responsible for monitoring the road and controlling the vehicle. D.Ct.Dkt.584.at.84-85, 156-60. In 2019, all but one of the 76 vehicle models with Level 2 systems used hands-on-wheel technology like Tesla's to monitor driver engagement; the lone exception was Cadillac's hands-free Super-Cruise, which (unlike all the hands-on-wheel systems) could only be used on certain roads. D.Ct.Dkt.577.at.88-89; D.Ct.Dkt.585.at.234-35.

The owner's manual for McGee's 2019 Model S—accessible from the vehicle's touchscreen—explained Autopilot's features and warned McGee about their proper use and limitations. Among other things, the manual:

- instructed McGee to "[n]ever depend on [Autopilot] components to keep you safe" because "[i]t is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times." D.Ct.Dkt.542-10.at.P-53-0081; D.Ct.Dkt.584.at.120;

6

- warned that TACC "is not a collision warning or avoidance system," that drivers should "[n]ever depend" on it to slow the vehicle, and that they must "[a]lways watch the road" and "be prepared to take corrective action at all times," D.Ct.Dkt.542-10.at.P-53-0083; and

- explained that FCW is "for guidance purposes only" and "not a substitute for attentive driving and sound judgment," and that AEB "is designed to reduce the severity of an impact" and "not designed to avoid a collision," D.Ct.Dkt.542-10.at.P-53-102-04; D.Ct.Dkt.585.at.162-63, 227.

Those warnings all reinforced the same core point: Autopilot could improve safety for an attentive driver, but did not relieve drivers of their responsibility to watch the road or maintain control. D.Ct.Dkt.579.at.98-99; D.Ct.Dkt.584.at.120-22; *accord Banner*, 411 So.3d at 5 (noting that Tesla "repeatedly warned against misuse of the [Autopilot] features").

Although McGee knew his 2019 Model S had an owner's manual, he never read it. D.Ct.Dkt.579.at.52. Even so, McGee knew that his 2019 Model S was not a "self-driving" vehicle, and that it was his responsibility—even with Autopilot activated—to remain attentive and in control of the vehicle at all times. D.Ct.Dkt.579.at.59, 94-99. In fact, before ever using his vehicle's Autopilot features, McGee had to review Tesla's warnings about the features' limitations and click to agree that he would continue paying attention to the road and remain in control. D.Ct.Dkt.579.at.98-99; D.Ct.Dkt.584.at.95-97. And then every time McGee engaged Autosteer, his vehicle displayed a message instructing him to keep his hands on the steering wheel and remain in control. *See* D.Ct.Dkt.584.at.120-22. If McGee

7

failed to keep his hands on the wheel, the system would trigger visual and audible warnings; if those were ignored, it would "strike out" and disengage with a loud alarm and an image on the screen demanding that McGee "Take Over Immediately." D.Ct.Dkt.584.at.119, 128-29.

### 2.    McGee speeds through a T-intersection and crashes into a parked car.

On the night of April 25, 2019, McGee was driving recklessly on Card Sound Road in Key Largo, Florida.  D.Ct.Dkt.587.at.20.  McGee knew the road well, having driven it many times (including with Autopilot features engaged) on his commute, D.Ct.Dkt.579.at.34, 46, 72-73, and so knew that the road ended in a T-intersection where he would need to press the brake to stop.  This time, however, McGee was distracted, using his phone to make travel arrangements for a funeral the next day.  D.Ct.Dkt.579.at.55-56, 82-83.  His TACC set a cruising speed at the posted limit of 45mph, D.Ct.Dkt.584.at.16-17, but McGee overrode it by pressing the accelerator and speeding up to about 62mph as he approached the T-intersection in the dark, D.Ct.Dkt.584.at.19-23.

As he neared the T-intersection, McGee's car gave him repeated audio and visual warnings for over a minute before the eventual collision. D.Ct.Dkt.584.at.119.  Starting 49 seconds before impact, while McGee was continuing to press the accelerator, the instrument panel displayed the warning: "Cruise will not brake.  The accelerator pedal is being pressed."  D.Ct.Dkt.584.at.118-19.

8

And 1.5 seconds before impact, the vehicle replaced that warning with a "Take Over Immediately" alert that was both visual and audible, and accompanied by a flashing red light.  D.Ct.Dkt.584.at.118-19.

McGee, however, was not paying attention to the road or his vehicle's illuminated instrument panel.  Instead, as he approached the T-intersection, McGee was looking down to find his phone (which he had dropped), while keeping his hand on the wheel and pressing the accelerator.  D.Ct.Dkt.579.at.111.  By the time McGee looked up and hit the brakes—roughly half a second before impact—it was too late.  D.Ct.Dkt.585.at.213-14; D.Ct.Dkt.584.at.23.  He sped past the stop sign and through the T-intersection, crashing off the road into a parked vehicle, which then collided with Naibel Benavides and Dillon Angulo, tragically killing her and injuring him.  *See* D.Ct.Dkt.587.at.20, 25-26.

When police officers arrived at the scene, McGee immediately took responsibility for the deadly crash, telling them that he "dropped [his] phone and looked down, and [he] ran a stop sign and hit the guy's car."  D.Ct.Dkt.575.at.34.  He repeatedly admitted to the police that he was not paying attention to the road because he was distracted by his phone, and that he had driven through the intersection and hit the parked car.  D.Ct.Dkt.575.at.35, 37, 40-41, 106-07.

### B.    Procedural Background

Plaintiffs filed suits against McGee and settled them on undisclosed terms. *See* D.Ct.Dkt.542-25; D.Ct.Dkt.542-26.

Plaintiffs separately filed product-liability claims against Tesla.  In their amended complaint, Plaintiffs alleged that the 2019 Model S was defectively de-signed because it did not (1) use "geofencing" to restrict the Autopilot feature to certain roads, (2) employ a driver-facing camera rather than a hands-on-wheel de-tection system to monitor driver engagement, and (3) automatically brake before the collision.  D.Ct.Dkt.205.¶¶114-28.  They further alleged that Tesla did not ade-quately warn drivers of the dangers inherent in using the Autopilot features. D.Ct.Dkt.205.¶¶129-37.

Less than a year after Plaintiffs filed their amended complaint, the Florida District Court of Appeal decided *Banner*.  There, the driver of a Tesla equipped with the same Autopilot features died in a tragic collision with a semi-trailer truck that ran a stop sign and drove across his path.  411 So.3d at 2.  The driver's estate sued Tesla, alleging—exactly like Plaintiffs here—that the vehicle was defective because it (1) did not use geofencing to "restrict a driver's ability to engage" the Autopilot system to certain roads; (2) did not use a driver-facing camera rather than "steering wheel torque" to "monitor driver inattentiveness"; and (3) had no "safe and effective automatic emergency braking safety feature." *Id.* at 2-4.  In addition, like Plaintiffs

here, the driver's estate alleged that Tesla had not provided adequate warnings, and relied on the same liability expert as Plaintiffs here to seek punitive damages. *Id.*

The trial court allowed the plaintiff's estate to add a claim for punitive damages, *id.* at 4-5, but the Florida District Court of Appeal reversed. Under Florida law, the court explained, punitive damages are proper only in cases of intentional misconduct or "reckless disregard for human life equivalent to manslaughter." *Id.* And as a matter of law, the allegations in *Banner*—which were indistinguishable from the allegations against Tesla here—could not show "egregious" recklessness "equivalent to criminal manslaughter." *Id.* Instead, "Tesla's Autopilot features were 'state-of-the-art' and complied with all industry and regulatory standards," and "Tesla repeatedly warned against misuse of the features, which was industry practice." *Id.* at 5. Tesla accordingly "cannot be liable for failing to provide technology that it did not advertise and that did not exist." *Id.*

Despite that directly on-point Florida appellate precedent—issued just months before trial—the district court allowed Plaintiffs to proceed to trial on their design-defect and failure-to-warn theories and to seek punitive damages. D.Ct.Dkt.428.

Plaintiffs' claims at trial were wholly divorced from the facts of the collision, the technology used in McGee's vehicle, and the industry state of the art in 2019. As to geofencing, Plaintiffs asserted that Tesla should have precluded McGee from engaging his car's driver-assistance features on Card Sound Road. But the trial ev-

idence showed that imposing that limitation would have departed from state-of-the-art industry standards, including published and peer-reviewed industry guidelines from the Society of Automotive Engineers maintaining that drivers (not the car itself) must have ultimate control over whether and where to engage (or override) Level 2 driver-assistance features, which enhance safety for attentive drivers. D.Ct.Dkt.584.at.156.  Out of the 76 vehicle models with driver-assistance features on the market in 2019, Plaintiffs could not identify a single vehicle with a hands-on-wheel system that disabled its driver-assistance features via geofencing, and the only identified model with geofencing employed an entirely different hands-free system. D.Ct.Dkt.577.at.88-89; D.Ct.Dkt.584.at.156.  In fact, the evidence showed that geofencing limitations would have *reduced* safety by preventing responsible drivers from taking advantage of driver-assistance features, in contravention of industry standards.  *See* D.Ct.Dkt.584.at.154-60.

As to the assertion that Tesla should have used a driver-facing camera rather than a hands-on-wheel detection system, the evidence demonstrated that a hands-on-wheel system was standard industry practice, that only four of the 76 vehicle models in 2019 with driver-assistance features used driver-facing cameras, and that all of the driver-monitoring systems in existence—hands-on-wheel and driver-facing-camera systems alike—were designed to protect against complacent drivers, not *actively reckless* drivers like McGee.  D.Ct.Dkt.585.at.234.

As to automatic braking, the evidence showed that *no* car in existence in 2019 would have automatically braked to avoid a collision with the out-of-lane parked vehicle here, especially when McGee was pressing on the accelerator. No car at the time was designed to recognize and automatically brake for stop signs, parked cars, or any hazard other than in-line and in-lane vehicles, meaning that if McGee's car was defective for failing to prevent the collision here, so was every other car on the road. D.Ct.Dkt.586.at.109-10, 128-37; *accord Banner*, 411 So.3d at 5 ("Tesla's Autopilot features were 'state-of-the-art' and complied with all industry and regulatory standards"). And allowing Autopilot to override driver input and brake automatically—as Plaintiffs claim should have happened here—would have violated the Society of Automotive Engineers' published industry guidelines, and such a radical deviation from industry standards would likely have created unreasonable safety risks and grounds for regulatory intervention. That is why no car then or now would have operated in that manner.

Finally, as to Plaintiffs' failure-to-warn theory, the evidence showed that McGee's car provided multiple warnings, which McGee simply ignored. *See, e.g.,* D.Ct.Dkt.578.at.116;    D.Ct.Dkt.579.at.71,    98;    D.Ct.Dkt.584.at.116,    118-20; D.Ct.Dkt.585.at.162-63, 227; *accord Banner*, 411 So.3d at 5 (Tesla "repeatedly warned against misuse of the [Autopilot] features, which was industry practice").

13

Faced with that evidence, Plaintiffs worked hard to change the subject and focus the jury instead on irrelevant and highly inflammatory sideshows. For instance, Plaintiffs claimed that Tesla had received data about the crash from McGee's vehicle collected through the vehicle's "shadow mode" operation, including an augmented video showing the stop sign and the end of the "drivable space" before the parked car into which McGee crashed, and that Tesla had deleted that data from its servers. *See* D.Ct.Dkt.577.at.183-87. Plaintiffs presented that story as a purported "cover-up" reflecting Tesla's "malice or evil intent" and warranting punitive damages. D.Ct.Dkt.469.at.1-3; D.Ct.Dkt.574.at.191-93; D.Ct.Dkt.586.at.271. The district court rejected that argument before trial, finding Tesla had not "willfully withheld information or deliberately attempted to destroy evidence" and Plaintiffs had "received all the information and evidence requested in discovery." D.Ct.Dkt.285.at.3; D.Ct.Dkt.405.at.12-13.

Despite that ruling, and Plaintiffs' own experts' acknowledgement that no relevant data was deleted or corrupted and the vehicle data had provided them a "treasure trove" of information, the court allowed Plaintiffs to present evidence at trial about the purported "cover-up"—a ruling Plaintiffs exploited vigorously, inundating the jury with testimony from *eight witnesses* on the issue. *See* D.Ct.Dkt.577.at.189; D.Ct.Dkt.583.at.47, 53-56; D.Ct.Dkt.587.at.50-51. At the charge conference, Plaintiffs affirmed this evidence was "not relevant to any of the liability claims," but was

14

presented solely to show "consciousness of guilt" to support their claim for punitive damages.  D.Ct.Dkt.586.at.254-55, 270-71.  But after allowing Plaintiffs to infect the trial by presenting that irrelevant and prejudicial evidence through witness after witness, the district court (correctly, albeit belatedly) held that evidence was indeed irrelevant to punitive damages, because there was no causal relationship between Tesla's purported post-collision mishandling of the data and Plaintiffs' injuries. D.Ct.Dkt.586.at.270, 273.  The court nevertheless refused to order a mistrial, or even a curative instruction, deeming the evidence relevant to liability despite Plaintiffs' contrary concession.  D.Ct.Dkt.530;  D.Ct.Dkt.586.at.254, 270-73; D.Ct.Dkt.587.at.10-14.  Undeterred, Plaintiffs argued in closing that Tesla's failure to produce that data showed its "consciousness of guilt," after which the court again denied Tesla's motion for a mistrial.  D.Ct.Dkt.587.at.5-6, 50-51, 76-77, 122-23.

Plaintiffs also presented evidence of unrelated accidents with dissimilar facts, which the court admitted despite acknowledging that Plaintiffs had "failed to satisfy their burden of establishing substantial similarity" between those accidents and this case.  D.Ct.Dkt.486.at.13; D.Ct.Dkt.576.at.4-5, 161; D.Ct.Dkt.582.at.20-25.  And Plaintiffs were allowed to introduce and rely on irrelevant forward-looking state-ments by Elon Musk about the potential *future* capabilities of self-driving cars, which McGee never heard and had nothing to do with ordinary consumer expecta-

tions for *existing* Tesla cars like McGee's. *See, e.g.*, D.Ct.Dkt.576.at.147-48; D.Ct.Dkt.585.at.125, 129-31.

The jury ultimately returned a verdict assigning 67% of the responsibility for the collision to McGee and 33% to Tesla. D.Ct.Dkt.534.at.2; D.Ct.Dkt.588.at.14. As to damages, the jury found compensable harm of $70 million for Angulo and $35 million for Benavides' mother—well over the $56 million and $30 million that they respectively requested—plus $24 million for Benavides' father, for a total of $129 million. D.Ct.Dkt.534.at.2-3. Based on the jury's apportionment of responsibility, those findings resulted in a $42.57 million compensatory-damages award against Tesla. D.Ct.Dkt.534.at.2-3; D.Ct.Dkt.588.at.14-16. The jury then awarded *$200 million* in punitive damages against Tesla—nearly five times its compensatory-damages award—resulting in a total award against Tesla of $242,570,000. D.Ct.Dkt.538.at.1-2; D.Ct.Dkt.612.at.2.

Tesla moved for judgment as a matter of law, a new trial, or remittitur. D.Ct.Dkt.591. Among other things, Tesla explained that *Banner* was directly on point and binding on the federal courts and squarely foreclosed any punitive damages, and that the punitive-damages award also violated federal due process, was foreclosed by Supreme Court precedent, and exceeded Florida's statutory cap. The district court denied Tesla's motion with only a single paragraph of analysis; it provided no new reasoning and gave no explanation of how the jury's punitive-

16

damages award could be reconciled with Florida law (including *Banner*) and federal due process requirements as articulated by the Supreme Court.  D.Ct.Dkt.612.

### C.    Standard of Review

This Court reviews de novo a denial of judgment as a matter of law.  *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007).  The Court reviews the denial of a new trial for abuse of discretion, *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254-55 (11th Cir. 2016), and a court "by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996).  A new trial is appropriate when "the verdict is against the weight of the evidence," "the damages are excessive," or there are "questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis*, 817 F.3d at 1254.  The Court reviews evidentiary rulings for abuse of discretion, *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1349-50, 1352 (11th Cir. 2007), and reviews de novo the legality of an award of punitive damages, *see Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1212 (11th Cir. 2010).

### SUMMARY OF ARGUMENT

The judgment below cannot stand.  The tragedy here was the product of McGee's extreme recklessness, not any defect in safety features that make state-of-the-art cars, like McGee's 2019 Tesla, safer than ever for responsible and attentive drivers.  The $242 million judgment against Tesla reflects serious legal and eviden-

tiary errors, and the punitive-damages award is a non-starter. It is squarely foreclosed by on-point Florida law and excessive as a matter of the federal Constitution and state statute.

First, Plaintiffs' product-liability claims fail as a matter of law. As the trial evidence showed, and as the Florida District Court of Appeal concluded in *Banner* in foreclosing punitive damages, Tesla designed and manufactured a state-of-the-art vehicle that complied with industry standards and provided clear warnings, unheeded by McGee, about the vehicle's capabilities and limits. Those state-of-the-art features enhanced safety for any driver who was attentive and willing to heed warnings. McGee was neither, and his extreme recklessness cannot transform state-of-the-art safety features into design defects. No safety feature in the world at the time could have prevented McGee's utter recklessness—reaching down for his phone, and accelerating through a stop sign and a T-intersection all while keeping his hand on the wheel and his foot on the accelerator. Holding Tesla liable for providing drivers with advanced safety features just because a reckless driver like McGee overrode those features and caused a tragic collision cannot be reconciled with Florida law or the commonsense proposition that tort law should incentivize, not punish, innovation and safety advances.

Second, even if judgment as a matter of law were not required, the district court's multiple serious and prejudicial evidentiary errors necessitate a new trial.

18

The court allowed Plaintiffs to present irrelevant evidence regarding Tesla's post-collision handling of data from McGee's vehicle, dissimilar accidents, and forward-looking statements by Elon Musk that McGee never heard about hypothetical future vehicles that Tesla may or may not ever make.  None of that evidence was remotely probative of the issues in this case, and all of it was deeply prejudicial, especially when Plaintiffs exploited those irrelevant sideshows as their central jury arguments. Indeed, the district court ultimately recognized that much of that evidence was irrelevant on the sole issue (punitive damages) for which Plaintiffs sought to introduce it—but nevertheless refused to order a mistrial after the jury was improperly exposed to its prejudicial influence.  D.Ct.Dkt.587.at.14.  Those repeated errors, and their strategic exploitation by Plaintiffs, manifestly distorted the jury's verdict and leave no doubt that it cannot stand.

Third, at a bare minimum, Florida law and the federal Constitution require eliminating or significantly reducing the jury's $200 million punitive-damages award.  Florida law sets high hurdles for punitive damages, all but eliminating them in product-liability cases.  And there is no need for an *Erie* guess about whether punitive damages are available here.  The Florida District Court of Appeal concluded in *Banner* on a materially identical record, in a case involving the same Autopilot features and a driver less obviously at fault, that the Florida-law standard was not met, foreclosing punitive damages as a matter of law.  Nothing in the record remotely

19

suggests that Tesla's innovative safety-enhancing features, which met and exceeded industry standards, involved anything remotely near the level of culpability that Florida law requires for punitive damages, and imposing punishment under these circumstances would violate basic principles of federal due process. And even if punitive damages were not entirely foreclosed, both the Due Process Clause and Florida's statutory cap would require reducing the jury's extraordinary *$200 million* punitive-damages award. This Court should reverse.

## ARGUMENT

### I.     Plaintiffs' Claims Fail As A Matter Of Law.

First and foremost, this Court should reverse the judgment below because Plaintiffs' claims fail as a matter of law. The trial evidence demonstrated that McGee's car had state-of-the-art safety features (as the Florida District Court of Appeal concluded in *Banner*). But McGee abused those safety features and ignored Tesla's warnings. On this record, neither Plaintiffs' design-defect theory nor their failure-to-warn theory can survive under Florida law and Tesla is entitled to judgment as a matter of law. Even if this Court were to conclude that only one of Plaintiffs' theories is flawed, a new trial would be required because the jury did not explicitly adopt either (let alone both) of those theories as the basis for its verdict. *McGriff v. Minn. Mut. Life Ins. Co.*, 127 F.3d 1410, 1416 (11th Cir. 1997).

### A.    Plaintiffs' Design-Defect Theory Fails as a Matter of Law.

Plaintiffs' design-defect theory fails twice over.  First, Tesla's safety features were not defective; instead, as the *Banner* court explicitly recognized, they were state-of-the-art and met or exceeded all industry and regulatory standards.  Second, Plaintiffs cannot show causation.  The evidence plainly showed that no design in the world could have prevented McGee's extreme recklessness, speeding through the stop sign and T-intersection, with his head down and his foot on the accelerator, and crashing on the far side of the T-intersection into a parked car.

### 1.    McGee's car was not defectively designed.

Florida law imposes two alternative tests for a design defect.  A product is defectively designed under the consumer-expectations test if it "fail[s] to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So.3d 489, 503 (Fla. 2015).  A product may also be defectively designed under the risk-utility test if "the risk of danger in the design outweighs [its] benefit[s]." *Cavanaugh v. Stryker Corp.*, 308 So.3d 149, 153-56 (Fla. Ct. App. 2020) (per curiam).  But Florida law makes clear that, in employing both tests, factfinders must not be swayed by hindsight bias based on subsequent developments.  Instead, they "shall consider the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of … injury."  Fla. Stat. §768.1257.

21

Plaintiffs offered three theories at trial for how McGee's car was defectively designed, asserting that (1) Autopilot should have been "geofenced" to prevent its use on Card Sound Road, (2) the car should have employed a different driver-monitoring system, and (3) the car should have automatically braked to avoid the collision. The first two theories essentially allege that because a handful of other vehicles in 2019 employed different approaches, Tesla should have *removed* its safety features to keep reckless drivers from taking advantage of them. The third theory asks for a feature that had not yet been developed by anyone at the time, and that would have squarely contravened published industry guidelines (and likely triggered regulatory intervention) by requiring driver-assistance features to override driver commands. Those same defect theories (among others) were asserted in *Banner*, and as *Banner* confirms, each fails under Florida law. 411 So.3d at 2, 4.

*Geofencing*. First, Plaintiffs argued that the Autopilot feature in McGee's car should have been "geofenced" to prevent its use on certain roads, including Card Sound Road. That is, Plaintiffs argued that Tesla should have strictly limited the use of this safety feature. But that theory fails as a matter of law (as well as common sense), because the undisputed industry standard was to make driver-assistance systems available without geographic restrictions. As the Society of Automotive Engineers explained, "it is the role of the user"—not the automobile itself—"to determine whether and when engagement and disengagement of the driving automation system

22

is appropriate." D.Ct.Dkt.584.at.156. Plaintiffs do not dispute that when McGee's car was manufactured, the state-of-the-art technology made drivers responsible for deciding whether, when, and where to utilize driver-assistance systems like Autopilot. D.Ct.Dkt.584.at.156; *accord Banner*, 411 So.3d at 4-5 (Tesla's decision not to geofence Autopilot to "limited-access highways without cross traffic" was "'state-of-the-art' and complied with all industry and regulatory standards"). Given that Autopilot comported with settled industry standards, an ordinary consumer could not have reasonably expected it to have different features.

The vehicle market in 2019 confirms as much. At that time, 14 manufacturers offered 75 vehicle models with hands-on-wheel driver-assistance systems like Tesla's, and *not a single one* used geofencing. D.Ct.Dkt.577.at.88-89. In contrast, Plaintiffs identified only a single 2019 vehicle model—the Cadillac CT6—that used geofencing, and it involved an entirely different hands-free system. *Id.* That inapposite outlier only underscores the indisputable fact that the state-of-the-art for hands-on-wheel driver-assistance systems in 2019 did not involve geofencing, and the absence of something no comparable model offered is hardly a design defect.

Unsurprisingly, Plaintiffs presented *no evidence at all* that an ordinary consumer would have expected something that no one offered—no testimony regarding consumer expectations, no consumer surveys, no industry guidance, no market analysis. Instead, Plaintiffs argued generically that consumers would expect that "Tesla

23

wouldn't allow use of Autopilot in an area unless it could be safely used there." D.Ct.Dkt.602.at.9. But Autopilot *could* be used safely on Card Sound Road; it was only McGee's extreme recklessness that created the danger here. *See infra* pp.29-32. In addition, as Florida law makes clear, the consumer-expectations test cannot be framed at Plaintiffs' preferred level of generality. Every consumer broadly expects products to be "safe." *Grieco v. Daiho Sangyo, Inc.*, 344 So.3d 11, 19 (Fla. Dist. Ct. App. 2022). But the relevant question is whether the product operates as safely as an ordinary consumer would expect it to operate, given the state of the art at the time. *Aubin*, 177 So.3d at 503; *see* Fla. Stat. §768.1257. Here, the record makes clear that no ordinary consumer in 2019 would have expected that McGee's car would preclude the use of its Autopilot system on Card Sound Road, or that a driver could safely choose to ignore the road under any circumstances. *See supra* pp.6-8, 11-12, 22-23.

Plaintiffs also provided no proof under the risk-utility test that geofencing would have made the 2019 Model S safer overall. While geofencing might be necessary to restrict map-based driver-assistance features to map-based roads, Tesla's system was "not map-based" and instead depended on "clearly marked lane lines" for its camera-based system to follow. D.Ct.Dkt.579.at.154-55; *see* D.Ct.Dkt.584.at.154-55. Geofencing would therefore have undercut safety for all other 2019 Model S drivers, by preventing them from using Tesla's safety-enhancing

24

Autopilot system in appropriate circumstances and by hampering future safety improvements.

***Driver Monitoring System.*** Second, Plaintiffs asserted that McGee's car was defective because its Driver Monitoring System relied on a hands-on-wheel detection system, rather than a driver-facing camera, to ensure that the driver remained engaged and attentive. That theory likewise defies contemporaneous consumer expectations and the state-of-the-art balance of risks and benefits. In 2019, only four of the 76 models with driver-assistance features used driver-facing cameras to monitor driver awareness; and like the hands-on-wheel systems, the driver-facing-camera systems were designed only to address overly complacent drivers, not actively reckless drivers like McGee. D.Ct.Dkt.585.at.234. Tesla's decision to use the industry-standard hands-on-wheel system rather than Plaintiffs' preferred driver-facing cameras accordingly cannot establish a design defect. *See Voynar v. Butler Mfg. Co.*, 463 So.2d 409, 412 (Fla. Dist. Ct. App. 1985) (manufacturers may "permissibly choose[]" among reasonably safe designs); *Royal v. Black & Decker Mfg. Co.*, 205 So.2d 307, 310 (Fla. Dist. Ct. App. 1967) (no design defect where plaintiff showed neither "deviation from the norm" nor that the product "did not meet the standards of the industry"); *accord Banner*, 411 So.3d at 4-5 (Autopilot's use of "steering wheel torque, instead of a camera, to monitor driver inattentiveness" was "'state-of-the-art' and complied with all industry and regulatory standards").

25

Plaintiffs' invocation of a years-later NHTSA investigation of Tesla's driver-assistance technology—which was unrelated to the collision here and spanned various Tesla models and model years—was equally meritless.  In that separate investigation, NHTSA opined five years after the collision here that there was a "mismatch[]" between Autopilot's purportedly "weak driver engagement system" and its "permissive operating capabilities" that "did not adequately ensure that drivers maintained their attention."  D.Ct.Dkt.542-12.at.6.  But that post hoc assessment again focuses on driver *passivity* and the optimal means to ensure a complacent driver stays engaged; it does not remotely suggest that a driver-facing camera or anything else could have stopped the kind of extreme aggressiveness and recklessness exhibited by McGee.  Nothing in the NHTSA assessment comes anywhere near showing that the Autopilot features here were defective because they could not prevent a collision when McGee was actively steering the car and pressing down on the accelerator.

***Automatic Emergency Braking and Forward Collision Warning.***  Plaintiffs' final complaint is that the Automatic Emergency Braking (AEB) and Forward Collision Warning (FCW) systems did not prevent McGee from speeding through the T-intersection and crashing into a vehicle parked off the road.  That theory asks for the impossible.  At the time, state-of-the-art technology had not yet developed the ability to recognize and react to out-of-lane obstacles; no car in existence could stop for

26

out-of-lane obstacles, let alone stop for them while the driver was pressing the accelerator. Tesla challenged Plaintiffs at trial to identify any car in the world that would have stopped at that T-intersection under the circumstances McGee had created—and Plaintiffs had no response, because no such car existed. Indeed, no such car could exist without contravening published industry guidelines requiring driver-assistance features to obey driver commands. D.Ct.Dkt.574.at.203-04.

That is because in 2019, all existing AEB and FCW systems were designed to react only to a vehicle in the same lane and traveling in the same direction. None of those systems could detect or react to stop signs, parked cars, or other out-of-lane hazards. D.Ct.Dkt.586.at.100-01, 109. In fact, NHTSA testing procedures specifically cautioned at the time that these features were "not supposed to warn if there's a vehicle outside the lane," because that was outside their workable scope, and attempting to extend those features in that way would risk "false positives"—creating a *greater* risk that the car might automatically brake for phantom threats and potentially cause an avoidable collision with a car behind it. D.Ct.Dkt.585.at.160; D.Ct.Dkt.586.at.109.

Plaintiffs argued at trial that the Model S should have stopped because it detected an out-of-lane hazard (namely, the parked car into which McGee crashed). But that detection occurred only because Model S employed a forward-looking "shadow mode" that gathered data to assist with *future* product development—a

critical component of ensuring that features enhance safety *before* they are released. D.Ct.Dkt.586.at.188. That "shadow mode" permitted data collection to ensure a safer future, but it was "not connected to the controls," and could neither brake nor steer. D.Ct.Dkt.586.at.146. And connecting "shadow mode" to the controls prematurely would only have made McGee's vehicle *less* safe, by releasing a feature that had not undergone Tesla's rigorous testing and forcing it to do what no car in the world could. *See supra* pp.4-5.

In short, no ordinary consumer would have expected that McGee's car would do what no car in existence could do and what published industry guidelines prohibited—namely, automatically brake and prevent the collision here when McGee was commanding it to do the opposite by pressing on the accelerator. D.Ct.Dkt.586.at.128-37. That simple reality precludes liability here as a matter of law. As *Banner* recognized, "Tesla cannot be liable for failing to provide technology … that did not exist." 411 So.3d at 5. Forcing manufacturers who develop innovative new safety features to bear liability whenever a user abuses those features to drive more recklessly would only discourage innovation and make everyone less safe. So too would punishing companies for collecting data to power future safety innovation. Florida law wisely rejects any such senseless approach.

### 2.    Plaintiffs failed to prove causation.

Even if McGee's car were somehow deemed defectively designed, Plaintiffs' design-defect theory would still fail as a matter of law, because the tragic collision here was caused solely by McGee's recklessness and not by any of the driver-assistance features in his car.  The causation requirement is "one of the most basic principles of tort law," *Peoples Gas Sys. v. Posen Constr., Inc.*, 322 So.3d 604, 613 (Fla. 2021), and Florida law does not impose liability on a defendant if a third party was the "sole proximate cause" of the plaintiff's injury—including where a third party "intentionally misuses" the defendant's product.  *DZE Corp. v. Vickers*, 299 So.3d 538, 540 (Fla. Dist. Ct. App. 2020).  That commonsense rule governs here.

The evidence at trial was unequivocal:  Given McGee's extraordinary recklessness (which McGee himself admitted), Tesla's design choices were beside the point and did not cause the collision here, in either a but-for or a proximate sense.  As to but-for causation, the record evidence is clear that different design choices—such as adding geofencing, more alerts, or any other hypothetical features to McGee's car—would not have made any difference when McGee was *actively overriding* his car's safety features.  The Autopilot system had repeatedly attempted to limit McGee's speed on Card Sound Road, but he overrode it by pressing down on the accelerator.  D.Ct.Dkt.578.at.108; D.Ct.Dkt.579.at.107-08.  And for at least twenty seconds before the crash, McGee had also "overridden the electronic con-

29

trols" by placing his hands on the steering wheel, "*actively driving that vehicle without assistance*" such that "right before the crash, [McGee] was driving the car. The car wasn't driving the car for him." D.Ct.Dkt.583.at.105 (emphasis added); *see* D.Ct.Dkt.583.at.182. Adding more features for McGee to override or ignore could not have prevented the crash he caused, and would only have made Tesla's vehicles less safe for attentive and responsible drivers.

McGee's extreme misconduct also rules out proximate causation. As McGee conceded to the police at the scene and in his testimony at trial, despite knowing that he was responsible for his vehicle, he was looking down and "fishing for [his] phone" while continuing to hold the wheel, press the accelerator, speed through a stop sign and T-intersection, and crash off the road into a parked car. D.Ct.Dkt.579.at.55-56. McGee himself admitted that had he paid attention, observed the stop sign, and applied the brakes, "this crash would not have happened," D.Ct.Dkt.579.at.112, and it was undisputed that an "alert and attentive driver" would have "had sufficient cues and time to avoid the incident," D.Ct.Dkt.585.at.186. Given the undisputed evidence that McGee "intentionally misuse[d]" his car, Florida law "does not permit a jury to consider proximate cause." *DZE*, 299 So.3d at 541. The blame for McGee's extraordinary recklessness and its tragic result rests squarely on McGee, not on Tesla's safety-enhancing design choices.

30

Plaintiffs put forward nothing but speculation in response.  They presented no evidence to show that geofencing Autopilot to prevent its use on Card Sound Road would have prevented McGee's reckless driving or the resulting collision—nor could they, given that McGee overrode the Autopilot system by pressing the accelerator to speed through the T-intersection and off the road on the other side. D.Ct.Dkt.578.at.108; D.Ct.Dkt.579.at.107-08.  They likewise presented no evidence to show that a driver-facing camera rather than hands-on-wheel technology would have avoided the collision, offering only empty supposition that their preferred system might have done better at encouraging McGee to watch the road.  *See* D.Ct.Dkt.578.at.26.  And they presented no evidence that any more effective AEB or FCW system would have avoided the crash—indeed, the evidence made clear that no car in the world could have prevented a collision under the circumstances here, and that designing a car to brake automatically even when the driver was pressing the accelerator would have contravened published industry guidelines that required driver-assistance features to defer to driver commands at all times. D.Ct.Dkt.578.at.117; D.Ct.Dkt.586.at.128-37; *see supra* pp.11-12.

Plaintiffs' assertions that McGee's car "furnished [him] with the opportunity to be careless" cannot satisfy the proximate-cause requirement or support imposing liability on Tesla for the results of McGee's own extraordinary recklessness.  *Kohler v. Medline Indus., Inc.*, 453 So.2d 908, 909 (Fla. Dist. Ct. App. 1984). "Because

31

virtually any product can be misused, a manufacturer cannot be held responsible and liable for every possible, creative misuse that consumers can conceive," and "[p]roducts liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product." *Grieco*, 344 So.3d at 18. Moreover, it would be particularly dangerous and counterproductive to view innovations that improve safety for responsible drivers as invitations for carelessness or recklessness at the hands of someone like McGee. Recognizing that risk to innovation, Florida law makes clear that when a person "intentionally misuses a product," that misuse "does not permit" a finding of proximate cause. *DZE*, 299 So.3d at 541. Given that rule, and McGee's deliberate misuse of his vehicle, Plaintiffs' design-defect theory cannot show proximate cause and therefore fails as a matter of law.

### B.   Plaintiffs' Failure-to-Warn Theory Fails as a Matter of Law.

Plaintiffs also advanced a separate failure-to-warn theory, asserting that Tesla should be held liable for failing to provide adequate warnings regarding McGee's car. To succeed on that theory, Plaintiffs needed to establish that Tesla had a duty to warn, that Tesla provided inadequate warnings, and that the inadequacy of those warnings caused the collision here. *See Grieco*, 344 So.3d at 20-24. Plaintiffs fall short on every element.

### 1.    Tesla had no duty to warn McGee against the open and obvious risks of reckless driving.

First, Tesla had no duty to warn McGee about the open and obvious risks of his extraordinarily reckless driving.  The duty to warn extends only to dangers that are neither "obvious" nor "known." *Grieco*, 344 So.3d at 20.  Florida law does not require warnings about risks of which the user is actually aware or should have been aware.  *See, e.g.*, *Cohen v. Gen. Motors Corp.*, 427 So.2d 389, 391 (Fla. Dist. Ct. App. 1983).

That precludes Plaintiffs' failure-to-warn theory.  The risk posed by speeding through a stop sign and T-intersection in the dark while looking down for a lost phone is as open and obvious as dangers come.  McGee admitted as much, conceding that he knew it was "[a]bsolutely" his responsibility to control the vehicle and pay attention to the road even when he used Autopilot, and that if he had paid even minimal attention, "this crash would not have happened."  D.Ct.Dkt.579.at.59, 112.  That actual knowledge of the relevant risks precludes liability, because "[t]here [was] no duty to warn [McGee] of a danger that he [was] aware of." *Grieco*, 344 So.3d at 21.  To state the obvious, if someone already knows of a danger, then any failure to warn about that known danger is legally irrelevant.  And McGee's actual knowledge, while sufficient to defeat Plaintiffs' claim, was hardly idiosyncratic.  Every driver knows, from the first day of driver's education, that driving involves significant inherent risks and requires the driver's full attention, and it is beyond obvious that speeding

33

through a stop sign and T-intersection in the dark while looking down for a lost phone is incredibly dangerous and carries a high risk of causing injury or death. Florida law does not expose manufacturers to liability for not telling drivers what everyone already knows. *See, e.g.*, *Grieco*, 344 So.3d at 20-22 (no duty to warn against ingesting intoxicating drugs before driving); *Cohen*, 427 So.2d at 391 (no duty to warn against manually releasing emergency brake while car was running).

### 2.    Tesla provided adequate warnings in any event.

Even if Tesla had a duty to warn, the company satisfied it. Florida requires "warnings [that] are 'accurate, clear, and unambiguous.'" *Grieco*, 344 So.3d at 21 (emphasis omitted). Here, as *Banner* recognized on a materially identical record, Tesla "repeatedly warned against misuse of the [Autopilot] features" in clear and unambiguous terms, and its warnings accorded with "industry practice." 411 So.3d at 5. Those warnings sufficed under Florida law.

Tesla's owner's manual provided extensive warnings on the risks, limitations, and responsibilities of its driver-assistance system. Tesla warned users to watch the road and maintain control over the vehicle. *See, e.g.*, D.Ct.Dkt.584.at.120; D.Ct.Dkt.585.at.162-63, 227:3-16. Those warnings made clear that Autopilot would not prevent collisions caused by reckless driving. In particular, they made clear that: the car would not apply its cruise-control braking if the driver was accelerating, D.Ct.Dkt.578.at.116; it would not "detect and stop for a stop sign,"

D.Ct.Dkt.579.at.71; and it would brake only to reduce the impact of a frontal collision, and could not prevent collisions with out-of-lane objects like the parked car here, D.Ct.Dkt.585.at.162-63.

Tesla also provided real-time visual and audio reminders warning McGee to drive responsibly and be aware of his Autopilot system's limits.  The first time McGee wanted to use Autosteer, he had to toggle the feature on from the center touchscreen (while parked) and then acknowledge and accept its limitations.  McGee was warned to use the system only if he was willing to pay close attention to the road and "be prepared to take over at any time."  D.Ct.Dkt.579.at.98.  Each subsequent time McGee used Autopilot, his car displayed a message warning him to keep his hands on the steering wheel, pay attention to the road, and stay in control.  D.Ct.Dkt.584.at.120.  And on the night of the crash, the car repeatedly alerted McGee to watch the road and maintain control of his vehicle, and warned him that the car would not brake because McGee was pressing the accelerator.  D.Ct.Dkt.578.at.116; D.Ct.Dkt.584.at.116, 119; *see supra* pp.8-9.

Plaintiffs' responses at trial only underscore that their claims are foreclosed as a matter of law.  For instance, Plaintiffs argued that the warnings in McGee's owner's manual were inadequate because they were only available electronically rather than in hard copy, and were supposedly difficult to access.  But most people today get information electronically, and the manual was accessible to drivers at the touch of

35

a button. D.Ct.Dkt.584.at.94. Regardless, McGee testified that he never read the hard-copy manuals for his other cars. D.Ct.Dkt.579.at.52-53. Plaintiffs argued that Tesla failed to provide sufficient in-vehicle warnings to ensure driver attentiveness, but the manifold warnings described above—including consistent reminders every time McGee stepped into his car—were more than sufficient to provide the "accurate, clear, and unambiguous" warning that Florida law requires. *Grieco*, 344 So.3d at 21; *see Banner*, 411 So.3d at 5.

### 3. Any purported failure to warn did not cause the crash.

Plaintiffs' failure-to-warn theory fails a third time over because any inadequate warnings here did not proximately cause the crash. Again, McGee was already aware of the relevant dangers, so any failure to warn McGee of what he already knew could not have been the proximate cause of the crash. In addition, Florida law provides that when a party "has not read the [warning], an inadequate warning cannot be the proximate cause of the plaintiff's injuries." *Lopez v. S. Coatings, Inc.*, 580 So.2d 864, 865 (Fla. Dist. Ct. App. 1991) (per curiam). Here, McGee admitted that he knew his vehicle had an owner's manual (which was easily accessible on the touchscreen), but that he never read the manual or its many warnings. D.Ct.Dkt.579.at.52. That forecloses, as a matter of law, the purportedly inadequate warnings from being the proximate cause of the crash. *Lopez*, 580 So.2d at 865; *see, e.g.*, *Leoncio v. Louisville Ladder, Inc.*, 601 F.App'x 932, 933 (11th Cir.

36

2015) (per curiam) (applying *Lopez*).  Still worse, McGee also disregarded the repeated real-time alerts that his vehicle provided him, including in the critical moments before the collision.  *See Leoncio v. Louisville Ladder, Inc.*, 2014 WL 11429056, at *4 (S.D. Fla. Apr. 8, 2014) (where a user "disregarded or ignored an allegedly inadequate warning," plaintiffs "cannot establish an ineffective warning was the proximate cause of [their] injuries"), *aff'd*, 601 F.App'x 932 (11th Cir. 2015).  In short, McGee knew that driving without paying full attention to the road was dangerous, and yet still chose to drive in an extraordinarily reckless and irresponsible way, all while ignoring multiple warnings about his reckless behavior.  On this record, any failure-to-warn theory fails three times over.

## II.    The District Court's Serious And Prejudicial Evidentiary Errors Require A New Trial.

The district court coupled these legal errors with multiple evidentiary errors that severely prejudiced Tesla and account for the jury's improbable and outsized verdict.  Those errors independently and collectively require a new trial.

### A.    The Data-Handling Evidence Was Irrelevant and Highly Prejudicial.

First, the district court improperly admitted irrelevant and highly prejudicial evidence about Tesla's supposed mishandling of post-collision data.  Plaintiffs focused extensively at trial on what they portrayed as a "cover-up": Tesla's "handling of critical vehicle data during the post-accident investigation."  D.Ct.Dkt.586.at.211.

37

That purported cover-up never happened; as the court recognized before trial, Tesla never "willfully withheld information or deliberately attempted to destroy evidence," D.Ct.Dkt.405.at.12, and Plaintiffs' own experts confirmed at trial that no relevant data had been deleted or corrupted, D.Ct.Dkt.583.at.47, 53-56.  The court nevertheless allowed Plaintiffs to saturate the trial with extensive evidence about post-collision data handling, including three witnesses who testified exclusively about this topic and five more whom Plaintiffs examined extensively on the topic.

Plaintiffs justified that inflammatory sideshow as relevant *solely* to punitive damages, claiming that Tesla's purported "cover-up" scheme proved that Plaintiffs were "entitle[d] to punitive damages," D.Ct.Dkt.469.at.1-2; D.Ct.Dkt.574.at.191-93, because it established Tesla's "malice or evil intent," D.Ct.Dkt.586.at.271.  Indeed, Plaintiffs flatly stated at the charge conference that this evidence was "*not relevant to any of the liability claims in this case.*"  D.Ct.Dkt.586.at.254 (emphasis added). But after the jury heard all that prejudicial evidence—offered only to prove Tesla's "evil intent" and "consciousness of guilt"—the district court correctly held that it was irrelevant to punitive damages.  D.Ct.Dkt.586.at.269-70, 273; D.Ct.Dkt.587.at.14.  That alone should have triggered a mistrial.  But instead, the court *sua sponte* deemed the evidence relevant to liability (without explaining why, and despite Plaintiffs' own contrary position), and then denied Tesla a curative instruction to boot.  D.Ct.Dkt.530; D.Ct.Dkt.587.at.10-14.  Plaintiffs then ignored the

38

court's admonition that the data-handling evidence could not be used as a basis for punitive damages, and argued in their closing that Tesla's alleged mishandling of the crash data showed its "consciousness of guilt"—yet the court again denied a mistrial. D.Ct.Dkt.587.at.50-51, 76-77, 123.

The district court's rulings were plainly wrong, and caused Tesla substantial prejudice that requires vacating the judgment. As Plaintiffs themselves conceded, the post-collision data-handling evidence had no bearing on the elements of their product-defect claims, which focus under Florida law "on the product itself and the reasonable expectations of the consumer." *Grieco*, 344 So.3d at 18; *see* D.Ct.Dkt.586.at.254, 270, 273. Product-defect claims have no *mens rea* require-ment, and so evidence of purported "consciousness of guilt" through a purported post-collision "cover-up" is irrelevant (though highly prejudicial). And Plaintiffs' belated (and largely unexplained) assertion that Tesla's post-collision data handling could suggest the existence of a design defect was "a sharp departure from their explanation of this evidence to the jury" throughout trial, which focused on using the data-handling cover-up theme to incite the jury to inflict a massive punishment on Tesla for (allegedly) engaging in egregious intentional misconduct. *Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1244 (11th Cir. 2020).

Moreover, even if Tesla's post-collision data handling were somehow "mar-ginally relevant" to liability, *see* D.Ct.Dkt.587.at.14, it should still have been ex-

39

cluded under Rule 403, because "its probative value was substantially outweighed by the danger of unfair prejudice," *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1502 (11th Cir. 1985). Plaintiffs repeatedly relied on that evidence to portray Tesla as a "willful and malicious" bad actor, *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162-63 (11th Cir. 2004), referring to it "throughout the trial," including "[m]ost notably, during closing argument," *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001); *see, e.g.*, D.Ct.Dkt.574.at.193; D.Ct.Dkt.578.at.22-25; D.Ct.Dkt.581.at.199; D.Ct.Dkt.587.at.48-52. Because that evidence "was highly prejudicial, no correcting instructions were given, and the inadmissible evidence was not only intentionally elicited but also emphasized in closing argument," it necessitates a new trial. *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994).

### B. The District Court Admitted Evidence of Dissimilar Accidents Under the Wrong Legal Standard.

The district court independently erred by allowing Plaintiffs to present severely prejudicial evidence of unrelated and dissimilar accidents. Because evidence of unrelated incidents in product-liability cases is generally irrelevant and poses particular risks of unfair prejudice, courts must exclude such evidence unless plaintiffs can show that the past incidents are "substantially similar" to the one at issue—that is, "similar enough to the present incident to allow the jury to draw a reasonable inference regarding the defendant's knowledge or ability to foresee the

40

incident at issue." *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023).

But the district court refused to apply that settled standard to all but three of the numerous prior accidents that it permitted Plaintiffs to discuss at trial. As to eight other prior accidents that it initially excluded because "Plaintiffs failed to satisfy their burden of establishing substantial similarity," D.Ct.Dkt.486.at.13, the court subsequently reversed course on the theory that Tesla had acknowledged the occurrence of those accidents in its discovery responses, D.Ct.Dkt.486.at.13. But the mere fact that those accidents *occurred* says nothing about their admissibility, i.e., their relevance and/or risk of unfair prejudice—which is what the substantial-similarity test addresses. *See Henderson*, 72 F.4th at 1243.

As to the multiple other prior accidents discussed in a NHTSA report that Plaintiffs were allowed to introduce, the district court (after initially excluding them) applied what it called a "relaxed" substantial-similarity "test for the limited purpose of showing [Tesla's] notice." D.Ct.Dkt.486.at.13-16. That contravened this Court's precedent, which does not water down the substantial-similarity test when prior accidents are introduced to show notice. *See, e.g., Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287-88 (11th Cir. 2015); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661-62 (11th Cir. 1988). After all, the relevance and prejudice concerns posed by dissimilar accidents are no less acute in the notice context—and unless the prior acci-

dents at issue are truly similar, they provide no meaningful notice.  The district court invoked prior district-court decisions that have relaxed the similarity standard for *discovery* purposes, *see* D.Ct.Dkt.486.at.13-14, but that hardly justifies relaxing the *admissibility* standard.  And while the court invoked some out-of-circuit decisions applying a relaxed admissibility standard, *see* D.Ct.Dkt.486.at.14, that just highlights that this Court has a different view.  *See Sorrels*, 796 F.3d at 1287-88.  The district court's error in disregarding the binding substantial-similarity standard and allowing Plaintiffs to present evidence of multiple unrelated and dissimilar accidents requires a new trial.

C.    **The District Court Admitted Irrelevant Statements by Elon Musk That Severely Prejudiced Tesla.**

Last but certainly not least, the district court erred by allowing Plaintiffs to present numerous irrelevant and prejudicial statements by Elon Musk about the potential capabilities of *future* self-driving cars—statements that McGee admitted he never heard.  D.Ct.Dkt.320.at.13-14; *see* D.Ct.Dkt.579.at.88-91.  Despite ruling before trial that statements by Musk that were "forward-looking or aspirational or only appl[y] to fully self-driving vehicles" would be inadmissible, the court again reversed course by allowing Plaintiffs to present statements by Musk that purportedly "discuss[ed] Autopilot generally," on the theory that those statements would "help the jury understand whether an ordinary consumer would have reasonably expected the  Vehicle's  Autopilot  to  warn  of  or  avoid  the  subject  collision."

42

D.Ct.Dkt.433.at.34.  But Plaintiffs exploited that loophole over and over, relying repeatedly on forward-looking statements by Musk about "complete autonomy" that expressly discussed *future* capabilities and could *not* have shaped consumer expectations about the *existing* state of the art circa 2019.  *See, e.g.*, D.Ct.Dkt.576.at.147-48; D.Ct.Dkt.585.at.125-27, 129; *see also* Fla. Stat. §768.1257 (requiring the jury to consider "the state of the art … that existed at the time of manufacture").

Plaintiffs claimed that they "spent so much time talking about Mr. Musk" because "the ordinary consumer expectation is based upon the way [Tesla] marketed their vehicles."  D.Ct.Dkt.587.at.37.  But Plaintiffs did not offer any evidence to show that ordinary consumers would have made purchasing decisions based on Musk's statements, that those statements would have led them to believe McGee's car would have a combination of features no other vehicle in history had ever included, or that the vehicle's capabilities would have allowed McGee to safely engage in extraordinarily reckless driving.  Indeed, the district court itself concluded at the close of evidence that Musk's statements were irrelevant to punitive damages because those statements—which McGee never heard, D.Ct.Dkt.579.at.88-91—lacked any nexus to Plaintiffs' injuries, D.Ct.Dkt.586.at.262; *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  For the same reason, they were equally irrelevant to liability, as statements that McGee never heard could not have deceived him into thinking that he was driving a car that did not exist.  On the contrary, McGee

43

acknowledged that he knew his vehicle "was not a fully self-driving vehicle," would not "stop for a stop sign," and did not allow him to "take [his] eyes off the road." D.Ct.Dkt.579.at.70-71.

Musk's statements thus constituted precisely the kind of "evidence that is tangential [and] only inflammatory," with "little bearing" on the merits, that must be excluded. *State Farm*, 538 U.S. at 418. The district court's decision to admit that evidence—and to let Plaintiffs use that evidence to whip up the jury to "send a message" to Tesla through "[t]he punitive damages award," D.Ct.Dkt.587.at.72—accordingly warrants a new trial. Both independently and collectively, the district court's repeated and severely prejudicial evidentiary errors warrant a new trial.

## III.    The Unlawful and Excessive Punitive-Damages Award Cannot Stand.

Even if the liability verdict below could stand, the punitive-damages award cannot, as both Florida and U.S. Supreme Court precedent make clear. To award punitive damages, Florida law requires intentional misconduct or gross negligence akin to criminal manslaughter. Given that McGee's car used state-of-the-art technology, complied with or exceeded industry standards, and was accompanied by repeated warnings, that legal threshold cannot be satisfied here—which is exactly what the highest Florida court to consider the question has already said. And even if punitive damages in some amount were appropriate, the jury's extravagant $200 million punitive-damages award exceeds both the outer limits of federal due process

44

and Florida's statutory cap. Confronted with all those arguments, the district court made no effort to square this outsized award with precedential Florida law, due process, or Supreme Court precedent. The award must be vacated.

## A. Florida Law Prohibits Any Punitive Damages Here.

Florida law sets a high bar for punitive damages, allowing them only when a plaintiff proves under a rigorous "clear and convincing evidence" standard that the defendant "was personally guilty of intentional misconduct or gross negligence." Fla. Stat. §768.72(2). That standard requires proof that the defendant acted despite "actual knowledge of the wrongfulness of the conduct" and of a "high probability" of injury to the plaintiff, or else engaged in conduct "so reckless or wanting in care that it constitute[s] a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* §768.72(2)(a)-(b). As Florida courts have observed, that stringent standard requires "a reckless disregard for human life equivalent to manslaughter," *Chrysler Corp. v. Wolmer*, 499 So.2d 823, 825 (Fla. 1986); *see Valladares v. Bank of Am. Corp.*, 197 So.3d 1, 11 (Fla. 2016), and "has all but eliminated punitive damage awards in products liability cases," *Jeep Corp. v. Walker*, 528 So.2d 1203, 1205 (Fla. Dist. Ct. App. 1988); *see Banner*, 411 So.3d at 5.

There is no need to speculate as to how Florida courts would apply this demanding punitive-damages standard to facts like these. The Florida District Court

45

of Appeal has already rejected punitive damages on a materially indistinguishable record. In *Banner*, the plaintiff filed suit following an accident involving a 2018 Tesla vehicle with the same Autopilot features. 411 So.3d at 2-3. As here, the plaintiff claimed the vehicle was unsafe because Tesla should have used geofencing, a driver-facing camera, or different automatic braking features, and that Tesla failed to provide adequate warnings. *Id.* at 4. Indeed, the only material difference between this case and *Banner* is that the *Banner* driver was not so obviously reckless and at fault. On those facts, the court held that Florida law did not permit punitive damages for "Autopilot features [that] were 'state-of-the-art' and complied with all industry and regulatory standards," or for alleged failures to warn when "Tesla repeatedly warned against misuse of the features, which was industry practice." *Id.* at 5.

That holding is controlling under *Erie* because *Banner*'s "facts [are] essentially indistinguishable from the facts at hand." *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011); *see Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005) (federal courts sitting in diversity "adhere to the decisions of the Florida appellate courts absent some persuasive indication that the Florida Supreme Court would decide the issue otherwise"). Here, as in *Banner*, Tesla cannot be punished "for failing to provide technology that it did not advertise and that did not exist." 411 So.3d at 5. *Banner* thus precludes any award of punitive damages in this case, full stop.

46

Even if *Banner* had not already resolved the proper application of Florida law, first principles would mandate the same result. Under Florida law, "even gross negligence, the degree of negligence that lies between ordinary negligence and willful and wanton conduct, is not enough" to permit punitive damages. *Wolmer*, 499 So.2d at 824; *see Carraway v. Revell*, 116 So.2d 16 (Fla. 1959). Instead, punitive damages are narrowly limited under Florida law to cases involving intentional misconduct or "reckless disregard for human life equivalent to manslaughter." *Wolmer*, 499 So.2d at 825.

That strict requirement of intentional misconduct or extreme recklessness cannot be met here. Tesla's driver-assistance features "were 'state-of-the-art' and complied with all industry and regulatory standards," *Banner*, 411 So.3d at 5; *see Wolmer*, 499 So.2d at 824-26, and McGee's reckless driving overrode those safety features and independently caused the crash, *supra* pp.29-32. Given that *every* product entails risk/benefit tradeoffs, a company may "reasonably rely on" industry and regulatory standards "for guidance" such that compliance with those standards gives them a "good-faith basis for believing" they have acted lawfully and imposing punitive liability violates fair-notice principles. *BMW of N. Am. v. Gore*, 517 U.S. 559, 579-80 (1996). That is why "[c]ompliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind." *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th Cir.

47

1993).  Given Tesla's compliance with industry and regulatory standards, imposing punitive damages on Tesla for failing to implement nonexistent or outlier features contravened Florida law and fundamental fair-notice requirements of the Due Process Clause.  *See Gore*, 517 U.S. at 574-75, 580.

The district court made no attempt in its post-trial order to reconcile the jury's punitive-damages award with Florida law, *see* D.Ct.Dkt.612.at.7-8, and Plaintiffs' efforts fare no better.  At trial, Plaintiffs relied on testimony from Tesla's corporate representative, Akshay Phatak, to argue that in designing the Autopilot system, Tesla failed to study "driver compliance with automated driving systems," human reaction times needed to avoid accidents, and Autopilot's ability to handle poor road conditions.  D.Ct.Dkt.522.at.19-21; *see* D.Ct.Dkt.579.at.135.  But Phatak confirmed Tesla *did* conduct studies related to a driver's situational awareness when using Autopilot and the effectiveness of its driver-monitoring system.  D.Ct.Dkt.579.at.127, 143; *see* D.Ct.Dkt.584.at.124, 149-50, 174-76.  Tesla further considered "the possibility that drivers could misuse the [Autopilot] system in a variety of ways," including that drivers might "fail to pay attention … while using Autopilot," "use Autopilot features on roadways outside of the recommended environment," or use it "in conditions beyond the system's specified design intent,"  D.Ct.Dkt.542-5.at.3.  And Tesla studied "the impact of Autopilot on driver behavior" through "extensive internal validation during its development," and purposefully "designed Autopilot to address

48

each of these examples," including by improving its "hands-on-wheel detection" and "warning[s]."  D.Ct.Dkt.542.at.3-5.  On this record, Plaintiffs cannot come close to showing "intentional misconduct" or reckless indifference to human life—certainly not by clear and convincing evidence.  Fla. Stat. §768.72(2)(a)-(b).

Plaintiffs invoked reports of dissimilar accidents to argue that Tesla failed to make necessary changes to its Autopilot system.  But none of the accidents Plaintiffs cited involved circumstances remotely similar to this case, or suggested that any changes to Autopilot could have avoided the collision here.  *See supra* pp.29-32, 40-42.  More to the point, the evidence showed that Tesla "continually reviews Autopilot data ... to improve the safety of the features," and "introduced significant product enhancements to deter and mitigate the effects of driver misuse" before the collision here.  D.Ct.Dkt.542-5.at.11, 17-18.  That record comes nowhere near proving by clear and convincing evidence that Tesla intentionally designed a defective vehicle or acted with a "reckless disregard for human life equivalent to manslaughter." *Wolmer*, 499 So.2d at 825.

### B.    Federal Due Process Limits Any Punitive Damages Here to No More Than the Amount of the Compensatory Damages Awarded Against Tesla.

Because Plaintiffs failed to show anything like the culpable intent required by Florida law, the punitive-damages award must be vacated in its entirety.  But even if some portion of that award could survive, the $200 million in punitive damages that

49

the jury awarded was "grossly excessive" in violation of the Due Process Clause's guarantee of "fair notice not only of the conduct that will subject [a defendant] to punishment, but also of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574-75. The district court made no attempt in its post-trial order to defend that enormous windfall or square it with Supreme Court precedent, *see* D.Ct.Dkt.612.at.7-8, and it is indefensibly excessive. On this record, the highest punitive-damages award that could conceivably be imposed consistent with federal due process would be an amount no more than the already-substantial $42,570,000 in compensatory damages awarded against Tesla. *See State Farm*, 538 U.S. at 426; *cf. Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (applying a 1:1 ratio under federal maritime law).

To decide whether a punitive-damages award is constitutionally excessive, the Supreme Court has established three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. Here, all three guideposts mark the punitive-damages award as grossly excessive.

### 1. Tesla's conduct was not remotely reprehensible.

First, Tesla's conduct here was not even remotely reprehensible. *See State Farm*, 538 U.S. at 419. Indeed, not even the jury thought Tesla was the principal cause of Plaintiffs' injuries. It was McGee's reckless misuse of his car and abuse of its safety features, not any conduct by Tesla, that harmed Plaintiffs—as the jury recognized in attributing two-thirds of the fault to McGee. D.Ct.Dkt.534.at.2. Tesla showed no "indifference" or "reckless disregard" for safety. *State Farm*, 538 U.S. at 419. To the contrary, Tesla sought to improve driver safety (and did improve safety for countless drivers who used, rather than abused, the safety features of the 2019 Model S). *See supra* pp.5-7. Tesla likewise did not exploit any financially vulnerable victim, repeatedly engage in any prohibited conduct while knowing it to be unlawful, or engage in any "intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419; *see Gore*, 517 U.S. at 576. The absence of any reprehensible conduct here confirms that the $200 million punitive-damages award cannot stand.

### 2. There is a substantial disparity between the $200 million punitive-damages award and the compensatory-damages award against Tesla.

The massive disparity between the jury's punitive-damages award and its compensatory-damages award against Tesla supports the same conclusion. The jury awarded $200 million in punitive damages and only $42.57 million in compensatory damages against Tesla—a nearly 5:1 ratio. But where "compensatory damages are

substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425; *accord Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 754-55 (11th Cir. 2020) (when a plaintiff "has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee"). That is especially true where, as here, the compensatory award includes non-economic damages, which "already contain [a] punitive element" that is then "duplicated in the punitive award." *State Farm*, 538 U.S. at 426; *see Williams*, 947 F.3d at 765 n.23 (recognizing that a "goodly portion" of an award of non-economic damages could "be considered as intended to punish the defendant"). And it is all the more true where, as here, the compensatory-damages figure was substantially higher—by some $20 million—than even Plaintiffs had sought. *See supra* p.16. Those principles should have limited the punitive-damages award here to an amount no more than the compensatory-damages award, and they confirm that the jury's $200 million punitive-damages award is excessive.

Notably, the Seventh Circuit recently observed that no court "has upheld a 2:1-or-higher ratio resulting in over $200 million in punitive damages," and that courts instead impose "a 1:1 ratio based on significantly lower compensatory awards." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1143-44 (7th Cir. 2020) (reducing $280 million award to $140 million, a 1:1 ratio); *see, e.g.*,

52

*Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 442-43 (6th Cir. 2009) (1:1 ratio maximum allowable for compensatory damages of $10 million, where reprehensibility was low); *Dawe v. Corrs. USA*, 506 F. App'x 657, 660 (9th Cir. 2013) (1:1 ratio proper for compensatory damages of about $2.5 million, even where some reprehensibility factors tilted toward plaintiffs).  The $200 million award here, at a nearly 5:1 ratio to compensatory damages, is therefore an extreme outlier.

The district court made no attempt to engage with the disparity between the jury's extravagant punitive-damages award and its compensatory-damages award against Tesla, *see* D.Ct.Dkt.612.at.7-8, and Plaintiffs themselves did little better. Rather than defend a 5:1 ratio, Plaintiffs attempted to move the goalposts by suggesting that the relevant comparator was the *total* compensation the jury awarded, including the compensatory damages the jury attributed to McGee.  But that approach is plainly inconsistent with due process, as "a ratio based on the full compensatory award would improperly punish [Tesla] for conduct that the jury determined to be the fault of [McGee]." *Clark v. Chrysler Corp.*, 436 F.3d 594, 606 n.16 (6th Cir. 2006); *see, e.g.*, *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1068 (10th Cir. 2016); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000); *see also Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1210 (11th Cir. 2020) (assuming that the correct ratio looks to "the amount of compensatory and punitive damages awarded against each defendant").  As this case

illustrates, Plaintiffs' theory would convert a defendant's relative non-fault into a justification for greater punishment. When most of the harm is allocated to another party, using the total amount to justify punishment for the far-less-responsible party gets matters backwards. And even that backwards theory cannot justify the punitive-damages award here, which nearly doubles the *total* $129 million in compensable injury that the jury found was caused by McGee and Tesla *combined*. That disparity further confirms that the punitive-damages award must be set aside.

### 3. The civil penalty for comparable conduct underscores the excessiveness of the punitive-damages award.

The third *State Farm* guidepost points in the same direction, as civil penalties for comparable conduct provided no fair notice of the "severity of the penalty" imposed on Tesla. *Gore*, 517 U.S. at 574. The $200 million punitive-damages award here is nearly *ten thousand times* the maximum $21,000 civil penalty for violations of federal motor-vehicle safety standards. 49 U.S.C. §30165(a). That extreme disparity underscores how much the jury's $200 million punitive-damages award violates due process—especially when Tesla *complied* with all the governing federal regulations. Under all three *State Farm* guideposts, the jury's $200 million punitive-damages award is wildly excessive, and must be reduced to an amount no more than the compensatory damages awarded against Tesla.

**C.    Florida's Statutory Cap Limits Any Punitive Damages Here to Three Times the Compensatory Damages Awarded Against Tesla.**

As noted, the only permissible amount of punitive damages under Florida law here is zero. *See Banner*, 411 So.3d at 4-5. But the highest-possible outer limit of punitive damages here is set by Florida's statutory cap, which provides that "an award of punitive damages may not exceed … [t]hree times the amount of compensatory damages awarded to each claimant entitled thereto." Fla. Stat. §768.73(1)(a). The jury's $200 million punitive-damages award plainly exceeds that limit, as it is $72 million more than three times the $42.57 million compensatory-damages award against Tesla. *See* D.Ct.Dkt.538.at.1-2.

Once again, the district court never explained how the award could be squared with Florida's cap, *see* D.Ct.Dkt.612.at.7-8, and Plaintiffs' efforts below are demonstrably wrong. Plaintiffs suggested that the relevant base for the ratio was Plaintiffs' total compensable harm ($129 million) attributable primarily to McGee, rather than the $42.57 million in damages actually awarded against Tesla. But that argument cannot be reconciled with the statutory text, which explicitly bases its punitive-damages cap on "the amount of compensatory damages *awarded* to each claimant *entitled thereto*," not the total injury suffered. Fla. Stat. §768.73(1)(a) (emphases added). The only compensatory damages that Plaintiffs were "awarded" here, and the only compensatory damages they are "entitled" to receive, are the $42.57 million in compensatory damages that the judgment ordered Tesla to pay.

*Id.*; *see, e.g.*, *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) ("In ordinary usage, 'award' most often means 'give by judicial decree' or 'assign after careful judgment.'").  No judgment entitles Plaintiffs to a $129 million award.

That plain-text interpretation is bolstered by judicial precedent and common sense.  The Florida Supreme Court has strongly suggested that the compensatory damages actually awarded against a defendant set the punitive-damages baseline under §768.73(1)(a).  *See Coates v. R.J. Reynolds Tobacco Co.*, 375 So.3d 168, 171, 176 (Fla. 2023) (evaluating punitive-damages award against "the $150,000 net compensatory damages award" against the defendant, rather than the total $300,000 in compensable harm suffered by the plaintiff).  The whole point of the statutory cap is to protect the defendant against excessive punitive damages, so focusing on the amount of compensatory damages the defendant must pay plainly makes more sense than focusing on the plaintiffs' total harm.  And Plaintiffs' interpretation of a cap intended to mitigate due-process concerns would have the perverse effect of defying those principles by making defendants deemed to be only partially at fault pay higher ratios of punitive damages than defendants solely responsible for the plaintiff's injury.  *See supra* pp.53-54.

\*   \*   \*

The collision on Card Sound Road was a tragedy—but it was a tragedy caused by McGee's extraordinarily reckless driving, not by any defect in his car.  Florida

law does not impose liability on a vehicle with state-of-the-art safety features that protect most drivers just because one driver recklessly abused those features, and Tesla "cannot be liable for failing to provide technology that it did not advertise and that did not exist." *Banner*, 411 So.3d at 5. The jury held Tesla liable only after severely prejudicial evidentiary errors that demand a new trial. And at a bare minimum, *Banner* and federal due process principles make clear that the jury's wildly excessive $200 million punitive-damages award cannot stand. Leaving the judgment below in place would contravene clear precedent and send a chilling message that would deter progress, innovation, and safety. This Court should not countenance that result.

## CONCLUSION

This Court should reverse and direct entry of judgment for Tesla. Alternatively, the Court should vacate and remand for a new trial. At a minimum, the Court should eliminate or substantially reduce the punitive-damages award.

Respectfully submitted,

s/Paul D. Clement

| | |
|---|---|
| THEODORE J. BOUTROUS, JR. | PAUL D. CLEMENT |
| JULIAN W. POON | C. HARKER RHODES IV |
| GIBSON, DUNN & CRUTCHER LLP | PHILIP HAMMERSLEY |
| 333 South Grand Avenue | CLEMENT & MURPHY, PLLC |
| Los Angeles, CA 90071 | 706 Duke Street |
| (213) 229-7000 | Alexandria, VA 22314 |
| tboutrous@gibsondunn.com | (202) 742-8900 |
| | paul.clement@clementmurphy.com |
| JEFFREY B. WALL | WENDY F. LUMISH |
| MORGAN L. RATNER | BOWMAN AND BROOKE LLP |
| GIBSON, DUNN & CRUTCHER LLP | Two Alhambra Plaza, Suite 800 |
| 1700 M Street, N.W. | Coral Gables, FL 33134 |
| Washington, DC 20036 | (305) 995-5600 |
| (202) 955-8500 | wendy.lumish@bowmanand- |
| jwall@gibsondunn.com | brooke.com |

*Counsel for Appellant Tesla, Inc.*

July 2, 2026

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

July 2, 2026

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on July 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement