No. 26-10858

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

NEIMA BENAVIDES, of Naibel Benavides Leon, deceased,
DILLON ANGULO,

*Plaintiffs-Appellees*,

v.

TESLA, INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Florida,
No. 1:21-cv-21940-BB (Hon. Beth Bloom)

# BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, THE AMERICAN TORT REFORM ASSOCIATION, THE AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION, AND NETCHOICE AS *AMICI CURIAE* SUPPORTING APPELLANT AND REVERSAL

Jonathan D. Urick
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT REFORM ASSOCIATION
1101 Connecticut Ave., NW
Suite 400
Washington, DC 20036
(202) 682-1168

July 9, 2026

Gregory G. Garre
Sakina J. Haji
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Kerry Sheehan
NETCHOICE
1401 K Street, NW
Suite 502
Washington, DC 20005
(202) 827-7594

*Counsel for* Amici Curiae *the Chamber of Commerce of the
United States of America, the American Tort Reform Association, the American
Property Casualty Insurance Association, and NetChoice*
*(additional counsel on inside cover)*

Paul Tetrault
AMERICAN PROPERTY CASUALTY
  INSURANCE ASSOCIATION
555 12th Street, NW
Suite 550
Washington, DC 20004
(202) 828-7100

*Benavides v. Tesla, Inc.*, No. 26-10858

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *Amici Curiae* the Chamber of Commerce of the United States of America, the American Tort Reform Association, the American Property Casualty Insurance Association, and NetChoice state that they are nonprofit, tax-exempt organizations that have no parent corporations, and no publicly held company has 10% or greater ownership in the organizations. They also certify that, in addition to those listed in the party and *amicus curiae* briefs filed in this case, the following individuals or entities have an interest in the outcome of this case:

- American Property Casualty Insurance Association

- American Tort Reform Association

- Chamber of Commerce of the United States of America

- Garre, Gregory G.

- Haji, Sakina J.

- Joyce, H. Sherman

- Latham & Watkins LLP

- NetChoice

- Palmer, Kevin R.

- Sheehan, Kerry

*Benavides v. Tesla, Inc.*, No. 26-10858

- Sheets Jarrell, Lauren

- Tetrault, Paul

- Urick, Jonathan D.

Dated:  July 9, 2026                    Respectfully submitted,

                                        */s/ Gregory G. Garre*
                                        Gregory G. Garre

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICI CURIAE* ................................................................1

STATEMENT OF THE ISSUES.................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ........................................................................................6

I. THE JUDGMENT HOLDS MANUFACTURERS TO UNREASONABLE STANDARDS THAT WILL DETER INNOVATION AND DEVELOPMENT OF SAFER PRODUCTS..............6

    A. There Is No Basis For Holding Manufacturers Liable For Excluding Product Features That No Consumer Would Expect And That Would Make The Product Less Safe ..................................7

    B. Holding Manufacturers Liable For Not Warning Of Obvious Risks Is Nonsensical...........................................................14

    C. Imposing Massive Liability On Manufacturers For Injuries That Resulted From Obvious Human Error Will Act As An "Innovation Tax" That Further Thwarts Welcome Progress ..............17

II. THE ASTRONOMICAL PUNITIVE-DAMAGES AWARD IS INVALID AND EXACERBATES THE HARMS DISCUSSED ABOVE..........................................................................17

CONCLUSION.....................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allstate Life Insurance Co. v. Miller*,
424 F.3d 1113 (11th Cir. 2005) .............................................................19

*American Cyanamid Co. v. Roy*,
498 So. 2d 859 (Fla. 1986) .........................................................18, 19

*Aubin v. Union Carbide Corp.*,
177 So. 3d 489 (Fla. 2015) ...........................................................7, 10

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996)...................................................................22

*Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989).....................................................................20

*Cates v. Zeltiq Aesthetics, Inc.*,
73 F.4th 1342 (11th Cir. 2023) ...............................................6, 7

*Chrysler Corp. v. Wolmer*,
499 So. 2d 823 (Fla. 1986) ...............................................................18

*Coates v. R.J. Reynolds Tobacco Co.*,
375 So. 3d 168 (Fla. 2023) .............................................................21

*Cohen v. General Motors Corp.*,
427 So. 2d 389 (Fla. Dist. Ct. App. 1983)......................................15

*Grieco v. Daiho Sangyo, Inc.*,
344 So. 3d 11 (Fla. Dist. Ct. App. 2022)....................................11, 14

*Houdaille Industries, Inc. v. Edwards*,
374 So. 2d 490 (Fla. 1979) .................................................................3

*Husky Industries, Inc. v. Black*,
434 So. 2d 988 (Fla. Dist. Ct. App. 1983)....................................10, 11

**Page(s)**

*Insua v. JD/BBJ, LLC*,
913 So. 2d 1262 (Fla. Dist. Ct. App. 2005)........................................................15

*Jeep Corp. v. Walker*,
528 So. 2d 1203 (Fla. Dist. Ct. App. 1988)........................................................18

*Kapp v. Bob Sullivan Chevrolet Co.*,
353 S.W.2d 5 (Ark. 1962).................................................................................11

*Light v. Weldarc Co.*,
569 So. 2d 1302 (Fla. Dist. Ct. App. 1990)..........................................................8

*Richards v. Michelin Tire Corp.*,
21 F.3d 1048 (11th Cir. 1994) ...........................................................................19

*Siemens Energy & Automation, Inc. v. Medina*,
719 So. 2d 312 (Fla. Dist. Ct. App. 1998)..........................................................15

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
538 U.S. 408 (2003)...........................................................................................22

*Tesla, Inc. v. Banner*,
411 So. 3d 1 (Fla. Dist. Ct. App. 2025).......................................................19, 20

*Valladares v. Bank of America Corp.*,
197 So. 3d 1 (Fla. 2016) ....................................................................................20

*Voynar v. Butler Manufacturing Co.*,
463 So. 2d 409 (Fla. Dist. Ct. App. 1985)......................................................9, 11

**STATUTES**

49 U.S.C. § 30165(a) ..........................................................................................23

Fla. Stat. § 768.72(2).........................................................................................18

Fla. Stat. § 768.73(1)(a) ....................................................................................21

Fla. Stat. § 768.1257 ...........................................................................................7

iii

**Page(s)**

## OTHER AUTHORITIES

Fed. R. App. P. 29(a)(4)(E)......................................................................1

Ben Flody, *As Automatic Braking Becomes More Common in Cars,
    So Do Driver Complaints*, Wall St. J. (Aug. 27, 2019),
    https://www.wsj.com/articles/as-automatic-brakes-become-
    common-so-do-driver-complaints-11566898205 ...................................9

Kyle Hyatt & Chris Paukert, Self-driving cars: A level-by-level
    explainer of autonomous vehicles, CNET (Mar. 21, 2018),
    https://www.cnet.com/roadshow/news/self-driving-car-guide-
    autonomous-explanation/.........................................................................9

Charlotte Morabito, *Warning labels in the U.S. seem to be
    everywhere.  Here's why they may be pointless*, CNBC
    (July 23, 2023), https://www.cnbc.com/2023/07/23/why-most-
    consumers-ignore-warning-labels.html ................................................16

NHTSA, *Driver Assistance Technologies*,
    https://www.nhtsa.gov/vehicle-safety/driver-assistance-
    technologies (last visited July 8, 2026).................................................13

Andrew Sheldon, *A Seat Belt History Timeline*, AAA (May 21, 2025),
    https://magazine.northeast.aaa.com/daily/life/cars-trucks/auto-
    history/a-seat-belt-history-timeline/ ....................................................12

Tesla, *Autopilot and Full Self-Driving Capability*,
    https://www.tesla.com/en_gb/support/autopilot (last visited July 8,
    2026) .........................................................................................................9

W. Kip Viscusi, *The Blockbuster Punitive Damages Awards*,
    53 Emory L.J. 1405 (2004)......................................................................12

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation.  As the nation's leading advocate for business, it represents companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the executive branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the nation's business community.

The American Tort Reform Association (ATRA) is a broad-based coalition of businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation.  For more than three decades, ATRA has filed amicus briefs in cases like this one involving important product liability and related issues.

The American Property Casualty Insurance Association (APCIA) is the primary national trade association for home, auto, and business insurers.  It promotes and protects the viability of private competition for the benefit of consumers and

---

[1]  All parties consent to the filing of this brief.  No counsel for any party authored this brief in whole or in part, and no person or entity, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  Fed. R. App. P. 29(a)(4)(E).

insurers, with a legacy dating back 150 years.  APCIA's member companies represent nearly 63% of the United States' property casualty insurance market and write more than $55 billion in premiums in the State of Florida, including over 67% of the state's commercial insurance market.  On issues of importance to the insurance industry and marketplace, APCIA advocates sound and progressive public policies on behalf of its members in legislative and regulatory forums at the federal and state levels and submits amicus curiae briefs in significant cases before federal and state courts.

NetChoice is a national trade association of e-commerce and online businesses that share the goal of promoting convenience, choice, and commerce on the internet.  For over two decades, NetChoice has worked to increase consumer access and options via the internet, while minimizing burdens on small businesses that are making the internet more accessible and useful.

The Chamber, ATRA, APCIA, NetChoice, and their members have a substantial interest in ensuring that product-liability law is predictable and fosters an environment that encourages businesses to innovate and develop safer products.  The $243 million verdict in this case threatens to engender the opposite landscape:  By punishing Tesla for not providing additional features and warnings simply because it provided one innovative, safety-enhancing technology that a reckless driver misused, the verdict disincentivizes manufacturers from developing such

2

technologies in the first place.  The massive, $200 million punitive-damages award promises to further chill innovation for fear that any injury linked to any product with a new technology may lead to astronomical and unpredictable liability.

*Amici* submit this brief to highlight that the liability verdict and the punitive-damages award mark a stark departure from settled Florida law and, if upheld, threaten to deter innovation and thwart the development of safer products that may save countless lives now and in the long run.  The decision below should be reversed.

## STATEMENT OF THE ISSUES

1.    Whether the verdict holding Tesla liable for a car crash caused by a reckless driver's own misuse of his vehicle violates Florida product-liability law.

2.    Whether the $200 million punitive-damages award—representing a 5:1 ratio to compensatory damages—violates Florida law and the Due Process Clause.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Florida law is clear that a manufacturer "is not an insurer for all physical injuries caused by its product." *Houdaille Indus., Inc. v. Edwards*, 374 So. 2d 490, 493 (Fla. 1979).  Flouting that well-established and important limitation on manufacturers' liability, the district court allowed Plaintiffs to recover from Tesla for a tragic car crash caused by a driver who—while rummaging around for his cell phone—overrode every safety feature of his 2019 Model S, accelerated the car, blew past a stop sign, and crashed into a car off the side of the road.  No car in 2019 would

have been able to prevent the consequences of this driver's extraordinary recklessness. The jury nevertheless returned a $243 million judgment against Tesla on the theory that because Tesla designed the car with one innovative, safety-enhancing technology, it should have included even more technologies and warnings that supposedly might have averted this tragedy. But manufacturers are not required to design foolproof products that completely eliminate the baseline threat of injury and misuse that always exists. And a reasonably safe product does not become unsafe simply because it can be misused by the most reckless consumers. If it were otherwise, manufacturers would become insurers of all injuries related to their innovative products, significantly discouraging innovation.

The verdict against Tesla violates critical limitations of Florida product-liability law, which does not require manufacturers to provide product features that ordinary consumers would not expect and that would make the product less useful or more unsafe. Nor does it require manufacturers to warn consumers of obvious and known risks. The 2019 Model S did not need to include the additional features advanced by Plaintiffs to be a reasonably safe car, and it did not need to warn drivers that distracted driving could result in accident and death. Upholding the verdict and imposing those responsibilities on manufacturers would dramatically expand Florida product-liability law, creating novel duties for manufacturers of products with new, innovative features. The upshot will be abandonment of such features out of fear

4

that a product including them will lead to massive, unpredictable damages verdicts in one of the country's largest consumer markets.  Now and in the long run, businesses and consumers will miss out on product features and technologies that would have enhanced the safety of the vast majority of users and saved countless lives.

The jury's $200 million punitive-damages award exacerbates all these harms. Not only does it blatantly violate well-established Florida law that prevents courts from assessing punitive damages against manufacturers whose products comply with all applicable industry standards—like Tesla's 2019 Model S—it exceeds the proportionality limits of Florida law and the U.S. Constitution.  It is almost *five times* the compensatory damages assessed against Tesla.  Upholding this astronomical award will encourage juries to punish manufacturers of products with new, innovative technologies and cause manufacturers to abandon such technologies to avoid massive legal exposure and uncertainty.  The resulting loss of such technologies kept off the market will harm—not help—consumer safety.

This Court should set aside the verdict and reverse the judgment below.

**ARGUMENT**

**I.    THE JUDGMENT HOLDS MANUFACTURERS TO UNREASONABLE STANDARDS THAT WILL DETER INNOVATION AND DEVELOPMENT OF SAFER PRODUCTS**

Florida product-liability law holds manufacturers liable for (1) defective products or (2) inadequate product warnings that caused a plaintiff's injuries. *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1347, 1350-51 (11th Cir. 2023). Tesla's 2019 Model S met or exceeded all then-applicable industry standards, employed state-of-the-art Autopilot technology to assist drivers, and provided extensive warnings about the capabilities and limits of that technology. Yet the jury in this case held Tesla liable for a tragic collision on the theory that the 2019 Model S caused the collision because its safety features were defectively designed and lacked adequate warnings, causing a distracted driver to run a stop sign and crash his car into an SUV parked well off the road as he was rummaging around for his cell phone with one hand while steering with the other and accelerating the car.

Plaintiffs identified no car in existence in 2019 that would have prevented such reckless driving or the resulting tragic injuries. But in the jury's view, because the 2019 Model S included *some* driver-assistance safety technologies, it should have included even more, notwithstanding that the omitted technologies were not industry custom, would not have been expected by ordinary consumers, and might have resulted in other safety tradeoffs. Florida product-liability law does not hold

6

manufacturers to that unreasonable standard.  Upholding the verdict below that rests on such a standard will deter manufacturers from developing and providing new, live-saving safety technologies in the first place, and encourage juries to punish manufacturers who do with sweeping and unpredictable tort liability.

> **A.      There Is No Basis For Holding Manufacturers Liable For Excluding Product Features That No Consumer Would Expect And That Would Make The Product Less Safe**

Florida courts use two tests to determine whether a product is defective: "(1) the consumer expectations test and (2) the risk utility test."  *Cates*, 73 F.4th at 1351.  The consumer-expectations test considers whether a product is unreasonably dangerous because "it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner."  *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 503 (Fla. 2015).  The risk-utility test requires a plaintiff to demonstrate that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design, . . . and the omission of the alternative design renders the product not reasonably safe."  *Id.* at 505 (citation omitted).  Regardless of which test is applied, the asserted defects must be assessed based on "the state of the art of scientific and technical knowledge and other circumstances that existed *at the time of manufacture*, not at the time of loss or injury."  Fla. Stat. § 768.1257 (emphasis added).  That rule

ensures that a manufacturer's 2019 product is judged against 2019—not current—standards.

Plaintiffs in this case asserted that Tesla's 2019 Model S was defective because it lacked three technologies: (1) geofencing that would have prevented the driver from using the car's Autopilot feature in the area where the crash occurred; (2) camera-based driver monitoring that would have ensured the driver paid attention to his driving rather than fish around for his dropped cell phone; and (3) automatic braking for not-in-lane hazards that would have stopped the car from speeding past the stop sign and crashing into the SUV parked off the road, when the driver was not paying attention.  Tesla Opening Br. 22-28.  The jury agreed.

But in 2019, the technologies Plaintiffs advanced were not industry custom and were not widely available in automobiles.  Ordinary consumers thus would not have expected the 2019 Model S to restrict where they could use Autopilot, monitor their driving through cameras, or brake automatically for off-road hazards.  *See Light v. Weldarc Co.*, 569 So. 2d 1302, 1304 (Fla. Dist. Ct. App. 1990) (consumer expectations test is based on the expectations of "the ordinary consumer," with "the ordinary knowledge common to the community").  Moreover, it was well known at the time that even if the driver was using an advanced driver-assistance system like Autopilot, he still had to actively monitor the vehicle's progress and remain ready to

8

intervene at any time.[2]   Ordinary consumers thus would not have expected that if they were steering and accelerating the 2019 Model S, and thus *overriding* the car's driver-assistance features, then the car would still retake control via the technologies advanced by Plaintiffs.

Including the non-standard technologies Plaintiffs focused on would also have presented tradeoffs.   For example, automatic-braking technology for not-in-lane hazards would have heightened the risk that the car would brake for phantom threats, potentially causing a collision with a trailing car.   *See* Ben Flody, *As Automatic Braking Becomes More Common in Cars, So Do Driver Complaints*, Wall St. J. (Aug.   27,   2019),   https://www.wsj.com/articles/as-automatic-brakes-become-common-so-do-driver-complaints-11566898205.   Manufacturers carefully consider such tradeoffs when designing their product and deciding which features to include in it.   Mere "hindsight" is not a basis to "retroactively recharacterize" those product design choices as "'unsafe.'"   *Voynar v. Butler Mfg. Co.*, 463 So. 2d 409, 412 (Fla. Dist. Ct. App. 1985).

---

[2]   *See, e.g.*, Kyle Hyatt & Chris Paukert, *Self-driving cars: A level-by-level explainer of autonomous vehicles*, CNET (Mar. 21, 2018), https://www.cnet.com/roadshow/news/self-driving-car-guide-autonomous-explanation/; Tesla, *Autopilot and Full Self-Driving Capability*, https://www.tesla.com/en_gb/support/autopilot (last visited July 8, 2026).

Although neither the consumer-expectations test nor the risk-utility test supports their asserted theory of liability, Plaintiffs nevertheless contend that Tesla must be held liable. In their view, because Tesla provided one safety-enhancing technology—Autopilot—it should have also provided *additional* technologies to neutralize the risky behaviors that some users would engage in. But as long as there have been automobiles, there have been reckless drivers. Holding Tesla liable for not providing additional safety features to prevent every potential reckless misuse of the 2019 Model S would impose an unrealistic standard on manufacturers, requiring them to provide features that are not industry custom, that ordinary consumers would not expect, and that might make their product less useful or more unsafe for most users to protect against the prospect of some reckless consumers misusing their products. To extend this principle would be to tell the automotive industry—and manufacturers at large—to stop introducing new products and technologies altogether.

Florida law does not require or support that result. As the consumer-expectation and risk-utility tests make clear, a manufacturer's duty is to produce a "'reasonably safe'" product that matches the expectations of "ordinary consumer[s]" using the product "as intended." *Aubin*, 177 So. 3d at 503, 505 (citation omitted). It is not "to design a product which is totally incapable of injuring those who foreseeably come in contact with the product." *Husky Indus., Inc. v. Black*, 434 So.

10

2d 988, 991 (Fla. Dist. Ct. App. 1983) (citation omitted).  After all, "[v]irtually any product is capable of producing injury when put to certain uses or misuses."  *Id.* (citation omitted).  And virtually any safety feature may embolden some reckless users to engage in dangerous behavior and misuse, even as the feature enhances the safety of the vast majority of others who interact with the product.  *See, e.g.*, *Kapp v. Bob Sullivan Chevrolet Co.*, 353 S.W.2d 5, 9 (Ark. 1962) ("Like any other article, a seat belt is subject to misuse . . . .").  Holding manufacturers "responsible and liable for every possible, creative misuse that consumers can conceive" would turn product-liability law on its head and make manufacturers "'insurer[s] of all foreseeable accidents which involve [their] product[s].'"  *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 18 (Fla. Dist. Ct. App. 2022) (citation omitted).  Florida product-liability law does not permit that result, yet it is exactly the result reached by the verdict against Tesla.

The upshot of the verdict is a dramatic expansion of the scope of Florida product-liability law.  In future cases, plaintiffs whose injuries are related in any way to a product could easily obtain a large judgment against its manufacturer, simply by pointing to some feature that might have prevented the product's reckless misuse and the resulting injuries if it had been included.  As noted, such "hindsight" bias is not a basis to "retroactively recharacterize" a manufacturer's product design "into a choice between a 'safe' product and an 'unsafe' product."  *Voynar*, 463 So. 2d at 412.

And manufacturers do not violate Florida law by introducing features that improve safety without eliminating the baseline threat of misuse that always exists. Upholding the verdict below would encourage plaintiffs to engage in more retroactive recharacterizations that would heighten the burdens imposed on manufacturers beyond anything recognized under Florida product-liability law.

Such lawsuits driven by hindsight bias would especially plague rapidly innovating industries. The pace of technological advancement in these industries causes features that were nascent or cutting-edge just a few years ago to seem commonplace and mundane a few years later. Shortly after the three-point seat belt's invention in 1959, for example, seat belts became a required safety feature in all new cars in some states by 1961, and nationally by 1968. Andrew Sheldon, *A Seat Belt History Timeline*, AAA (May 21, 2025), https://magazine.northeast.aaa.com/daily/life/cars-trucks/auto-history/a-seat-belt-history-timeline/. Juries deciding product-liability cases involving such industries might readily view a product designed a few years ago as defective for failing to include now-commonplace features, and punish manufacturers for not including those features through large compensatory- and punitive-damages awards. *See* W. Kip Viscusi, *The Blockbuster Punitive Damages Awards*, 53 Emory L.J. 1405, 1406 (2004) (discussing jurors' "hindsight biases making them unable to take themselves back to the pre-accident situation in assessing whether the defendant has been reckless"). But reasonable

12

product-design choices should be overseen by engineers and safety regulators, not punished through the tort system.

The combination of more hindsight-driven lawsuits and juries susceptible to hindsight bias will ultimately harm innovation and punish innovative companies. In this case, for instance, Plaintiffs do not contend that all automobiles must include geofencing, camera-based driver monitoring, and automatic braking for not-in-lane hazards to be considered reasonably safe. Rather, they single out the 2019 Model S as needing to include those features, because it included some other driver-assistance features. Given that, Tesla might have limited its exposure to liability by not including *any* driver-assistance features, even though it is well established that these features have the potential to dramatically enhance safety for the vast majority of drivers and, in turn, save thousands of lives lost each year due to human error. NHTSA, *Driver Assistance Technologies*, https://www.nhtsa.gov/vehicle-safety/driver-assistance-technologies (last visited July 8, 2026). These cannot possibly be the incentives Florida tort law seeks to establish.

Innovative companies faced with the prospect of massive jury verdicts like the one at issue here may increasingly abandon the development and provision of safety-enhancing technologies out of fear that these technologies will result in sweeping and unpredictable tort liability just because they cannot eliminate every cause of every injury. The resulting dearth of innovation will only harm businesses

13

and consumers in the long run by slowing down or entirely stopping the development of safety features that would save lives.

**B.** **Holding Manufacturers Liable For Not Warning Of Obvious Risks Is Nonsensical**

Plaintiffs also asserted that the 2019 Model S lacked adequate warnings. Under Florida law, "a manufacturer has a duty to warn where its product is inherently dangerous or has dangerous propensities." *Grieco*, 344 So. 3d at 20-21 (citation omitted). And such a product is considered "'not reasonably safe'" if it is not accompanied by "reasonable instructions or warnings" that could have reduced or avoided "the foreseeable risks of harm posed by the product." *Id.* at 20 (citation omitted). But if the product poses dangers that are "obvious or known," then "there is no duty to warn." *Id.* (citations omitted).

Tesla had no duty to warn here. It is common sense that the driver is ultimately responsible for controlling his or her car and avoiding crashing into others. And it is well-known and obvious that accident and injury to bystanders can occur if a driver neglects this responsibility. Car manufacturers thus have no duty to warn that accelerating the car over the speed limit and ignoring a stop sign while looking down and fumbling around for a dropped cell phone could cause a serious car crash and death.

Plaintiffs nevertheless claimed that because the 2019 Model S included Autopilot, Tesla had a duty to warn of patently obvious and well-known risks. Like

Plaintiffs' design-defect claim, this too dramatically expands Florida product-liability law, which imposes no duty on manufacturers to warn of obvious risks. *See, e.g.*, *Cohen v. General Motors Corp.*, 427 So. 2d 389, 390-91 (Fla. Dist. Ct. App. 1983) (no duty to warn because "the danger of manually releasing the emergency brake while the car was running and *in gear* was obvious"); *Siemens Energy & Automation, Inc. v. Medina*, 719 So. 2d 312, 314-15 (Fla. Dist. Ct. App. 1998) (reversing jury verdict because "there was no duty to warn the plaintiff of the obvious danger of standing on the top of a 9-foot high piece of equipment that was not designed to be used as a work platform and of the possibility of falling off"); *Insua v. JD/BBJ, LLC*, 913 So. 2d 1262, 1264 (Fla. Dist. Ct. App. 2005) (no duty to warn because "working on wires in an electrically charged panel" is "known to be inherently dangerous"). If the verdict is upheld, it will be trivially easy for plaintiffs in future lawsuits to identify some unique aspect of their injury that the manufacturer should have warned about, and for juries to punish the manufacturer for failing to warn of a risk that was obvious at the time but might seem less obvious in hindsight.

Again, upholding the verdict will harm innovative companies and consumers. Had the 2019 Model S lacked Autopilot, no one would have thought it reasonable that Tesla must warn the driver that accident and death may result if he speeds through a stop sign while not paying attention to the road. Imposing such an obligation merely because the vehicle included an innovative technology intended

15

to *enhance* driver safety will deter manufacturers from developing and providing such technologies in the first place, thwarting life-saving advancements.

Tesla's opening brief details the warnings accompanying the 2019 Model S, which made clear that the driver must remain attentive at all times, and that Autopilot would not prevent accidents under circumstances like those here, *i.e.*, when the driver is accelerating and the hazard is not-in-lane. Tesla Opening Br. 34-35. These warnings were sufficient. Precedent requiring warnings beyond the extensive ones provided here will likewise deter manufacturers from innovating and providing new technologies out of fear that some warning will be missed and become the basis for large and unpredictable tort liability. And it will make it even more difficult for consumers to review and understand the already bulky warnings that accompany most technology products. Charlotte Morabito, *Warning labels in the U.S. seem to be everywhere. Here's why they may be pointless*, CNBC (July 23, 2023), https://www.cnbc.com/2023/07/23/why-most-consumers-ignore-warning-labels.html. Indeed, requiring lawyer-driven warnings against the most commonsense risks—like the dangers of speeding and running a stop sign while recklessly searching for a cell phone on the floor of a vehicle—will just lead consumers to ignore warnings altogether.

16

### C. Imposing Massive Liability On Manufacturers For Injuries That Resulted From Obvious Human Error Will Act As An "Innovation Tax" That Further Thwarts Welcome Progress

The verdict against Tesla holds manufacturers of innovative products with new technologies to a heightened standard, requiring them to eliminate every possible risk and provide every possible warning if they want to avoid massive tort liability. And it does so despite there being no doubt that the crash here was caused by the driver's reckless behavior: Had he paid attention to the road rather than accelerate his car while fishing around for his cell phone, the tragic collision never would have happened. The jury's finding that Tesla is nonetheless liable effectively turns manufacturers into insurers of every potential injury that might result from every potential misuse of their products that contain any new technology. The massive liability manufacturers would face under this new regime, at the hands of juries motivated to award large compensatory- and punitive-damages awards to plaintiffs, will act as an "innovation tax"—a penalty for manufacturers who innovate and develop cutting-edge technologies and features to make better and safer products. This tax will make such products more costly and scarcer, harming businesses and consumers now and over the long run.

## II. THE ASTRONOMICAL PUNITIVE-DAMAGES AWARD IS INVALID AND EXACERBATES THE HARMS DISCUSSED ABOVE

The possibility of an unbounded punitive-damages award only exacerbates the problems discussed above. The staggering $200 million punitive-damages

award assessed against Tesla here violates Florida law and should be set aside in its entirety. At minimum, Florida law and the U.S. Constitution require that the award be drastically lowered. Otherwise, manufacturers will face unpredictable and massive litigation exposure that will stifle innovation and creation of safer products.

A.    Florida law sets a high bar for punitive damages in product-liability cases. The Florida Supreme Court has held that punitive damages are warranted only if the manufacturer engaged in "extreme wrongdoing" that "exhibited a reckless disregard for human life equivalent to manslaughter by designing and marketing the [product]." *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986). The Florida Legislature has likewise required a heightened showing for punitive damages: A plaintiff must prove by "clear and convincing evidence . . . that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). These standards are so stringent that Florida courts view "punitive damage awards in product liability cases" as "all but eliminated." *Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205-06 (Fla. Dist. Ct. App. 1988).

Moreover, Florida courts typically do not permit punitive-damages awards against manufacturers whose products comply with all applicable industry standards. *See, e.g.*, *Chrysler*, 499 So. 2d at 826 (no punitive damages where Chrysler's vehicle satisfied applicable "performance standards during its compliance test"); *American Cyanamid Co. v. Roy*, 498 So. 2d 859, 862-63 (Fla. 1986) (no

18

punitive damages where defendant "compli[ed] with industry guidelines"). This rule makes good sense: Such a manufacturer's behavior does not "represent[] such an extreme departure from accepted standards of care as to justify punitive damages." *American Cyanamid*, 498 So. 2d at 862-63; *see also Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994). After all, a manufacturer who carefully designed a product to match industry specifications is unlikely to have exhibited the "reckless disregard for human life equivalent to manslaughter" or "intentional misconduct or gross negligence" that is a prerequisite to any punitive-damages award. The 2019 Model S met or exceeded all applicable industry standards—that fact alone should foreclose the massive punitive-damages award here.

*Tesla, Inc. v. Banner*, 411 So. 3d 1, 5 (Fla. Dist. Ct. App. 2025), compels this conclusion. Federal courts sitting in diversity, as here, must "adhere to the decisions of the Florida appellate courts absent some persuasive indication that the Florida Supreme Court would decide the issue otherwise." *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005). In *Banner*, a Florida appellate court rejected a plaintiff's bid for punitive damages on nearly identical facts. Specifically, the court reasoned that because "Tesla's Autopilot features were 'state-of-the-art' and complied with all industry and regulatory standards," and "Tesla repeatedly warned against misuse of the features," the plaintiff could not establish that "Tesla knew, or should have known, that its SAE Level 2 driving assistance features were likely to

19

cause death or great bodily injury."  411 So. 3d at 5.  The court further noted that "Tesla cannot be liable for failing to provide technology that it did not advertise and that did not exist."  *Id.*  The same conclusions apply here.  And there is no reason to think that in light of cases like *Chrysler* and *American Cyanamid*, the Florida Supreme Court would decide *Banner* any differently.  *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016) (reaffirming *Chrysler*'s standard).

Disregarding the 2019 Model S's compliance with all applicable industry standards and imposing punitive damages against Tesla would not only violate Florida law, but would also have "a detrimental effect on the research and development of new products."  *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 282 (1989) (O'Connor, J., concurring in part and dissenting in part).  Facing the threat of enormous punitive-damages awards, manufacturers will increasingly "abandon new projects" in order to "avoid uncertain liability" rather than introduce a product containing a new technology into the market.  *Id*.  The upshot will be fewer new technologies and product features, ultimately harming consumer safety.

B.    At minimum, Florida law and the Fourteenth Amendment's Due Process Clause require a substantial reduction in the jury's $200 million punitive-damages award.

1.     Florida law is clear that "an award of punitive damages may not exceed . . . [t]hree times the amount of compensatory damages awarded to each claimant entitled thereto."  Fla. Stat. § 768.73(1)(a).  Here, the jury's compensatory-damages award attributable to Tesla is $42,570,000.  Under Florida law, the punitive-damages award assessed against Tesla thus cannot exceed $127,710,000.

The district court viewed the pre-fault-reduction compensatory-damages award of $129 million as the baseline for analyzing the proportionality of the punitive-damages award.  That was wrong.  *Coates v. R.J. Reynolds Tobacco Co.* shows that the proportionality of the punitive-damages award must be based on the "*net* compensatory damages award."  375 So. 3d 168, 176 (Fla. 2023) (emphasis added).  In that case, the jury had awarded "a total of $300,000" in compensatory damages and "$16 million" in punitive damages, and it had found the defendant 50% responsible. *Id.* at 171.  The Florida Supreme Court thus assessed the proportionality of the $16 million punitive-damages award based on a compensatory-damages award of $150,000—not $300,000. *Id.* at 176.  Any other rule would make little sense:  It would permit a defendant who the jury found to be only 1% responsible for damages of $1 million to face punitive damages of up to $3 million, even though the defendant's share of the compensatory damages is only $10,000—a 300:1 ratio.

2.     The punitive-damages award also violates the Fourteenth Amendment's Due Process Clause.  "[T]hree guideposts" determine whether a

21

punitive-damages award violates the U.S. Constitution:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).  All three guideposts show that the award here was "grossly excessive."  *Id.* at 417.

First, Tesla's conduct was not remotely reprehensible:  The jury found the driver primarily responsible for the physical harm; Tesla did not act with "indifference" or "reckless disregard" to safety but rather tried to improve safety; Tesla did not exploit a "financial[ly] vulnerab[le]" victim; Tesla did not repeatedly engage in prohibited conduct; and Tesla did not engage in "intentional malice, trickery, or deceit."  *See id.* at 419; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-80 (1996).  Second, there is a substantial disparity between the $42.5 million compensatory damages assessed against Tesla and the $200 million punitive-damages award—almost a 5:1 ratio.  "When compensatory damages are substantial," as here, then punitive damages should be "perhaps only equal to compensatory damages."  *State Farm*, 538 U.S. at 425.  And third, the $200 million punitive-damages award dwarfs the $21,000 civil penalty the Secretary of Transportation can impose on vehicle manufacturers for each vehicle that violates the National Traffic

and Motor Vehicle Safety Act, with an aggregate maximum penalty of $105 million for a related series of violations.  49 U.S.C. § 30165(a).  In short, every guidepost points only to the unconstitutionality of the punitive-damages award.

Allowing this unconstitutional, arbitrary punitive-damages award to stand would severely hamper innovation by creating immense legal uncertainty for innovative companies that want to create new products.  A high level of legal uncertainty and scientific innovation cannot coexist.  Instead, the scope of research and development will be restricted, and new, safe products will be kept off the market, harming businesses and consumers alike.

## CONCLUSION

The judgment below should be reversed.

Dated:  July 9, 2026

Jonathan D. Urick
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT REFORM ASSOCIATION
1101 Connecticut Ave., NW
Suite 400
Washington, DC 20036
(202) 682-1168

Paul Tetrault
AMERICAN PROPERTY CASUALTY
  INSURANCE ASSOCIATION
555 12th Street, NW
Suite 550
Washington, DC 20004
(202) 828-7100

Respectfully submitted,

*/s/ Gregory G. Garre*
Gregory G. Garre
Sakina J. Haji
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Kerry Sheehan
NETCHOICE
1401 K Street, NW
Suite 502
Washington, DC 20005
(202) 827-7594

*Counsel for* Amici Curiae *the Chamber of Commerce of the
United States of America, the American Tort Reform Association, the American
Property Casualty Insurance Association, and NetChoice*

24

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,177 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Gregory G. Garre*
Gregory G. Garre

**CERTIFICATE OF SERVICE**

I certify that on July 9, 2026, the foregoing brief was electronically filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All parties were served through the Court's CM/ECF system.

*/s/ Gregory G. Garre*
Gregory G. Garre