**No. 26-10858**

**IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

NEIMA BENAVIDES, of Naibel Benavides Leon, deceased, MR. DILLON ANGULO,

*Plaintiffs-Appellees*,

v.

TESLA, INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:21-cv-21940-BB

# BRIEF FOR APPELLEES NEIMA BENAVIDES AND DILLON ANGULO

TODD POSES
ADAM BOUMEL
POSES BOUMEL
169 East Flagler Street, Suite 1600
Miami, FL 33131
(305) 577-0200

BRETT SCHREIBER
SINGLETON SCHREIBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
(619) 331-7752

DOUGLAS EATON
EATON & WOLK PL
2665 South Bayshore Dr., Suite 609
Miami, FL 33133
(786) 752-4742

ELIZABETH B. PRELOGAR
JOSHUA REVESZ
COOLEY LLP
1299 Pennsylvania Ave NW, Suite 700
Washington, DC 20004
(202) 842-7800

ANNA M. STAPLETON
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000

DIANA G. LI
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs have no objection to Tesla's request for oral argument.

## TABLE OF CONTENTS

**Page**


STATEMENT REGARDING ORAL ARGUMENT ....................................................i

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE.....................................................................4

A. The Card Sound Road Crash ..................................................................4

B. Proceedings Below ..............................................................................5

C. Jury Verdict and Appeal.......................................................................7

SUMMARY OF THE ARGUMENT ..............................................................8

ARGUMENT ........................................................................................10

I. Tesla Is Not Entitled to Judgment as a Matter of Law.......................10

A. The evidence was sufficient for the jury to find a design defect. ....................................................................11

1. A reasonable jury could find that the Tesla vehicle was defectively designed. ............................................12

a. Tesla set false consumer expectations................13

b. McGee's Tesla had three specific design defects. ..................................................15

c. Tesla's contrary arguments defy the record and the law.........................................................21

2. A reasonable jury could find that Tesla's design defects caused plaintiffs' injury....................................25

B. The evidence was sufficient for the jury to find that Tesla failed to warn. ......................................................................28

II. The District Court's Evidentiary Rulings Were Not Abuses of Discretion. ..............................................................................32

A. Evidence that Tesla withheld and sought to delete crash data was admissible..........................................................32

B. Evidence about Tesla's prior crashes was admissible. ............38

C. Musk's statements were admissible.......................................41

III. The Award of Punitive Damages Was Proper. ....................................42

A. The jury had ample evidence to award punitive damages. ......43

B. The punitive-damages award is consistent with the Fourteenth Amendment. ........................................................49

1. Tesla's conduct was reprehensible. ...............................49

2. The damages ratio is not excessive. ..............................51

3. No analogous civil penalties point against this award.......................................................................52

C. The punitive-damages award is consistent with Florida law. ..........................................................................53

CONCLUSION ...........................................................................................57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases***

*Am. Cyanamid Co. v. Roy*,
498 So.2d 859 (Fla. 1986) ....................47

*Arnold Rogers v. City of Orlando*,
660 F. App'x 819 (11th Cir. 2016) ....................36

**Aubin v. Union Carbide Corp.*,
177 So.3d 489 (Fla. 2015) ....................12, 13, 41

*Bogle v. McClure*,
332 F.3d 1347 (11th Cir. 2003) ....................38

*Brown v. Ala. Dep't of Transp.*,
597 F.3d 1160 (11th Cir. 2010) ....................10, 11

*Brown v. Glade & Grove Supply, Inc.*,
647 So.2d 1033 (Fla. Dist. Ct. App. 1994) ....................31

*Cabello v. Fernández-Larios*,
402 F.3d 1148 (11th Cir. 2005) ....................12

*Cates v. Zeltiq Aesthetics, Inc.*,
73 F.4th 1342 (11th Cir. 2023) ....................12

*Coates v. R.J. Reynolds Tobacco Co.*,
375 So.3d 168 (Fla. 2023) ....................55, 56

*Conroy v. Abraham Chevrolet-Tampa, Inc.*,
375 F.3d 1228 (11th Cir. 2004) ....................32, 36

*DZE Corp. v. Vickers*,
299 So.3d 538 (Fla. Dist. Ct. App. 2020) ....................27

*Eghnayem v. Bos. Sci. Corp.*,
873 F.3d 1304 (11th Cir. 2017) ....................28

* Citations upon which Appellees primarily rely are marked with asterisks.

*Ermini v. Scott*,
937 F.3d 1329 (11th Cir. 2019) ....................................................32, 38

*Est. of Miller v. Ford Motor Co.*,
2004 WL 7330563 (M.D. Fla. July 22, 2004) ....................................................43

**Faulk v. Dimerco Express USA Corp.*,
172 F.4th 844 (11th Cir. 2026) ....................................................50, 51, 52, 53

*Fin. Info. Techs. LLC v. iControl Sys., USA, LLC*,
21 F.4th 1267 (11th Cir. 2021) ....................................................10, 12

*Fla. Dep't of State v. Martin*,
916 So.2d 763 (Fla. 2005) ....................................................55

*Furcron v. Mail Ctrs. Plus, LLC*,
843 F.3d 1295 (11th Cir. 2016) ....................................................42

*Gen. Motors Corp. v. McGee*,
837 So.2d 1010 (Fla. Dist. Ct. App. 2002) ....................................................38

*Goldsmith v. Bagby Elevator Co.*,
513 F.3d 1261 (11th Cir. 2008) ....................................................37, 51

*Grieco v. Daiho Sangyo, Inc.*,
344 So.3d 11 (Fla. Dist. Ct. App. 2022) ....................................................27, 29

*Henderson v. Ford Motor Co.*,
72 F.4th 1237 (11th Cir. 2023) ....................................................39, 40

*Holmes v. Bridgestone/Firestone, Inc.*,
891 So.2d 1188 (Fla. Dist. Ct. App. 2005) ....................................................44

*Ingham v. Johnson & Johnson*,
608 S.W.3d 663 (Mo. Ct. App. 2020) ....................................................52

*Jackson v. H.L. Bouton Co., Inc.*,
630 So.2d 1173 (Fla. Dist. Ct. App. 1994) ....................................................24

*Kemp v. Am. Tel. & Tel. Co.*,
393 F.3d 1354 (11th Cir. 2004) ....................................................52

*Kerrivan v. R.J. Reynolds Tobacco Co.*,
953 F.3d 1196 (11th Cir. 2020) ....................................................51, 52, 53

*Liggett Grp., Inc. v. Davis*,
973 So.2d 467 (Fla. Dist. Ct. App. 2007).........................................................13

*Managed Care Sols., Inc. v. Essent Healthcare, Inc.*,
736 F. Supp. 2d 1317 (S.D. Fla. 2010)..............................................................37

*McGinnis v. Am. Home Mortg. Servicing, Inc.*,
901 F.3d 1282 (11th Cir. 2018) ........................................................................52

*McQueeney v. Wilmington Trust Co.*,
779 F.2d 916 (3d Cir. 1985) ............................................................................37

*Michelin Tire Corp. v. Milbrook*,
799 So.2d 248 (Fla. Dist. Ct. App. 2001).........................................................36

*Mosher v. Speedstar Div. of AMCA Int'l, Inc.*,
979 F.2d 823 (11th Cir. 1992) ..........................................................................27

*Munoz ex rel. Munoz v. S. Miami Hosp.*,
764 So.2d 854 (Fla. Dist. Ct. App. 2000).........................................................31

*Norton v. Snapper Power Equip., Div. of Fuqua Indus., Inc.*,
806 F.2d 1545 (11th Cir. 1987) ........................................................................24

**Owens-Corning Fiberglas Corp. v. Ballard*,
749 So.2d 483 (Fla. 1999) .........................................................................38, 42

*Pamperin v. Interlake Cos., Inc.*,
634 So.2d 1137 (Fla. Dist. Ct. App. 1994) ......................................................27

*Perlmutter v. Federal Ins. Co.*,
434 So.3d 681 (Fla. 2026) ...............................................................................48

*R.J. Reynolds Tobacco Co. v. Coates*,
308 So.3d 1068 (Fla. Dist. Ct. App. 2020).......................................................56

*R.J. Reynolds Tobacco Co. v. Townsend*,
118 So.3d 844 (Fla. Dist. Ct. App. 2013)...................................................55, 56

*R.J. Reynolds Tobacco Co. v. Townsend*,
90 So.3d 307 (Fla. Dist. Ct. App. 2012) .......... 55

*Richards v. Michelin Tire Corp.*,
21 F.3d 1048 (11th Cir. 1994) .......... 11

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) .......... 54

*S. Grande View Dev. Co., Inc. v. City of Alabaster*,
1 F.4th 1299 (11th Cir. 2021) .......... 38

*Sims v. BMW of N. Am. LLC*,
2025 WL 724047 (M.D. Fla. Mar. 5, 2025) .......... 43

*Smith v. R.J. Reynolds Tobacco Co.*,
880 F.3d 1272 (11th Cir. 2018) .......... 54

*Sorrels v. NCL (Bahamas) Ltd.*,
796 F.3d 1275 (11th Cir. 2015) .......... 39

*Sta-Rite Indus., Inc. v. Levey*,
909 So.2d 901 (Fla. Dist. Ct. App. 2004) .......... 24, 31

*Stanley Indus., Inc. v. W.M. Barr & Co., Inc.*,
784 F. Supp. 1570 (S.D. Fla. 1992) .......... 31

**State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) .......... 49, 51

*State Farm Mut. Auto. Ins. Co. v. Duckworth*,
648 F.3d 1216 (11th Cir. 2011) .......... 49

*Suzuki Motor Corp. v. Winckler*,
434 So.3d 104 (Fla. Dist. Ct. App. 2026) .......... 29

**Taylor v. Mentor Worldwide LLC*,
940 F.3d 582 (11th Cir. 2019) .......... 43, 44, 45, 46

*Tesla, Inc. v. Banner*,
411 So.3d 1 (Fla. Dist. Ct. App. 2025) .......... 25, 47, 48, 49

*United States v. Lopez*,
649 F.3d 1222 (11th Cir. 2011) ............................................................36

*United States v. Walther*,
867 F.2d 1334 (11th Cir. 1989) ............................................................36

*Valladares v. Bank of Am. Corp.*,
197 So.3d 1 (Fla. 2016) ............................................................43, 46

*Williams v. First Advantage LNS Screening Sols., Inc.*,
947 F.3d 735 (11th Cir. 2020) ............................................................51

**Statutes**

49 U.S.C. § 30165(a)(1)............................................................53

Fla. Stat.
§ 768.72(2)............................................................43
§ 768.72(2)(b) ............................................................43
§ 768.73(1)(a) ............................................................53
§ 768.81(2)............................................................54

**Other Authorities**

Fed. R. Civ. P. 36(b) ............................................................40

## INTRODUCTION

Across fourteen days of trial testimony, a Florida jury heard Tesla's extravagant promises about its Autopilot technology. It saw a video in which Tesla promised that "[t]he person in the driver's seat is only there for legal reasons," that "[h]e is not doing anything," and that "[t]he car is driving itself." It heard Elon Musk promise in 2016 that Tesla vehicles would brake for any object "both when Autopilot is active and when it's not active." And it heard Musk's claim that Tesla's "Model S and Model X, at this point, can drive autonomously with greater safety than a person," such that "autonomous driving [is] basically a solved problem."

For fourteen days, the jury heard that each of these claims was untrue—and indeed, that Autopilot had critical safety flaws that Tesla failed to disclose or fix. The jury learned from experts that Tesla knew that Autopilot was unsuitable for operation on certain roads, but that Tesla nevertheless allowed it to be used in all driving conditions. It saw a report by the National Highway Traffic Safety Administration (NHTSA) that Tesla's "Autopilot controls did not sufficiently ensure driver attention and appropriate use" and so "resulted in a critical safety gap." It heard expert testimony that Tesla inaccurately promised that its vehicles would brake—or at least warn the driver—before crashing into an object. And it heard evidence that other manufacturers avoided these design problems—so much so that NHTSA concluded that Tesla was "an industry outlier" in its safety failures.

For fourteen days, the jury learned that Tesla's corporate culture intentionally prioritized profits over safety. Tesla's own corporate witness acknowledged that the company did not conduct critical research before launching Autopilot. Evidence emerged that Tesla acknowledged to the government that its technology would lead drivers to be "distracted" and to use Autopilot outside of its safe "domain." Experts testified that Tesla failed to make safety improvements even after Autopilot caused other crashes. And experts explained that Tesla did not sufficiently test its products, preferring to "use[] products that had already been sold to consumers in part to do their product development."

And for fourteen days, the jury saw the tragic—and tragically predictable—consequences of Tesla's actions. George McGee purchased his Tesla after doing significant research on the company's "autonomous technology," including by visiting Tesla's website. And based on his beliefs about his vehicle's capabilities, on April 25, 2019, he "took [his] eyes off the road" when driving on Card Sound Road between the Florida Keys and Miami—something he testified he would not have done had he "not been driving Tesla on Autopilot." McGee's Tesla facilitated that negligence: It allowed Autopilot to operate even though Card Sound Road was outside of the technology's safe domain, and even though better driver-monitoring and warning systems would have prevented McGee from losing control of his vehicle. Yet the Tesla did not stop as McGee, relying on Autopilot while rummaging around

his car for a dropped cell phone, drove through a T-shaped intersection and into a parked car. That car careened into Naibel Benavides and Dillon Angulo, killing Benavides and giving Angulo severe, lifelong injuries.

On the fifteenth day of trial, the jury reached a unanimous verdict. It found that McGee's Tesla was defective, and that the vehicle's defects were one of two causes—along with McGee's negligence—of Benavides's death and Angulo's permanent injuries. The jury awarded Benavides's family and Angulo $129 million for their harms, which the district court reduced to approximately $43 million to account for McGee's role in the crash. And because it found that Tesla's behavior exhibited gross negligence towards the lives of others, the jury awarded plaintiffs $200 million in punitive damages.

That jury verdict is consistent with the evidence and the law, and this Court should reject Tesla's attempts to overturn it. Tesla seeks relief from liability because its "advanced safety features" are purportedly "state-of-the-art." But an appellate brief is not a closing argument, and Tesla fails to reckon with either the deference due to the jury's findings or the mountains of evidence—including from NHTSA, the federal government's car-safety regulator—refuting its claims. Tesla equally cannot show that this Court should second guess the district court's rulings admitting certain damaging evidence at trial. The district court was well within its discretion in determining that each category of evidence—evidence that Tesla repeatedly

withheld critical crash data and was not "cooperative" in the Florida Highway Patrol's investigation of the crash; details about prior crashes involving Autopilot; and Musk's public statements—would inform the jury's deliberations. Finally, Tesla's efforts to evade the jury's award of punitive damages fail. The jury had more than enough evidence to find that Tesla heedlessly disregarded the safety of others, and neither the U.S. Constitution nor Florida law prohibits the jury's assessment of how much Tesla should pay for that wrongdoing. This Court should affirm the judgment.

## STATEMENT OF THE CASE

### A. The Card Sound Road Crash

This case is about a tragic crash that occurred in Florida on April 25, 2019, shortly after 9:00 p.m. George McGee was using Autopilot to operate his 2019 Tesla Model S on Card Sound Road, a limited access roadway connecting Miami to the Florida Keys. Dkt.583.at.107-08. Although the Tesla had detected that Autopilot was not intended for use on that road—likely because it had non-standard signs, limited sight distance, and cross traffic—McGee was able to use Autopilot because Tesla had not geographically restricted its use. Dkt.577.at.144-47.

McGee was also able to use Autopilot despite regularly receiving "strikeouts," which turn Autopilot off after a driver ignores three audible alerts for inattention. Indeed, during the three months he owned his Tesla, McGee received a strikeout roughly every 140 miles of driving—with the only consequence that he had to put

the car in park and then put it back in drive to turn Autopilot back on. Dkt.577.at.153-54. In the minutes leading up to the crash, McGee was focused on a phone call about travel arrangements; when his phone fell, he looked down to "fish[]" around for it. Dkt.579.at.55-56, 75.

Although McGee's car detected a parked SUV, a pedestrian, and the end of the road's drivable space, it neither engaged the emergency brakes nor provided a forward collision warning to McGee. Dkt.576.at.98-102; Dkt.577.at.186-87, 197-98. McGee's Tesla therefore crashed into the SUV, which fatally struck Naibel Benavides and seriously injured Dillon Angulo. Dkt.583.at.108.

### B. Proceedings Below

Neima Benavides (Naibel's sister and personal representative) and Angulo each sued Tesla. The district court consolidated the cases and denied Tesla's motion for summary judgment. Dkt.428.

A fifteen-day jury trial ensued. During plaintiffs' case, the jury heard evidence and testimony from over twenty witnesses on topics including Tesla's exaggerated representations about Autopilot; the limitations of that technology; the known history of distracted drivers and fatal crashes; the incomplete warnings Tesla gave drivers; NHTSA's evaluation of Tesla's subpar driver-monitoring technology; the details of the crash; Tesla's refusal to produce incriminating crash data that plaintiffs later obtained on their own; Tesla's lack of cooperation with Florida law

enforcement investigating the crash; and Tesla's decision not to make any changes even after learning about the fatal consequences of Autopilot.

The jury also heard Tesla's defense. Tesla introduced testimony from four witnesses, who emphasized McGee's role in the crash; defended Tesla's technology as consistent with industry standards; characterized the crash as unlike any prior one involving a Tesla; and described the company's approach to safety. As explained below, several of those witnesses ultimately undercut Tesla's case: One Tesla expert witness turned out to have authored a prior article critical of Autopilot's safety features, while another admitted that non-Tesla vehicles performed better on his tests designed to elicit forward collision warnings.

Tesla's Statement—like its entire brief—reads as if the jury heard only Tesla's side of the trial. For instance, the Statement begins by describing Autopilot as "state-of-the-art," Br. 4, a phrase that Tesla's brief repeats twenty times. But Tesla nowhere discusses the substantial contrary evidence, such as a federal government report that called Tesla "an industry outlier in its approach to L2 technology by mismatching a weak driver engagement system with Autopilot's permissive operating capabilities." *E.g.*, Dkt.542-12.at.6. To provide a more complete picture of the trial, this brief discusses the trial evidence in detail in the relevant portions of the argument section.

Tesla has never attempted, however, to contest the extensive harm caused by the crash. Naibel's family members described the "nightmare" they have been living through since the accident. Dkt.582.at.53. The jury also heard about Angulo's injuries: bleeding in the brain and other internal organs, spine fractures, a broken jaw, a shattered pelvis, a ruptured bladder, and a scrotum tear. Dkt.575.at.21, 24-25; Dkt.579.at.196, 202-04, 209. Those "lifelong" injuries have caused permanent damage: One witness described Angulo as a "walking wounded," Dkt.580.at.42, 54, while another explained that he will need significant care and "age much faster than the general population," Dkt.581.at.30-31.

### C. Jury Verdict and Appeal

After hearing both sides' evidence and deliberating, the jury ruled for plaintiffs. The jury determined that Tesla placed McGee's vehicle on the market with a defect that legally caused plaintiffs' injuries. Dkt.534.at.1. The jury awarded $35 million to Benavides's mother and $24 million to her father in compensatory damages, as well as $15 million for Angulo's past injuries and $55 million for his future injuries. Dkt.534.at.2-3. The jury recognized that McGee also bore responsibility for the crash and allocated 67% of the responsibility to him and 33% to Tesla, making Tesla's share of the damages about $43 million. *See* Dkt.534.at.2; Dkt.612.at.2 & n.1. The jury awarded $200 million in punitive damages against Tesla. Dkt.534.at.3.

The district court denied Tesla's renewed motion for judgment as a matter of law or for a new trial. Dkt.612. Tesla appealed. Dkt.616.

## SUMMARY OF THE ARGUMENT

The trial record overwhelmingly supports the jury's unanimous decision to find Tesla liable for its role in the crash that killed Naibel Benavides and badly injured Dillon Angulo—as well as its decision to award actual and punitive damages against Tesla. The record demonstrates that Tesla defectively designed and failed to warn users about the dangers of its Autopilot technology. It shows that those failures caused the tragic crash at issue here. And it confirms that Tesla knew before this crash that Autopilot was unsafe and chose not to take appropriate measures to correct those problems, thus satisfying the gross-negligence standard for punitive damages under Florida law. None of Tesla's arguments supports reversal or modification of the judgment below. This Court should affirm.

*First*, Tesla is not entitled to judgment as a matter of law. The jury heard extensive evidence that the Tesla vehicle was defective. Tesla's marketing—including statements by its CEO and a high-profile video promising that "[t]he person in the driver's seat is only there for legal reasons"—gave consumers unrealistic expectations of Autopilot's capabilities. Tesla's exaggerated promises were accompanied by three serious design defects in McGee's Tesla: The vehicle permitted Autopilot to operate on roads that did not meet the conditions in which the system was designed

to operate; its driver-monitoring system did not adequately ensure driver attention; and it neither applied emergency braking nor warned McGee before the full-frontal collision. The trial evidence readily demonstrated that these defects, together with the distracted driving that Autopilot encouraged, helped cause the crash. For similar reasons, the evidence shows that Tesla should have warned of these deficiencies with Autopilot—both in the Owner's Manual, which failed to disclose Autopilot's limitations, and in real-time warnings leading up to the crash.

*Second*, the district court did not abuse its discretion in admitting three categories of evidence that Tesla raises on appeal. The court properly admitted evidence of Tesla's actions to prevent plaintiffs and investigators from obtaining relevant crash data, which explained why plaintiffs' experts had superior information to Tesla's own witnesses. It properly admitted evidence of prior, substantially similar crashes involving Autopilot. And it properly admitted Musk's public statements boasting about Autopilot's then-current capabilities. Any conceivable error in these rulings was harmless given the weight of the remaining evidence.

*Third*, Tesla identifies no basis to eliminate or reduce the jury's punitive-damages award. The jury had more than sufficient evidence to find that Tesla was grossly negligent under Florida law: Tesla developed Autopilot without adequate research or testing, knew of the technology's dangers from prior fatal crashes and its own admissions to the government, and nonetheless prioritized selling cars over

making available safety improvements. The size of the punitive-damages award comports with federal due-process protections: Tesla's conduct was highly reprehensible; the award's ratio to the harm suffered is well within the range the Supreme Court has endorsed; and no comparable civil penalty undermines the award's reasonableness. Finally, the punitive-damages award does not exceed Florida's statutory cap, which is measured against the jury's pre-apportionment compensatory damages award.

## ARGUMENT

### I. Tesla Is Not Entitled to Judgment as a Matter of Law.

Tesla asks this Court (at 20-37) to reverse the jury's verdict, which was based on weeks of trial testimony, and to award Tesla judgment as a matter of law. Tesla bears a heavy burden: "Overturning a jury's liability finding is a difficult task," *Fin. Info. Techs. LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1272 (11th Cir. 2021), and "judgment as a matter of law is appropriate only if the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict," *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010).[1] In making that determination, a court "draw[s] all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh

[1] Unless otherwise noted, all internal quotation marks and citations are omitted and all alterations are adopted.

the evidence." *Id.* And to obtain judgment as a matter of law following a general verdict, Tesla must show that the evidence could not plausibly support either of plaintiffs' two claims. *See Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994).

Tesla comes nowhere close to satisfying that burden. The jury heard ample evidence from both sides' witnesses that Tesla defectively designed the 2019 Model S and failed to warn of its dangers, and that those mistakes caused this crash. Tesla's brief ignores that evidence, relying on the one-sided factual narrative that it presented to the jury—and that a reasonable jury could and did reject.

**A. The evidence was sufficient for the jury to find a design defect.**

The evidence at trial was crystal clear: When it comes to safety, Tesla overpromised and underdelivered. It overpromised by leading its customers to believe that vehicles equipped with Autopilot were far more capable than they were. And it underdelivered by eschewing safety features that would mitigate the misuse of Autopilot that Tesla's marketing encouraged. On April 25, 2019, those interrelated failures led to predictable tragedy: A driver who believed that his Tesla automatically "would stop for obstacles in the road" put too much trust in the Autopilot technology, killing Benavides and severely injuring Angulo. Dkt.576.at.103. On the full trial record, a reasonable jury could easily find Tesla liable on the design-defect claim.

### 1. *A reasonable jury could find that the Tesla vehicle was defectively designed.*

As Tesla recognizes (at 21), Florida law permits a plaintiff to demonstrate a design defect in two ways. Under the consumer-expectations test, a product is defective if it "is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So.3d 489, 503 (Fla. 2015). Under the risk-utility test, a product is defective if "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design," and "the omission of the alternative design renders the product not reasonably safe." *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1351 (11th Cir. 2023). Unlike the risk-utility test, "the consumer expectations test"—"the default under Florida law"—does not "require[] that the plaintiff prove a 'reasonable alternative design.'" *Id.*[2]

Plaintiffs' evidence satisfies both tests. Tesla's marketing created inaccurate consumer expectations, and its product failed to perform in line with those expectations—thereby creating a foreseeable risk of harm that could have been avoided by

[2] As Tesla tacitly admits, because "the jury rendered a general verdict," plaintiffs need to "show evidence … only as to one" of their design defects to defeat Tesla's request for judgment as a matter of law. *Fin. Info. Techs., LLC*, 21 F.4th at 1272; *see Cabello v. Fernández-Larios*, 402 F.3d 1148, 1160 (11th Cir. 2005) (per curiam) (same). While all three theories were supported by sufficient evidence, the Court need only hold that the evidence supported any design-defect theory.

better design choices. Tesla's contrary arguments find no support in the record or Florida law.

*a. Tesla set false consumer expectations.*

"The consumer expectations test … focuses on the expectations that a manufacturer creates." *Aubin*, 177 So.3d at 511. This aspect of the test is "based on an objective standard and not the viewpoint of any particular consumer." *Liggett Grp., Inc. v. Davis*, 973 So.2d 467, 475 (Fla. Dist. Ct. App. 2007). Much of the evidence at trial concerned how Tesla set sky-high expectations relative to Autopilot's actual capabilities.

That evidence starts with Tesla's decision to name Autopilot. The jury heard from an expert that use of the term Autopilot "engenders a lot more confidence, inappropriate confidence, in the car." Dkt.577.at.40. It also learned that "[p]eer vehicles generally use more conservative terminology like 'assist,' 'sense,' or 'team.'" Dkt.542-12.at.6.

Tesla's marketing amplified the expectation that Autopilot could automatically pilot a Tesla vehicle without human input. In 2016, Musk claimed that the "Model S and Model X, at this point, can drive autonomously with greater safety than a person." Dkt.576.at.146-47. Musk also boasted that a Tesla would be able to brake for an object "both when Autopilot is active and when it's not active." Dkt.576.at.149. In the same year, Tesla released an advertising video—called the

"Paint It Black" video—which claimed: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." Dkt.576.at.154.

The jury heard that Tesla's claims were false. Tesla's corporate representative admitted—at least five times—that when these statements were made, Tesla had no evidence that Autopilot was safer than a human driver. Dkt.575.at.242-43. Even the Tesla in the Paint It Black video was involved in "an accident in the filming" of that ad. Dkt.576.at.156-57.

In addition to misrepresenting Autopilot's capabilities, Tesla misrepresented data about Autopilot's safety. The jury heard that a safety report on Tesla's website claimed that use of Autopilot led to "a 40 percent reduction in crashes." Dkt.575.at.178-79. But as one expert explained, that number was grossly exaggerated: Among other problems, it failed to control for the fact that Autopilot is typically used in "more favorable driving conditions," such as highway driving. Dkt.575.at.176-77, 182. After plaintiffs' expert controlled the data for confounding factors, Tesla vehicles actually had a *higher* crash rate than non-Tesla vehicles. Dkt.575.at.190. The jury also heard expert testimony that "data from all of Tesla's peers" demonstrated that Tesla "stood alone" in the industry for its "high number of [frontal] crashes." Dkt.577.at.17-18. Indeed, the jury learned during Tesla's case

that the company's own data showed that Autopilot was "at fault" in "[s]ix percent of collisions" for which Tesla received data. Dkt.585.at.99; Dkt.542-17.at.1.

Finally, the jury heard—including in testimony by Tesla's expert witness—that regulators and researchers agreed that Tesla's choices led to overconfidence in Autopilot. Analyzing Tesla models dated from 2012 to 2023, NHTSA explained that while "Autopilot invited greater driver confidence" than the technology of Tesla's peers, "Autopilot controls did not sufficiently ensure driver attention and appropriate use"—resulting in a "mismatch" between how easily drivers can use Autopilot and the safeguards needed to limit that use. Dkt.542-11.at.1-2; *see* Dkt.577.at.18-19. And the jury learned that even Tesla's expert had written an article describing how Tesla drivers experience a "critical mismatch between the driver's expectations and understanding of what his role should be in the automated vehicle and the vehicle's requirements for driver oversight and intervention." Dkt.586.at.18.

*b. McGee's Tesla had three specific design defects.*

The jury also heard that—particularly given Tesla's exaggerations about Autopilot's capabilities—Tesla should have taken three steps to improve its vehicles' safety.

**Operational Design Domain.** The jury heard expert testimony that "Tesla's Autopilot is defective because Tesla knowingly allows the car to be operated in

operational domains for which it is explicitly not designed." Dkt.576.at.32. McGee's Tesla included an Owner's Manual that stated that Autopilot was intended "for driving on dry, straight roads, such as highways and freeways." Dkt.542-10.at.83; *see* Dkt.576.at.37. Card Sound Road, where this fatal collision occurred, is outside of that operational design domain because "it's not a limited access road-way" and has "intersections," "stop signs," "pedestrians," "cross traffic," and "lim-ited sight distance." Dkt.577.at.144-45. Put simply, Card Sound Road was a "very poor place[] to use Autopilot." Dkt.577.at.143.

But Tesla chose not to restrict Autopilot's use to roads where it assessed the technology was safe. Tesla had that capability: As one expert testified, the vehicle possessed GPS data and so "absolutely has the ability to determine what kind of road it's on before Autopilot is engaged"; Tesla could have prevented Autopilot use on inappropriate roads through a mere "software change." Dkt.577.at.146-47. Tesla knew of the problem: In 2016, NHTSA issued "findings of fact" that a Tesla in-volved in a fatal crash was "operating in an operational design domain which it was explicitly not supposed to be operated in per the Owner's Manual." Dkt.576.at.34. And Tesla's competitor had adopted this technology: Cadillac used basic GPS tech-nology to implement "geofencing," ensuring that drivers were "on the roads that have been pre-mapped and approved for use" of its assisted-driving product.

Dkt.576.at.57. Nevertheless, Tesla declined to implement this safety feature—"as a way," an expert testified, "to sell more cars." Dkt.576.at.58.

Given Tesla's representations about Autopilot's ability to sense objects and navigate them safely, *see supra* at 13-15, the jury could reasonably conclude that consumers would expect Tesla to disable Autopilot when a vehicle recognizes in real time that it is on a road unsuitable for such use. Similarly, the jury could have concluded that geofencing was a reasonable alternative design—as used by Cadillac—and that the absence of the feature rendered the product unsafe. Either way, the jury had enough evidence that Tesla's failure to limit Autopilot to its operational design domain was defective.

**Driver-Monitoring System.** The jury also heard evidence that "the Tesla driver monitoring system is simply not sufficient at keeping the driver engaged." Dkt.576.at.33. Tesla allowed a driver to continue to use Autopilot as long as the driver kept "holding the steering wheel," Dkt.576.at.92; but an expert opined that "measuring steering wheel torque is not a good proxy or substitute for measuring driver awareness" because "[s]omeone's hand on the wheel does not mean that they're monitoring the roadway ahead," Dkt.577.at.133. That was all too true here, where McGee had his hands on the wheel for a full 20 seconds before the crash—but was paying no attention to the road. Dkt.577.at.104-05. A different expert described that Tesla would give only "a visual warning" when users were not holding

the wheel and that "[t]here's no audio alert that comes with it, which is a big no-no in the world of user design." Dkt.576.at.92. And although drivers receive a "strikeout" (temporarily disengaging Autopilot) after ignoring three warnings, the jury heard that Tesla did not do enough to prevent misuse of Autopilot by repeat offenders—like McGee—because those "strikeout[s]" were "minor inconven-ience[s]" that simply required a driver "to pull over, put it in park, put it back in drive, and continue on." Dkt.577.at.155. Musk himself acknowledged that "expe-rienced" Tesla drivers would "continuously ignore[]" such warnings. Dkt.576.at.128.

The experts' testimony matched NHTSA's report, which concluded that Tesla's driver-monitoring system "did not sufficiently ensure driver attention and appropriate use" and thereby fostered "driver disengagement from the driving task." Dkt.542-11.at.2; *see* Dkt.577.at.18-19. The NHTSA report also explained that based on a "peer analysis," Tesla "invited greater driver confidence via its higher control authority and ease of engagement." Dkt.542-11.at.2; *see* Dkt.577.at.39. "Tesla's weak driver engagement system was not appropriate for Autopilot's permissive op-erating capabilities," NHTSA concluded, and that mismatch "resulted in a critical safety gap between drivers' expectations of the L2 system's operating capabilities and the system's true capabilities." Dkt.542-11.at.2. The jury also learned that after NHTSA reviewed these findings with Tesla, Tesla filed its own report ("applicable

to all Tesla models" with Autopilot) stating that "the prominence and scope of the system's controls may be insufficient to prevent driver misuse," Dkt.542-11.at.2—in other words, "Tesla agreed" with NHTSA that Autopilot's driver monitoring was defective, Dkt.577.at.19.

The jury also heard about safer alternatives. To avoid damaging evidence of a recall, Tesla stipulated that "[p]rior to 2019," it "was feasible" to incorporate additional monitoring-related measures—including "controls and alerts to the driver to keep their hands on the steering wheel" and to "improve suspension of Autopilot if the driver repeatedly fails" to pay attention. Dkt.582.at.19; *see* Dkt.587.at.21. And several of Tesla's competitors used "a camera that looks at the driver to … make sure that they know the driver is ready to take over at any time." Dkt.576.at.56; *see* Dkt.585.at.234.

Presented with this evidence, the jury easily could have found liability. NHTSA's conclusion that Tesla created a "critical safety gap" between expectations and reality succinctly encapsulates the consumer-expectations test. And as to the risk-utility test, Tesla's stipulation effectively conceded that safer alternatives existed, and the experts' testimony demonstrated why Tesla's flawed driver-monitoring system was unsafe.

**Forward Collision Warning and Automatic Emergency Braking.** Finally, the jury heard substantial evidence that the Tesla vehicle should have braked—or at

least warned McGee—as it hurtled toward the parked car. As to automatic braking, nearly three years before the crash, Musk stated Tesla vehicles already had hardware to "detect … and initiate a braking event" for "anything large or anything metallic or anything that's dense," regardless of whether Autopilot is on. Dkt.576.at.149-51. At trial, Tesla's corporate representative confirmed that "the vehicle gets confirmation that there is something dense in front of it in the roadway" and so "has capabilities … to perform a braking maneuver." Dkt.585.at.124. The Owner's Manual likewise stated that the Tesla would monitor for objects within 525 feet of its path and that "[w]hen a frontal collision is considered unavoidable, Automatic Emergency Braking is designed to apply the brakes to reduce the severity of the impact." Dkt.542-10.at.103-04.

In this fatal crash, Tesla's technology did not live up to these representations. McGee's Tesla did not automatically brake—even though, as one expert put it, this case presented a "perfect application" of Tesla's supposed braking technology. Dkt.578.at.156. And the jury heard that, based on the crash data, the car did not issue a forward collision warning despite identifying the parked SUV. Dkt.576.at.94-95; Dkt.577.at.186-87; *see* Dkt.579.at.58 (McGee did not recall any warning).[3] The jury also heard—from Tesla's own witness—that other cars issued

---

[3] Tesla contends that McGee received a warning "1.5 seconds before impact." Br. 9. But that contention is contradicted by testimony. Dkt.576.at.94-95 (one expert testifying that there was no frontal collision warning more than a second before

a warning prior to impact during testing in an environment meant to mirror Card Sound Road. Dkt.586.at.181-82. Under any conception of design defect, a reasonable jury could have found that the Tesla vehicle should have braked or warned as advertised.

c. *Tesla's contrary arguments defy the record and the law.*

Tesla's contrary arguments suffer from three interrelated flaws: It entirely ignores critical evidence; it seeks to relitigate factual arguments that the jury rejected; and it insists that it is not liable for reasons that Florida law rejects.

Tesla fails to engage with the extensive testimony that it created unrealistic consumer expectations. Tesla insists, for example, that "no ordinary consumer would have expected that McGee's car would do what no car in existence could do"—"namely, automatically brake and prevent the collision here." Br. 28. But, as the jury heard, Tesla chose to tell customers that Tesla vehicles would automatically brake. Tesla cannot inflate consumer expectations and then complain that those expectations are unrealistic.

Tesla's inability to address its false representations also defeats its rhetoric that it is being held liable for "failing to anticipate the future." Br. 3. Under the

---

impact); Dkt.577.at.186-87 (another expert testifying that "Autopilot did not warn Mr. McGee of anything in approximately the 20 seconds before this crash"). And the testimony Tesla cites was from a witness who admitted that he had not reviewed the subsequently revealed crash data, which confirmed that the Tesla did not issue a warning. *See* Dkt.585.at.41-42; *infra* at 34-35.

consumer-expectations test, liability is bounded by real-world expectations (just like liability under the risk-utility test is bounded by real-world alternative designs). It was only Tesla's sky-high promises that fostered the expectations Tesla now claims that no company can meet. Thus, this case is not about punishing innovative companies—it is about the principle that Tesla's actions and words have consequences for the company, just as they had consequences for Benavides and Angulo.

Next, Tesla relaunches a barrage of factual assertions that it made, unsuccessfully, to the jury. As to the operational design domain, Tesla insists that "Autopilot *could* be used safely on Card Sound Road" and that "[g]eofencing would therefore have undercut safety" by preventing use of Autopilot. Br. 24. The jury was entitled to disagree given the expert testimony, NHTSA's findings, and the statements in the Owner's Manual. Tesla also relies on "the Society of Automotive Engineers" to argue that geofencing is inappropriate, *id.* at 22, while neglecting to mention that the document it quotes is intended to be "descriptive and informative rather than normative," Dkt.542-30.at.1. And Tesla complains that Cadillac used a distinct "hands-free system," Br. 23, but a jury was entitled to conclude that this distinction made no difference.

As to the driver-monitoring system, Tesla has even less to say. It insists that "hands-on-wheel detection" was "safe," ignoring the contrary evidence. Br. 25; *see supra* at 17-19. Seeking to downplay NHTSA's damning conclusions, Tesla claims

that the investigation occurred "five years after the collision here," Br. 26—but the report studied "all Tesla models and hardware versions," including McGee's model. Dkt.542-11.at.2; *see* Dkt.576.at.161. Indeed, Tesla itself previously filed a report "applicable to all Tesla models" with Autopilot admitting that its driver-monitoring system was defective. *See supra* at 18-19. Regardless, at trial, Tesla stipulated that it could have implemented certain monitoring-related improvements "[p]rior to 2019, and the manufacture of [McGee's] Tesla Model S, across all makes and models of Tesla vehicles." Dkt.582.at.19; *see* Dkt.587.at.21. And while Tesla attempts to distinguish between technologies that would address "driver *passivity*" versus "extreme aggressiveness," Br. 26, the jury was entitled to find that distinction irrelevant here, where all agree that "McGee was distracted," *id.* at 8; *see* Dkt.574.at.216, suggesting that better monitoring could have avoided the crash.

As to braking and warning, Tesla again ignores the unfavorable aspects of the trial record. It complains that "no car" would have braked in this scenario, Br. 26-27—but under the consumer-expectations test, the jury was entitled to take seriously Musk's and the Owner's Manual's statements that a Tesla would brake. Tesla is also noticeably silent about forward collision warnings, no doubt because it told drivers that its vehicles would issue such warnings, Dkt.542-10.at.103, and because its expert conducted tests demonstrating that other cars issued warnings before

impact, Dkt.586.at.181-82. Finally, whether a car would be safer with different technology, *see* Br. 27-28, was also a factual issue for the jury.

Ultimately, Tesla's arguments reduce to a mantra that the company cannot be liable because it complied with "industry standard[s]" and offered "state-of-the-art technology." Br. 22-23. But both that premise and conclusion are incorrect. Cadillac, Subaru, and Mercedes all had vehicles that lacked a relevant design defect, and NHTSA (echoed by expert testimony) described Tesla as an "industry outlier" that was unlike its "peer[s]" in unduly fostering "greater driver confidence" in Autopilot. *See* Dkt.542-11.at.2; Dkt.542-12.at.6.

Moreover, "[o]n the facts of this case, the jury was not required to rule in [Tesla's] favor based on the 'state of the art' evidence offered." *Norton v. Snapper Power Equip., Div. of Fuqua Indus., Inc.*, 806 F.2d 1545, 1549 (11th Cir. 1987). Florida law makes plain that, so long as there is evidence that a safer design "was indeed feasible," whether that design has "been actually adopted by any … manufacturer is of little or no significance." *Sta-Rite Indus., Inc. v. Levey*, 909 So.2d 901, 904 n.4 (Fla. Dist. Ct. App. 2004); *see Jackson v. H.L. Bouton Co., Inc.*, 630 So.2d 1173, 1175 (Fla. Dist. Ct. App. 1994). And again, Tesla's advertising inflated consumer expectations beyond any of its peers. *See supra* at 13-15. The jury was entitled to find that Tesla's uniquely aggressive claims about Autopilot obligated the company to design its products to meet the expectations those claims engendered.

Finally, Tesla diminishes its credibility when it repeatedly urges that *Tesla, Inc. v. Banner*, 411 So.3d 1 (Fla. Dist. Ct. App. 2025), which also involved an Autopilot-related collision, bears on the liability inquiry. *See* Br. 20-23, 25, 28, 34, 36. As explained below, *Banner* was decided in a different posture on a different factual record, and so is wholly irrelevant. *See infra* at 47-48. But even setting those differences aside, *Banner*'s sole holding was that the plaintiff should not be permitted "to seek punitive damages." 411 So.3d at 5. *Banner* never addressed the viability of a design-defect claim and certainly did not preclude liability on the facts adduced at this trial.

### 2. *A reasonable jury could find that Tesla's design defects caused plaintiffs' injury.*

Continuing to relitigate its jury arguments, Tesla next claims (at 29-32) that the collision was caused solely by McGee and not Tesla. The jury concluded differently, assigning 67% of the fault to McGee and 33% to Tesla. Dkt.588.at.14. That apportionment was supported by the evidence and is consistent with Florida law.

"The evidence at trial was unequivocal," Br. 29—but not in the way that Tesla suggests. The jury heard testimony that the fatal crash would not have occurred but for Autopilot's unreasonable consumer expectations and accompanying design defects. Some of that evidence came from McGee, who researched Tesla's "autonomous technology" and the "features of the car," including by visiting Tesla's website, before purchasing his vehicle. Dkt.579.at.36-37. McGee testified that he

"trusted the technology too much" to serve as a "copilot"—and that he would not "have taken [his] eyes off the road … had [he] not been driving a Tesla on Autopilot." Dkt.579.at.51, 60, 116. Experts likewise explained that "[i]f Tesla had prevented Autopilot use outside of its [operational design domain], this crash would not have happened," as McGee would have acted differently had he been unable to engage Autopilot on Card Sound Road. Dkt.577.at.148-49.

The jury also could have determined that a less "permissive" driver-monitoring system would have prevented McGee's overreliance on Autopilot. McGee typically reacted to audible chimes within 1 to 1.3 seconds, and the jury heard that if his Tesla had warned as promised or the way other vehicles did, McGee "could have braked and avoided the crash completely." Dkt.578.at.16. Accordingly, the jury could have easily concluded that had Tesla not designed and marketed its vehicles to unjustifiably foster "greater driver confidence" than its peers, Dkt.542-11.at.2, McGee would have made different choices on Card Sound Road. Indeed, Tesla's expert was cross-examined on his prior writing that "[c]onsumers exhibit too much trust when interacting with the systems" and "expect that they do not need to be as vigilant." Dkt.586.at.20; *see* Dkt.586.at.21-24 (similar testimony). Thus, the question is not whether a different vehicle "could have prevented a collision under the circumstances here," Br. 31—it is whether Tesla's inaccurate statements about Autopilot caused the circumstances here in the first place.

Tesla's argument fares no better under the frame of "proximate causation." Br. 30. "Issues of proximate and intervening cause generally present jury questions[.]" *Pamperin v. Interlake Cos., Inc.*, 634 So.2d 1137, 1139 (Fla. Dist. Ct. App. 1994) (per curiam). And while Tesla suggests that McGee's "misconduct" negates proximate cause, Br. 30, this Court has held otherwise: "Florida law does not suggest that misuse will 'negate liability'"; instead, "misuse is simply to be considered as part of the comparative fault calculus." *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 979 F.2d 823, 826 (11th Cir. 1992). Where the alleged misuse does not rise to the level of "knowing misuse," a manufacturer cannot escape liability based on foreseeable misuse. *Id.* at 826 & n.11.

Tesla's cited authorities are irrelevant because they all relate to knowing or "intentional[] misuse[]" of a product. Br. 32. Under Florida law, "for strict liability to apply to the manufacturer, the product must have been used for the purpose intended." *Grieco v. Daiho Sangyo, Inc.*, 344 So.3d 11, 18 (Fla. Dist. Ct. App. 2022). Thus, there is no strict liability where a driver intentionally consumes a chemical marked "[n]ot for human consumption," *DZE Corp. v. Vickers*, 299 So.3d 538, 539 (Fla. Dist. Ct. App. 2020), or where a user "inhale[s]" a gas dusting spray "for its unintended side-effects," *Grieco*, 344 So.3d at 15, 19. But neither the evidence nor the arguments in this case relate to intentional misuse for an unintended purpose: Tesla's affirmative defense at trial was that "McGee was negligent," not intentional,

"in the operation and use of his 2019 Tesla Model S." Dkt.587.at.25. And on appeal, Tesla likewise recognizes that McGee was ultimately a "distracted," "reckless" driver who was using his Tesla for his routine "commute." Br. 1, 8. The jury was entitled to conclude that McGee used his Tesla for exactly the purpose Tesla intended.

### B. The evidence was sufficient for the jury to find that Tesla failed to warn.

Tesla also ignores the evidence (at 32-37) in seeking judgment as a matter of law on plaintiffs' failure-to-warn claim. The jury heard sufficient evidence that Tesla had a duty to warn, that Tesla provided inadequate warnings, and that Tesla's inadequacy was a cause of the collision here. *See Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321 (11th Cir. 2017).

*First*, Tesla had a duty to warn. Tesla attacks a strawman, claiming that plaintiffs expected it to warn about the risk of *any* car "speeding through a stop sign and T-intersection in the dark while looking down for a lost phone." Br. 33-34. That is incorrect: Plaintiffs' failure-to-warn theory is that Tesla had a duty to warn about the specific risk of overreliance on Autopilot, as such overreliance could (and did) result in serious injury. *See* Dkt.205.¶¶133-35. Or, as the district court put it, "the appropriate inquiry is not whether driving distracted is an obvious danger. Rather, the question is whether the dangers of using and relying on driver assistance technology, specifically Tesla's Autopilot system, to avoid a collision is an obvious danger[.]"

Dkt.428.at.79. That theory is consistent with Florida law, which holds that a "manufacturer has a duty to warn where its product is inherently dangerous or has dangerous propensities." *Grieco*, 344 So.3d at 20.

*Second*, a reasonable jury could find that Tesla's warnings were inadequate. "[W]hether warnings were adequate is generally a question for the jury." *Suzuki Motor Corp. v. Winckler*, 434 So.3d 104, 111 (Fla. Dist. Ct. App. 2026). And the jury had substantial evidence to conclude that Tesla failed to adequately warn of its technology's defects.

Start with Tesla's Owner's Manual. As Tesla explains, the company's argument at trial was that it was standard for a vehicle not to recognize and brake or warn for anything other than in-lane vehicles. *See* Br. 13, 26-27. But the jury heard testimony—from Tesla's own witness—that the Owner's Manual does "not contain[]" any "verbiage" about the "limitations of AEB [automatic emergency braking] and FCW [forward collision warning] being in-lane, in-path." Dkt.585.at.36-37; *see* Dkt.576.at.107. In other words, the jury heard that the Owner's Manual says nothing to drivers about the limitations on braking or warning that Tesla stressed at trial. As another example, the Manual did not convey that automatic braking has difficulty operating at night. Dkt.576.at.105. The Manual's shortcomings are unsurprising

given Musk's stated view that "[a]ny product that needs a manual to work is broken." Dkt.581.at.160.[4]

The jury also heard that the Tesla's in-car warnings related to driver attention were inadequate. As explained earlier, Tesla could have included additional "alerts to the driver to keep their hands on the steering wheel and pay attention" but failed to do so. Dkt.582.at.19; Dkt.587.at.21. The jury also learned that the Tesla's lack of an "audio alert" after it detects driver inattention is a "big no-no in the world of user design." Dkt.576.at.92. And NHTSA determined that "Autopilot's … warnings were insufficient for a driver assistance system that requires constant supervision." Dkt.542-11.at.3. Once again, Tesla was entitled to present its version of events about the in-car warnings McGee received, *see* Br. 35-36, but the jury was also entitled to reject that version, *see supra* at 17-19.

*Finally*, the jury could have concluded that the inadequate warnings proximately caused the crash. Tesla simply asserts that McGee disregarded in-car warnings, but the jury heard that McGee typically reacted to audible chimes and "could have braked and avoided the crash" if one had issued here. Dkt.578.at.16. As to the Owner's Manual, Tesla faults McGee (at 36-37) for not reading the Manual, but a

[4] Rewriting the trial evidence, Tesla claims that its Owner's Manual warns drivers that the Tesla "could not prevent collisions with out-of-lane objects." Br. 35. But the cited language simply stated that automatic braking "is designed to reduce the impact of a frontal collision only and does not function when Model S is in reverse." Dkt.585.at.163. That language says nothing about "out-of-lane" objects.

warning may "be defective … as a result of its location and the manner in which the warning is conveyed." *Brown v. Glade & Grove Supply, Inc.*, 647 So.2d 1033, 1035 (Fla. Dist. Ct. App. 1994). Here, there was testimony that it was "incredibly difficult for a user to recognize" how to access the Manual, that it was the "seventh item down in [a] list" that a user had to scroll through to reach, and that Tesla neither instructs customers about Autopilot at dealerships nor even gives a paper copy of the Manual to drivers. Dkt.576.at.41-43.

Tesla's authorities on proximate cause are thus off-point. Tesla claims that "Florida law provides that when a party 'has not read the warning, an inadequate warning cannot be the proximate cause of the plaintiff's injuries.'" Br. 36 (quoting *Lopez v. S. Coatings, Inc.*, 580 So.2d 864, 865 (Fla. Dist. Ct. App. 1991)). But Florida law permits failure-to-warn claims where, as with the Owner's Manual, "the very nature of the alleged breach is such that it causes a potential plaintiff to fail to read the warning which causes his injury." *Stanley Indus., Inc. v. W.M. Barr & Co., Inc.*, 784 F. Supp. 1570, 1574-75 (S.D. Fla. 1992) (distinguishing *Lopez*). Because "one who does not warn with the urgency and intensity deemed required under the circumstances cannot say that failure would have made no difference," Tesla's proximate-cause arguments fail. *Sta-Rite*, 909 So.2d at 905-06; *see Munoz ex rel. Munoz v. S. Miami Hosp.*, 764 So.2d 854, 857 (Fla. Dist. Ct. App. 2000) (similar).

## II. THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT ABUSES OF DISCRETION.

Tesla fares no better (at 37-44) in seeking to identify evidentiary errors. On appeal, a court "review[s] the district court's evidentiary rulings for abuse of discretion." *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004). This Court "will affirm a district court's evidentiary ruling unless the district court has made a clear error of judgment or has applied an incorrect legal standard." *Id.* And "[e]ven if a district court abuses its discretion," any "evidentiary error must still rise above the threshold of harmless error to warrant reversal." *Ermini v. Scott*, 937 F.3d 1329, 1343 (11th Cir. 2019). The "party asserting" error bears the "burden of proving that an error was not harmless." *Id.*

### A. Evidence that Tesla withheld and sought to delete crash data was admissible.

The district court properly admitted evidence that Tesla "attempt[ed] to withhold and destroy crucial evidence" about this fatal crash. Dkt.405.at.9. As the district court explained in an order granting "monetary sanctions" against Tesla, when a crash involving a Tesla occurs, a "snapshot package" of data is normally transmitted from the vehicle to Tesla's servers to help determine the cause of the crash. Dkt.405.at.2-3, 15 n.6; *see* Dkt.583.at.23. Tesla's position was that "the file was somehow deleted," such that it could not access critical data from the crash. Dkt.583.at.31-32. But as Tesla was later forced to admit, that claim was false:

Plaintiffs obtained the Autopilot data themselves in October 2024 by hiring their own consultant—who, in addition to extracting the allegedly unavailable data, confirmed that "the data was transferred … to Tesla's servers on the night of the collision, and the Tesla servers did confirm receipt of that data." Dkt.583.at.19-24. Tesla's own employee was thus forced to admit that it was "much more likely that somebody at Tesla took an affirmative action to delete" the crash data. Dkt.581.at.199.

Tesla's withholding of the data, had it succeeded, would have been consequential to the trial. The data allowed plaintiffs to show the jury an "augmented video" that revealed that the Tesla saw Angulo, his SUV, and the end of the road in the moments before the crash, Dkt.576.at.81, as shown on the following page (Dkt.542-8.at.88). And the crash data contained evidence that McGee's Tesla never issued a forward collision warning before the crash. *See supra* at 20 & n.3. Tesla's withholding of the data also impeded NHTSA's and the State's efforts to investigate the crash—indeed, at trial, the Florida Highway Patrol investigator handling the crash explained that Tesla had not been "cooperative" with respect to the state investigation. Dkt.575.at.152. In fact, evidence showed that a Tesla employee who had never previously "been involved in retrieving vehicle data" falsely told the investigator "that the file was corrupted." Dkt.575.at.67; Dkt.579.at.9-10.




Unable to explain its misconduct, Tesla urges that its attempts to withhold and delete the data should have been hidden from the jury. That argument is wrong for multiple reasons.

As the district court correctly held, evidence about how and why plaintiffs finally obtained this data over five years after the crash occurred gave critical context for the jury to resolve dueling factual narratives from both sides' witnesses. Plaintiffs' experts incorporated this new data—which provided more authoritative data about the crash—in their analyses. Dkt.576.at.95-102; Dkt.577.at.181-89. But each of Tesla's four witnesses refused to examine or fully account for the new data,

Dkt.584.at.38-40; Dkt.585.at.41-42, 169; Dkt.586.at.26, 173-76, resulting in conflicting accounts at trial. For example, the parties hotly contested whether the vehicle issued a warning shortly before the crash. *See supra* at 20 & n.3. With the benefit of the new data, two of plaintiffs' experts testified at trial that no such warning issued. Dkt.576.at.94-95; Dkt.577.at.186-87. And while Tesla's accident reconstructionist suggested otherwise, Dkt.583.at.147-48, he admitted that his statement did not account for the new data, Dkt.584.at.39. Similar exchanges occurred with Tesla's three other witnesses, who admitted that their opinions did not consider the new data. *See* Dkt.585.at.41-42, 169; Dkt.586.at.26, 173-76.

Critically, evidence about Tesla's continued resistance to producing the data was necessary to explain why the jury should credit plaintiffs' version of events. Without that background, the jury would have lacked a persuasive explanation for the surprising fact that plaintiffs obtained authoritative data about the crash that Tesla—the entity that generated that data—continued to ignore. Thus, as the district court put it, testimony by "several of … the Defendant's witnesses" was "undercut by the fact they incorrectly concluded that the data was not available," such that their testimony was based on "data [that] was different than what the actual data … revealed." Dkt.587.at.6, 14. The district court therefore properly exercised its discretion in concluding that the data-handling evidence "could assist the jury" in making "credibility determination[s]" and in resolving "different accounts of the

circumstances" of the crash. *Arnold Rogers v. City of Orlando*, 660 F. App'x 819, 828 (11th Cir. 2016) (per curiam); *see Michelin Tire Corp. v. Milbrook*, 799 So.2d 248, 251 (Fla. Dist. Ct. App. 2001) (rejecting a defendant's argument that the trial court improperly allowed evidence about its "destruction of the records" in a strict-liability case because that evidence explained why a witness "had no documentary basis for [his] argument").[5]

To the extent that Tesla now complains that the district court permitted too much testimony on the topic, *see* Br. 38-40, the "district court is uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like probativeness and prejudice." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011). Tesla did not even raise a Rule 403 objection at trial, subjecting this argument to plain-error review. *See United States v. Walther*, 867 F.2d 1334, 1343-44 (11th Cir. 1989). And some of the testimony was admitted only because Tesla raised the data-disclosure issue itself when questioning plaintiffs' witnesses, including by asking about plaintiffs' efforts to obtain Autopilot data in this case. *See* Dkt.577.at.102, 117-19; Dkt.578.at.122, 138, 146-47. Tesla thus "open[ed] the door" to the issue and rendered it "subject to full interrogation." *Conroy*, 375 F.3d at 1232.

[5] Contrary to Tesla's suggestion, plaintiffs have always maintained (apart from one instance where counsel "misspoke," *see* Dkt.602.at.25 n.9) that this evidence is relevant to liability. *See* Dkt.469.at.4-5; Dkt.587.at.13.

In addition, this evidence was relevant and admissible to show Tesla's consciousness that its products were defective. The rule has long been that "falsehood or other fraud in the preparation and presentation of [a party's] cause … is receivable against him as an indication of [its] consciousness that [its] case is a weak or unfounded one." *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 921-22 (3d Cir. 1985) (quoting 2 John Wigmore, *Evidence in Trials at Common Law* § 278(2) (rev. ed. 1979)); *see* Dkt.602.at.25-26 (collecting cases).[6] While Tesla posits that this doctrine is irrelevant because "[p]roduct-defect claims have no *mens rea* requirement," Br. 39, the case law has never drawn that distinction, which is why Tesla cites no authority to support its theory.

Independently, Florida law makes the evidence relevant and admissible for punitive damages. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285 (11th Cir. 2008) (no abuse of discretion when evidence is "otherwise admissible" for alternative reasons). The "attitude and conduct of [the defendant] upon discovery of the misconduct"—that is, the defendant's consciousness of guilt—matters to the

---

[6] Tesla is incorrect that the district court conclusively determined at the sanctions stage that Tesla's actions were not "willful[]" or "deliberate[]." Br. 38. The district court explicitly recognized "from the beginning of th[e] trial" that its sanctions holding did not control "the jury's factual finding[s]." Dkt.582.at.15-16; *see, e.g.*, *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1334 (S.D. Fla. 2010) (denying motion for sanctions but acknowledging "the possibility that the plaintiff will be able to introduce evidence of the defendant's failure to retain relevant documents at trial").

punitive-damages inquiry. *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 485, 487 (Fla. 1999). Thus, "[e]vidence of concealment of offensive conduct after it initially occurred is indicative of malice or evil intent sufficient to support punitive damages." *Gen. Motors Corp. v. McGee*, 837 So.2d 1010, 1035 (Fla. Dist. Ct. App. 2002). Here, the snapshot data provided a "treasure trove of how this crash happened," Dkt.577.at.181, showing Tesla's failure to deliver on its promises. Tesla's resistance to turning over that data thus bears on the reprehensibility of its conduct. *See Bogle v. McClure*, 332 F.3d 1347, 1361 (11th Cir. 2003).

Regardless, any alleged error was "harmless because substantial, permissible evidence produced at trial supports the jury's verdict." *S. Grande View Dev. Co., Inc. v. City of Alabaster*, 1 F.4th 1299, 1313 (11th Cir. 2021). Although Tesla's data deletion could have prevented plaintiffs from obtaining the critical snapshot data, that data—along with the other evidence of Tesla's defective design and warning choices—supports the verdict independently from Tesla's efforts to erase it. Tesla thus has not carried its "burden of proving that an[y] error was not harmless." *Ermini*, 937 F.3d at 1343.

### B. Evidence about Tesla's prior crashes was admissible.

Tesla also errs in protesting (at 40-42) the admission of prior crashes involving Autopilot. As Tesla recognizes, in products-liability cases, evidence of previous incidents is admissible when they are "similar enough" to "allow the jury to draw a

reasonable inference" regarding the defendant's knowledge of or ability to foresee the incident at issue. *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023). The district court correctly applied that standard. Tesla now concedes that the district court was correct in the most significant similarity ruling: the admission of evidence about the "Kanagawa, Banner, and Brown" crashes that plaintiffs emphasized in closing arguments. Dkt.587.at.109; *see* Br. 41. And Tesla identifies no abuse of discretion in admitting two other categories of crash evidence that played only minor parts in the trial.

*First*, the district court did not abuse its discretion in admitting evidence of multiple prior accidents discussed in the NHTSA report "for the limited purpose of showing [Tesla's] notice." Dkt.486.at.13-16. The district court found that in "every prior accident" discussed in the report, there was "a collision with an object directly in the travel path of the Tesla, resulting from driver inattention while using Autopilot." Dkt.486.at.13-14. Tesla does not dispute those facts or argue that those facts fail to demonstrate substantial similarity. Instead, it asserts (at 41-42) that the district court erroneously admitted those incidents under a "relaxed" substantial-similarity test. But the case that Tesla cites confirms that "substantial similarity doctrine does not require identical circumstances," but rather "allows for some play in the joints depending on the scenario presented and the desired use of the evidence." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287 (11th Cir. 2015). The essential

question is whether, under the circumstances of the case, the jury could draw a "reasonable inference" about Tesla's awareness from the evidence of prior incidents. *Henderson*, 72 F.4th at 1243.

*Second*, the district court did not abuse its discretion by admitting Tesla's eight responses to plaintiffs' requests for admission that described prior accidents. Br. 41 (citing Dkt.486.at.13). As Tesla recognizes, "[a] matter admitted" by defendant in response to a request for admissions "is conclusively established" unless withdrawn or amended. Fed. R. Civ. P. 36(b). The district court accordingly permitted plaintiffs' counsel to read those admissions to the jury verbatim, including Tesla's objections to the form of each request. Dkt.582.at.20-25. The transcript separately makes clear that those eight accidents were substantially similar to plaintiffs' accident because each involved a Tesla colliding with an object while operating with Autopilot engaged. *Id.*

Regardless, any error was harmless. Tesla cannot carry its burden to show that the jury would have reached a different verdict if this evidence had been excluded. After all, Tesla agrees that the jury properly heard about the Brown, Banner, and Kanagawa crashes, which consumed substantial trial time and were the only specific incidents mentioned in closing arguments. Tesla offers no reason to conclude that the other accidents swayed the jury's judgment.

### C. Musk's statements were admissible.

The district court likewise did not abuse its discretion in admitting certain statements by Elon Musk. *See* Br. 42-43. Florida's consumer-expectations test "focuses on the expectations that a manufacturer creates." *Aubin*, 177 So.3d at 511. As Tesla's CEO, Musk "play[ed] a pivotal role in crafting the image of a product and establishing the consumers' expectations for that product." *Id.* That was true regardless of whether McGee himself viewed those statements, because the test asks what the "ordinary consumer" would believe. *Id.* at 503.

Tesla apparently accepts that Musk's statements were admissible whenever they "help[ed] the jury understand" what "an ordinary consumer" expected from Autopilot. Br. 42 (quoting Dkt.433.at.34). And Tesla also agrees with the district court's legal ruling that "forward-looking or aspirational" statements were not admissible. Dkt.433.at.34. But Tesla complains that some of Musk's admitted statements fall on the "forward-looking" side of the line. Br. 43 (citing Dkt.576.at.147-48; Dkt.585.at.125-27, 129).

Tesla identifies no abuse of discretion in how the district court categorized the cited statements. Indeed, Tesla declines to quote those statements, presumably because they plainly were not aspirational. For example, the statement that the "Model S and Model X, at this point, can drive autonomously with greater safety than a person right now" is about Tesla's capabilities "now," not its aspirations.

Dkt.576.at.146-47. So is the statement that "all Tesla vehicles exiting the factory have the hardware necessary for Level 5 autonomy … the highest level of autonomy." Dkt.585.at.125-26. And so is the statement that Autopilot is "unequivocally safer than manually driven cars," such that it "would obviously be crazy to just turn off something that is preventing accidents." Dkt.585.at.126.

Finally, any error would be harmless. Given the volume of Musk's pronouncements about Autopilot's then-current capabilities, any admission of a stray aspirational comment would not have "substantially swayed" the jury. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).

## III. The Award of Punitive Damages Was Proper.

Tesla's final argument (at 44-57)—that the Court should eliminate or reduce the jury's punitive-damages award—is also meritless. "The decision whether to award punitive damages and the amount that should be awarded have traditionally been questions for the jury to determine." *Owens-Corning Fiberglas*, 749 So.2d at 486. Here, a wealth of evidence about Tesla's flawed development process and conscious disregard of the deadly consequences of Autopilot's defects supported the jury's verdict. And neither the federal Constitution nor Florida's statutory damages cap precludes the amount awarded.

**A. The jury had ample evidence to award punitive damages.**

Florida law makes punitive damages available if "the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). Gross negligence is defined as conduct that "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* § 768.72(2)(b). The question is whether the plaintiffs "presented sufficient evidence for a jury to find, based on clear and convincing evidence, that [Tesla] was grossly negligent." *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 597 (11th Cir. 2019); *see Valladares v. Bank of Am. Corp.*, 197 So.3d 1, 11 (Fla. 2016).

Contrary to Tesla's assertion, *see* Br. 45, courts routinely permit punitive-damages claims under this test in Florida products-liability cases "where the defendant had knowledge of a defective or dangerous condition and chose not to remedy the condition." *Est. of Miller v. Ford Motor Co.*, 2004 WL 7330563, at *3 (M.D. Fla. July 22, 2004) (quoting *Toyota Motor Co., Ltd. v. Moll*, 438 So.2d 192, 194 (Fla. Dist. Ct. App. 1983)); *see Sims v. BMW of N. Am. LLC*, 2025 WL 724047, at *2 (M.D. Fla. Mar. 5, 2025). For example, a Florida appellate court permitted a claim for punitive damages where the defendant "knew about" the defect in its tires "but delayed warning the public in order to protect its own financial interests."

*Holmes v. Bridgestone/Firestone, Inc.*, 891 So.2d 1188, 1191-92 (Fla. Dist. Ct. App. 2005). And this Court affirmed a punitive-damages award where there was evidence that a defendant "did not conduct sufficient product testing" and "knew of the relatively high rate of complications" but "concealed or materially understated those risks." *Taylor*, 940 F.3d at 598.

Here, the jury heard copious evidence that Tesla's conduct was grossly negligent under Florida law. That evidence covers two categories: Tesla's failures in the development and design of Autopilot, and its decision to continue selling defective cars despite knowing about the fatal consequences of those failures.

To start, the jury heard Tesla's corporate representative admit that Tesla was "unable to locate any documents" showing that Tesla "evaluated and considered data research and studies regarding driver complacency" when developing Autopilot. Dkt.576.at.111; *see* Dkt.576.at.116, 120. Only *after* Tesla released its vehicles did it consider data from "incidents"—*i.e.*, crashes—involving its "own cars," despite the availability of "hundreds of papers" that addressed driver attention. Dkt.576.at.111-12, 121.[7] One expert characterized Tesla's driver-complacency

[7] Tesla claims (at 48) that that witness's testimony showed that Tesla did conduct relevant studies. But Tesla's two cited pages illustrate the relevant testimony's inscrutability. For example, when asked if Tesla evaluated driver-monitoring methods, the witness responded: "The testing that—or the evaluation that I'm aware of is just evaluating on the—like, evaluations with the—evaluations of the overall system with the, like, internal employees of the—employees of Tesla." Dkt.579.at.127. The jury was entitled to form its own view of that testimony.

research as "woefully inadequate" at best; at worst, it appeared not to "exist[] at all." Dkt.576.at.113. Another expert explained that, unlike the rest of the "automotive industry," Tesla failed to "complete the product development process first before ever releasing the vehicle" and instead used a "reactionary" approach by "us[ing] products that had already been sold to consumers in part to do their product development." Dkt.577.at.167; *see* Dkt.577.at.51 (plaintiffs' expert explaining that "Tesla is the only manufacturer that allows drivers to have access to beta software"). That failure to conduct "sufficient product testing" supports punitive damages. *Taylor*, 940 F.3d at 598.

The jury also heard that Tesla's deficient development process predictably resulted in the defects described above—defects Tesla knew about. In 2016, Musk stated that there would be "half a dozen or more, sometimes as many as 10 warnings in one hour continuously ignored by the driver"—showing actual knowledge that Tesla's vehicles failed to maintain drivers' attention. Dkt.576.at.129. That same year, Tesla acknowledged that drivers would be "distracted to the point that they might fall asleep and/or be incapacitated," and that people are "likely to use the car outside of the [operational] design domain." Dkt.576.at.43-44, 52. Tesla spins those acknowledgments as evidence that it "considered" and "studied" the problems, Br. 48-49, but there was evidence that Tesla made no meaningful changes: Surveying Tesla models released from 2012 to 2023, NHTSA still found a "mismatch of weak

usage controls and high control authority" that "resulted in a critical safety gap" leading to "foreseeable misuse and avoidable crashes"—an evaluation that Tesla knew about and agreed with. Dkt.542-11.at.2.

Most troublingly, the jury learned about Tesla's refusal to change course when confronted with its design flaws' deadly consequences. In 2016, Joshua Brown died using Autopilot in an area "it was explicitly not supposed to be operated in per the Owner's Manual." Dkt.576.at.34. In 2018, a Tesla driver in Kanagawa, Japan, plowed into a pedestrian when he fell asleep while using Autopilot. Dkt.576.at.75. And in March 2019 (the month before this crash), Jeremy Banner crashed into a tractor-trailer when he was distracted while using Autopilot. Dkt.576.at.80. Those crashes all involved frontal plane collisions with inattentive drivers using Autopilot, providing clear evidence that Tesla "knew of the relatively high rate" of crashes and "ignored warnings" about those risks. *Taylor*, 940 F.3d at 598. Still, Tesla refused to make changes so it could "sell more cars," Dkt.576.at.58, and to avoid the "expense" and "time" needed to fix its products, Dkt.577.at.41-42. And all the while, it continued to charge consumers (like McGee) $5,000 for "Enhanced Autopilot" technology that failed to keep them—or others on the road—safe. Dkt.579.at.39-40. That choice to continue profiting off defective cars demonstrated Tesla's "reckless disregard of human life." *Valladares*, 197 So.3d at 11.

Tesla (at 47-48) again retreats to characterizing its vehicles as state-of-the-art, but the jury heard that Tesla's development process was deficient compared to other manufacturers, *see supra* at 44-45, and that Tesla's driver-monitoring system rendered it "an industry outlier," Dkt.542-12.at.6. Even if Tesla's technology were similar to that of its peers, it alone profited from overly aggressive marketing. *See supra* at 13-15. In any event, "compliance with industry guidelines should not be taken as conclusive evidence" for purposes of punitive damages. *Am. Cyanamid Co. v. Roy*, 498 So.2d 859, 862-63 (Fla. 1986). Instead, it is simply information that may "bear on whether a party's behavior … justif[ies] punitive damages." *Id.*

Dissatisfied with this trial's record, Tesla pushes the Court (at 45-46) to instead look to the record in *Banner*. But Tesla's superficial analogy fails multiple times over. *Banner* arose in a different posture, as an appeal from the grant of a motion to amend a complaint rather than from a jury verdict. 411 So.3d at 2. And *Banner* did not conclude as a matter of law that Autopilot's failures could never warrant punitive damages. Rather, it based its decision on "[t]he record" and "the evidence" available before any trial occurred, which led the court to believe that the *Banner* plaintiffs sought to hold Tesla "liable for failing to provide technology that it did not advertise and that did not exist." *Id.* at 5.

This case naturally involves a much more developed record, including evidence of Tesla's failure to provide technology that it *did* advertise and that *did* exist.

For one thing, NHTSA's report that "Autopilot invited greater driver confidence" than its peers, Dkt.542-11.at.2, postdated the *Banner* trial court's decision and so was not in the record. *Banner* thus did not include Tesla's stipulations about the safety improvements it declined to make. The *Banner* court also lacked the benefit of Tesla's own admissions that its technology was defective, and, of course, testimony about how the Banner crash itself provided yet another data point about Tesla's notice. *See supra* at 46. Finally, *Banner* lacked testimony from key witnesses: For example, there was no testimony from plaintiffs' accident reconstructionist expert, *see* Dkt.577.at.124-202; Dkt.578.at.8-157, nor did the *Banner* plaintiff benefit from the inculpatory testimony from Tesla's witnesses. In short, the *Banner* record was substantially less developed.

Regardless, a recent Florida Supreme Court decision expressly rejected the punitive-damages approach taken in *Banner*. In *Perlmutter v. Federal Insurance Company*, 434 So.3d 681 (Fla. 2026), the Florida Supreme Court held that in determining whether a punitive-damages claim should proceed—the issue in *Banner*—a "trial court should consider only the evidence identified or proffered by the claimant" and "should not entertain an evidentiary counter-submission from the opponent." *Id.* at 688. *Banner* did the opposite, dedicating a section to describing Tesla's evidence and then relying on that evidence to conclude that a punitive-damages claim was inappropriate. *See* 411 So.3d at 3-5. Because "the [Florida] Supreme

Court would reject" *Banner* now, this Court can give it no weight. *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011).

**B. The punitive-damages award is consistent with the Fourteenth Amendment.**

The district court also correctly rejected Tesla's effort to limit its damage exposure on federal constitutional grounds. The Due Process Clause prohibits only those punitive damage awards that are "grossly excessive." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417-18 (2003). To determine whether an award violates due process, courts consider three "guideposts": (1) the reprehensibility of the defendant's conduct; (2) the disparity between the "harm suffered by the plaintiff" and the amount of punitive damages awarded; and (3) the comparison of punitive damages awarded against available civil penalties. *Id.* at 418. The ultimate question is whether the award "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417. Tesla does not come close to making that showing.

***1. Tesla's conduct was reprehensible.***

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419. This Court follows *State Farm*'s "five-part test for reprehensibility": (1) whether the harm caused was physical rather than economic; (2) whether the misconduct "evinced an indifference to or a reckless disregard of the health or safety

of others," (3) whether "the target of the conduct was financially vulnerable," (4) whether the conduct "involved repeated actions or was an isolated incident," and (5) whether the harm "was the result of intentional malice, trickery, or deceit, or mere accident." *Faulk v. Dimerco Express USA Corp.*, 172 F.4th 844, 862 (11th Cir. 2026). The Court has called a defendant's conduct "exceedingly reprehensible" where even "[t]hree of the *State Farm* factors favor [plaintiff], two of them strongly." *Id.* at 864.

At least four of those factors favor plaintiffs here—which is presumably why Tesla declines to cite or apply them. Under the first factor, plaintiffs suffered extreme physical harm: One person was killed, and the other severely injured. Regarding the second, the record contained sufficient evidence to permit a reasonable jury to find "that Tesla acted in reckless disregard of human life for the sake of developing their product and maximizing profit." Dkt.428.at.96; *see supra* at 43-49. On the fourth factor, the evidence of prior accidents makes clear that Tesla's contribution to the crash here was part of an ongoing pattern of harmful conduct that Tesla never addressed. Dkt.542-11.at.2; *see supra* at 46. Finally, as to the fifth factor, Tesla's design and marketing choices were no accident. The company intentionally declined to improve its technology and intentionally misled drivers into relying on Autopilot in unsafe circumstances. *See supra* at 12-25. Thus, "the first—and most

important—guidepost weighs heavily in [plaintiffs'] favor." *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1209 (11th Cir. 2020).

### *2. The damages ratio is not excessive.*

Courts have long "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 424. But considering "a long legislative history … providing for sanctions of double, treble, or quadruple damages to deter and punish," the Supreme Court has held that "[s]ingle-digit multipliers are more likely to comport with due process." *Id.* at 425. Thus, this Court has "never held a single-digit ratio unconstitutionally excessive when a defendant's conduct involved a high degree of reprehensibility" and recently rejected a defendant's effort to "reduce the permissible ratio … to 4 to 1, or even 1 to 1." *Faulk*, 172 F.4th at 864; *see Goldsmith*, 513 F.3d at 1283-84 (upholding 9.2:1 ratio); *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 763 (11th Cir. 2020) (limiting ratio to 4:1 where defendant's conduct was not "severely reprehensible").

The single-digit ratio here is unobjectionable under those precedents. The ratio of punitive damages awarded ($200 million) to the gross harm suffered by plaintiffs ($129 million) is only 1.55 to 1. *See Kerrivan*, 953 F.3d at 1210 (concluding that a 1.6-to-1 ratio of punitive damages to gross compensatory damages was not excessive). "But even assuming [Tesla is] correct" that the "relevant ratio[]" is "the

amount of compensatory and punitive damages awarded against each defendant," that ratio is only 4.7 to 1. *Id.* On the record presented here, such a ratio "still would not be unreasonable." *Id.*[8]

Tesla also complains that punitive damages should be reduced because "the compensatory award includes non-economic damages." Br. 52. But this Court's precedents "ma[k]e no distinction between economic and emotional distress damages when upholding a punitive damages award"—particularly where, as here, the jury was instructed to base its compensatory damages award only on the appropriate amount "to compensate [plaintiffs] for [their] injury." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1290 (11th Cir. 2018); *see* Dkt.587.at.26-28. Indeed, this Court has been "untroubled" with as high a ratio as 9.2 to 1 where a defendant's "conduct was 'reprehensible' because it caused the plaintiff emotional distress." *Faulk*, 172 F.4th at 864. The ratio here comes nowhere near that example.

### *3. No analogous civil penalties point against this award.*

The third guidepost—analogous civil penalties—"is accorded less weight in the reasonableness analysis than the first two guideposts." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004). The purpose of this guidepost is to

[8] Tesla claims that "no court 'has upheld a 2:1-or-higher ratio resulting in over $200 million in punitive damages.'" Br. 52. That is not correct. *See, e.g.*, *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 722 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) ($715 million; 5.7:1 ratio).

"look[] to legislative judgments concerning appropriate sanctions for the conduct at issue." *Faulk*, 172 F.4th at 865. "[E]ven assuming that this guidepost favors [Tesla], it does not, in light of the first two guideposts, compel the conclusion" that an award of punitive damages was "unconstitutionally excessive." *Kerrivan*, 953 F.3d at 1211.

Tesla asserts, with little analysis, that the "civil penalty for violations of federal motor-vehicle safety standards" provides the best comparison. Br. 54. Tesla omits that the "maximum penalty … for a related series of violations" of that subsection "is $105,000,000." 49 U.S.C. § 30165(a)(1). Moreover, that provision does not address the type of consumer deception that the jury found Tesla to have committed or reflect the legislature's views about how best to deter design defects that result in death and serious injury. Tesla's arguments therefore provide no basis to conclude that the punitive damages here were unconstitutionally excessive.

### C. The punitive-damages award is consistent with Florida law.

With exceptions not relevant here, Florida caps punitive-damages awards at "the greater of:" "(1) three times the amount of compensatory damages awarded to each claimant entitled thereto"; or "(2) the sum of $500,000." Fla. Stat. § 768.73(1)(a). Tesla contends (at 55-56) that the punitive-damages award exceeds the statutory maximum. That is wrong: The jury awarded $200 million in punitive

damages, below three times the $129 million in total compensatory damages awarded to the two plaintiffs.

Starting with the text, the jury plainly "awarded" $129 million to the plaintiffs it found were "entitled to" damages. After all, as the district court instructed, "[i]f you find that George McGee was to any extent negligent, the Court in entering the judgment will make an appropriate reduction *in the damages awarded*." Dkt.588.at.14. This Court has used "award" the same way, asking "whether the district court should have reduced the jury's compensatory damages award based on the degree of fault." *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1275 (11th Cir. 2018). That ordinary usage of "award" defeats Tesla's reliance on *Roberts v. Sea-Land Services, Inc.*, 566 U.S. 93 (2012), which simply confirms that "'award' most often" means to "assign after careful judgment" or to "grant by formal process"—that is, by the jury's verdict. *Id.* at 100.

That reading is also consistent with statutory structure. A neighboring Florida statute provides that "[c]ontributory fault … diminishes proportionately the *amount awarded* as economic and noneconomic damages for an injury attributable to the claimant's contributory fault." Fla. Stat. § 768.81(2) (emphasis added). There, the "amount awarded" necessarily means the gross amount of damages that is subsequently "diminishe[d]" proportionate to the plaintiff's contributory fault. And Florida case law requires that "statutes relating to the same subject or object be construed

together to harmonize the statutes and to give effect to the Legislature's intent." *Fla. Dep't of State v. Martin*, 916 So.2d 763, 768 (Fla. 2005).

Precedent points in the same direction. The only Florida courts to have examined the proper basis for the statutory ratio applied the pre-reduction amount. In *R.J. Reynolds Tobacco Co. v. Townsend*, 90 So.3d 307 (Fla. Dist. Ct. App. 2012), the appellate court expressly considered "the ratio between the punitive damage award ($40.8 million) and the pre-apportionment compensatory damage award ($10.8 million)." *Id.* at 314-15. Then, in a follow-on case, the court rejected the argument that the relevant comparator is "the compensatory damages award after reduction for comparative fault," explaining that "the unreduced compensatory damages award [w]as the proper benchmark." *R.J. Reynolds Tobacco Co. v. Townsend*, 118 So.3d 844, 847 (Fla. Dist. Ct. App. 2013). There is no reason to believe Florida courts would deviate from those holdings.

Tesla's sole cited authority (at 56) is *Coates v. R.J. Reynolds Tobacco Co.*, 375 So.3d 168 (Fla. 2023). In that case, the Florida Supreme Court addressed an award of $16 million in punitive damages where the "damages proved were $300,000, reduced by [the plaintiffs' decedent's] 50% comparative fault to a net of $150,000." *Id.* at 175. But as those numbers make clear, the ratio was excessive under any measure. Accordingly, the earlier court of appeals decision had expressly reserved the question, noting that it "need not address this issue inasmuch as the

award is excessive when viewed under either calculation." *R.J. Reynolds Tobacco Co. v. Coates*, 308 So.3d 1068, 1073 n.6 (Fla. Dist. Ct. App. 2020). The Supreme Court likewise acknowledged that the award exceeded the statutory ratio without stating which comparator provided the proper basis. *Coates*, 375 So.3d at 175. That equivocation cannot overcome *Townsend* or the principles of statutory interpretation compelling the conclusion that the "amount awarded" refers to the amount on the jury's verdict form.

* * *

Tesla is correct that "[t]he collision on Card Sound Road was a tragedy" for Naibel Benavides, Dillon Angulo, and their families. Br. 56. But Tesla is wrong to insist that it played no role in causing that tragedy. As the jury heard throughout the trial, Tesla's choices about the design and marketing of Autopilot are among the reasons that Naibel is dead today. And as the jury also heard, this tragedy is part of a pattern of grossly negligent conduct on Tesla's part. Tesla's appellate arguments cannot overcome a unanimous jury's weighing of that trial evidence. The judgment below should stand.

## CONCLUSION

This Court should affirm the judgment below.

Dated: September 16, 2026

Respectfully submitted,

/s/ *Elizabeth B. Prelogar*

ELIZABETH B. PRELOGAR
JOSHUA REVESZ
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800

ANNA M. STAPLETON
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
(415) 693-2000

DIANA G. LI
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

TODD POSES
ADAM BOUMEL
POSES BOUMEL
169 East Flagler Street
Suite 1600
Miami, FL 33131
(305) 577-0200

BRETT SCHREIBER
SINGLETON SCHREIBER
591 Camino de la Reina
Suite 1025
San Diego, CA 92108
(619) 331-7752

DOUGLAS EATON
EATON & WOLK PL
2665 South Bayshore Drive
Suite 609
Miami, FL 33133
(786) 752-4742

## CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,993 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: September 16, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
ELIZABETH B. PRELOGAR

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system. I certify that all parties or their counsel of record are registered as ECF filers and that service will be accomplished by the CM/ECF system.

Dated: September 16, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
ELIZABETH B. PRELOGAR